**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| IN RE: GENERIC PHARMACEUTICALS PRICING ANTITRUST LITIGATION | MDL 2724<br>16-MD-2724<br>HON. CYNTHIA M. RUFE |
| IN RE:  PRAVASTATIN CASES | LEAD CASE: 16-PV-27240<br>END-PAYER CASE: 16-PV-27242 |
| THIS DOCUMENT RELATES TO:<br>*ALL END-PAYER ACTIONS* | |
| AMERICAN FEDERATION OF STATE, COUNTY AND MUNICIPAL EMPLOYEES DISTRICT COUNCIL 37 HEALTH & SECURITY PLAN; THE CITY OF PROVIDENCE, RHODE ISLAND; LOUISIANA HEALTH SERVICE & INDEMNITY COMPANY d/b/a  BLUE CROSS AND BLUE SHIELD OF LOUISIANA AND HMO LOUISIANA, INC.; SELF-INSURED SCHOOLS OF CALIFORNIA; SERGEANTS BENEVOLENT ASSOCIATION OF THE POLICE DEPARTMENT OF THE CITY OF NEW YORK HEALTH AND WELFARE FUND; UNITE HERE HEALTH; ROBBY JOHNSON; and DAVID SHERMAN, on behalf of themselves and all others similarly situated, | JURY TRIAL DEMANDED |
| Plaintiffs, | **CONSOLIDATED AMENDED<br>END-PAYER CLASS ACTION<br>COMPLAINT** |
| v. | |
| APOTEX CORP., GLENMARK PHARMACEUTICALS, INC., LUPIN PHARMACEUTICALS, INC., SANDOZ, INC., TEVA PHARMACEUTICALS USA, INC., and ZYDUS PHARMACEUTICALS (USA), INC., | |
| Defendants. | |

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

**TABLE OF CONTENTS**

**PAGE**

I.   NATURE OF THE ACTION .................................................................................... 1

II.  ONGOING FEDERAL AND STATE INVESTIGATIONS .................................... 6

III. JURISDICTION AND VENUE ............................................................................ 11

IV. PLAINTIFFS ....................................................................................................... 13

V.  DEFENDANTS ..................................................................................................... 19

VI. CO-CONSPIRATORS......................................................................................... 20

VII. INTERSTATE AND INTRASTATE TRADE AND COMMERCE .................... 20

VIII.BACKGROUND OF THE GENERIC DRUG INDUSTRY................................. 21

      A.    Generic Drugs Are Commodity Products ................................................ 21

      B.    Pricing in the U.S. Prescription Drug Industry ....................................... 25

IX. THE GENERIC PRAVASTATIN CONSPIRACY ............................................. 27

      A.    Congressional Responses to Generic Drug Price Increases..................... 27

      B.    The Generic Pravastatin Market .............................................................. 29

      C.    Defendants' Collective Market Dominance Permitted Them to Collude. .............. 30

      D.    Generic Pravastatin Price Increases ........................................................ 31

      E.    Defendants' Effective Prices Were Remarkably Stable before Skyrocketing in the Class Period. ........................................................... 38

      F.    As Part of The Conspiracy, Several Defendants Increased Their WAC Benchmarks in Lockstep. ............................................................. 44

      G.    There Were No Shortages That Could Explain the Price Increases. ........ 46

      H.    Defendants' Conspiracy........................................................................... 48

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

I.    Defendants' Concerted Efforts to Increase Prices for Generic Pravastatin Yielded Supracompetitive Profits ........................................ 68

J.    Factors Increasing the Market's Susceptibility to Collusion ................... 72

    1.    Industry Concentration................................................................ 72

    2.    Barriers to Entry......................................................................... 73

    3.    Demand Inelasticity ................................................................... 74

    4.    Lack of Substitutes..................................................................... 75

    5.    Standardized Product with High Degree of Interchangeability ................. 77

    6.    Inter-Competitor Contacts and Communications ....................... 78

X.    THE STATUTES OF LIMITATIONS DO NOT BAR PLAINTIFFS' CLAIMS .............. 85

A.    The Statutes of Limitations Did Not Begin to Run Because Plaintiffs Did Not and Could Not Discover Defendants' Unlawful Conspiracy ......................................... 85

B.    Fraudulent Concealment Tolled the Statutes of Limitations ................... 86

    1.    Active Concealment of the Conspiracy ..................................... 87

    2.    Plaintiffs Exercised Reasonable Diligence ................................ 88

XI.  CONTINUING VIOLATIONS ............................................................... 89

XII. DEFENDANTS' ANTITRUST VIOLATIONS................................................ 89

XIII. CLASS ACTION ALLEGATIONS ........................................................... 91

XIV. CAUSES OF ACTION ............................................................................ 95

FIRST COUNT:  Violation of Sections 1 and 3 of the Sherman Act (on behalf of Plaintiffs and the Nationwide Class)................................................ 95

SECOND COUNT:  Violation of State Antitrust Statutes (on behalf of Plaintiffs and the Damages Class) ............................................................... 97

THIRD COUNT:  Violation of State Consumer Protection Statutes (on behalf of Plaintiffs and the Damages Class ....................................... 119

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

FOURTH COUNT:  Unjust Enrichment (on behalf Plaintiffs and the
Damages Class)..................................................................................................... 155

XV.   PRAYER FOR RELIEF ......................................................................................... 179

XVI.  JURY DEMAND...................................................................................................... 181

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

## I.    <u>NATURE OF THE ACTION</u>

1.    This suit brings claims on behalf of indirect purchasers of generic Pravastatin Sodium tablets ("End-Payers" or "Plaintiffs") for injunctive relief and to recoup overcharges that resulted from an unlawful agreement among Defendants to allocate customers, rig bids, and fix, raise and/or stabilize the prices of 10, 20, 40, and 80 mg generic Pravastatin Sodium tablets ("Pravastatin").

2.    Pravastatin is a widely prescribed medication used to lower cholesterol.

3.    Pravastatin is one of a class of lipid-lowering compounds that reduce the biosynthesis of cholesterol. It belongs to a group of drugs known as HMG CoA reductase inhibitors, or "statins." It is a moderate-intensity statin. Pravastatin reduces the level of low-density lipoprotein and increases levels of high-density lipoprotein, thereby lowering levels of "bad" cholesterol and raising levels of "good" cholesterol, reducing the risk of heart attack and stroke.

4.    Pravastatin first became available in the United States as the brand name drug, Pravachol®, in 1991, and has been available in generic versions since 2006. When the Food & Drug Administration ("FDA") approved the generic version of Pravachol, it proclaimed that "its generic version can bring significant savings to the millions of Americans" at risk for cardiovascular disease.[1] Since its approval, generic Pravastatin has historically sold at prices significantly less than the branded version. Those price benefits were decimated as a result of Defendants' collusion.

---

[1] News Release, *FDA Approves First Generic Pravastatin* (Apr. 24, 2006), http://wayback.archive-it.org/7993/20170113133050/http://www.fda.gov/NewsEvents/Newsroom/PressAnnouncements/2006/ucm108644.htm.

5.     Pravastatin is available orally in the form of tablets in 10, 20, 40 and 80 milligram dosages. As used herein, "Pravastatin" refers to generic versions of Pravachol, in tablet form at all dosage levels.

6.     The Centers for Disease Control and Prevention estimates that more than 35% of adults in the United States are eligible for cholesterol-lowering statins or are already taking them.[2] By 2008, one-quarter of all adults over age 45 were taking statins, up from 2% in the early 1990s.[3] According to *Pharmacy Times*, in 2012, Defendant Teva's generic Pravastatin product was the 25th most-prescribed drug in the United States.[4] As of 2013, Pravastatin was the third most commonly prescribed cholesterol-lowering medication, with a market share of 14.5% of all drugs in the HMG-CoA class.[5]

7.     For years, competition among sellers of generic Pravastatin kept prices stable, at low levels. Prior to about May 2013, Defendants sold 10, 20, and 40 mg Pravastatin tablets for approximately 10 cents per tablet, and 80 mg tablets for between 10 and 20 cents per tablet.

8.     That changed in mid-2013, when the prices Defendants charged for all dosages of Pravastatin skyrocketed abruptly and inexplicably. Between mid-2013 and early 2014, the price per tablet rose by between 30 and 60 cents, depending on the dosage. These price increases were extreme and unprecedented, elevating prices sharply and without explanation until finally

---

[2] Gil Ross, Am. Council on Science & Health, *Too Few Americans Take Statins, CDC Reveals* (Dec. 4, 2015), *available at* http://www.acsh.org/news/2015/12/04/cdc-study-reveals-that-too-few-americans-are-on-statins.

[3] Ctrs. For Disease Control, Health, United States (2010) at 26, *available at* https://www.cdc.gov/nchs/data/hus/hus10.pdf

[4] Michael Bartholow, *Top 100 Drugs of 2012,* Pharmacy Times (July 17, 2013), *available at* http://www.pharmacytimes.com/publications/issue/2013/july2013/top-200-drugs-of-2012.

[5] The Statistica Portal, *Top HMG-CoA reductase inhibitors by U.S. prescription market share in 2013, available at* https://www.statista.com/statistics/311999/cholesterol-lowering-drugs-by-us-prescription-market-share/.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

coming to rest at substantially the same elevated level, an increase of some 300% to 600%. In fact, the U.S. Government Accountability Office ("GAO") identified Pravastatin as having "experienced an extraordinary price increase" in 2013-2014.[6] Even today, Pravastatin prices remain elevated.

9.      Defendants' unlawful and anticompetitive conduct in the Pravastatin market is part of a larger conspiracy or series of conspiracies involving numerous generic pharmaceuticals and pharmaceutical manufacturers.

10.     The price increases imposed by Defendant manufacturers and sellers of generic Pravastatin cannot be explained by supply shortages or any other market feature or shock. Nor were they the result of unilateral business decisions. Instead, the significant increases in the prices of Pravastatin were the result of an illegal agreement among Defendants.

11.     The market for Pravastatin was highly conducive to collusion, as it was controlled almost exclusively by the Defendants and is subject to high barriers to entry, including substantial manufacturing costs and regulatory requirements.  Because Pravastatin is a medically necessary product for which reasonable substitutes are not available and demand is inelastic, Defendants were able to raise prices in concert without suffering corresponding losses in sales volume.  Federal regulations require Defendants' Pravastatin products to contain the same type and amount of active pharmaceutical ingredient and to be therapeutically equivalent to one another.  They are therefore interchangeable commodity products.  Interchangeability facilitates collusion, as cartel members can easily monitor and detect deviations from a price-fixing or market allocation agreement.

---

[6] Gov't Accountability Office, *Generic Drugs Under Medicare-Part D Generic Drug Prices Declined Overall, but Some Had Extraordinary Price Increases* Appx. III (Aug. 12, 2016) ("GAO Report"), *available at* http://www.gao.gov/assets/680/679022.pdf.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

12.     Because purchasers choose whose Pravastatin product to buy based primarily on price, and unilateral price increases generally result in loss of market share, it would have been economically irrational for any one Defendant to dramatically raise its prices without assurance that its competitors would do the same.

13.     Defendants' attendance at trade association meetings, conferences, and workshops provided ample opportunities to agree on amitriptyline prices and allocate markets and customers for Pravastatin.  As alleged below, Defendants implemented their conspiracy through numerous secret meetings and communications, including trade association meetings held by the Generic Pharmaceutical Association ("GPhA") (now the Association for Accessible Medicines), the National Association of Chain Drug Stores ("NACDS"), the Healthcare Distribution Management Association (the "HDMA") (now the Healthcare Distribution alliance) ("HDA"), and Efficient Collaborative Retail Marketing ("ECRM"), among others.

14.     Extreme and unprecedented price increases in the generic drug industry—including those imposed by manufacturers of Pravastatin—have prompted close scrutiny of the industry by the U.S. Congress, federal and state enforcement agencies, and private litigants.

15.     An ongoing criminal investigation by the Antitrust Division of the U.S. Department of Justice ("DOJ") has, to date, resulted in price-fixing guilty pleas from two senior executives at Heritage Pharmaceuticals, Inc. relating to the sale of doxycycline hyclate and glyburide. But DOJ has made clear that its "investigation is ongoing"[7] and the evidence uncovered during the course of its investigation into those drugs also "implicates…a significant

---

[7] U.S. Dep't of Justice, Division Update Spring 2017 (Mar. 28, 2017), *available at* https://www.justice.gov/atr/division-operations/division-update-spring-2017/division-secures-individual-and-corporate-guilty-pleas-collusion-industries-where-products.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

number of the Defendants…[and] a significant number of the drugs at issue" in this Multidistrict Litigation.[8]

16.     The Attorney General for the State of Connecticut ("Connecticut AG"), whose office has been pursuing an investigation of the generic drug industry parallel to that of DOJ, confirms that its price-fixing investigation extends "way beyond the two drugs and the six companies. Way beyond . . . We're learning new things every day."[9] There is "compelling evidence of collusion and anticompetitive conduct across many companies that manufacture and market generic drugs in the United States…[and] evidence of widespread participation in illegal conspiracies across the generic drug industry."[10]

17.     Manufacturers of generic Pravastatin are implicated in these ongoing investigations; at least two of the Defendants named here, Teva, and Zydus, have received a federal grand jury subpoena and/or an investigative demand from the Connecticut AG as part of the generic drug price-fixing investigations. What is more, in addition to DOJ's and CTAG's investigations, members of Congress have requested information from various generic manufacturers, including Defendants Apotex, Teva, and Zydus, concerning Pravastatin specifically, among various other drugs. Finally, a Morgan Lewis "2015 Global Cartel

---

[8] Intervenor United States' Motion to Stay Discovery at 1-2 (May 1, 2017) (ECF No. 279).

[9] Liz Szabo, et al., *How Martinis, Steaks, and a Golf Round Raised Your Prescription Drug Prices*, Kaiser Health News (Dec. 21, 2016), *available at* http://www.thedailybeast.com/how-martinis-steaks-and-a-golf-round-raised-your-prescription-drug-prices.

[10] Press Release, *Connecticut Leads 20 State Coalition Filing Federal Antitrust Lawsuit against Heritage Pharmaceuticals, other Generic Drug Companies*, Office of the Attorney General (Dec. 15, 2016), *available at* http://www.ct.gov/ag/cwp/view.asp?A=2341&Q=588538.

5

Enforcement Report," published in January of 2016, identified Pravastatin as one of the "generic drugs at issue" in the investigations being conducted by DOJ and state Attorneys General.[11]

18.      As End-Payers in the chain of pharmaceutical distribution, Plaintiffs bear the brunt of Defendants' illegal conduct. Plaintiffs have paid many millions of dollars more than they would have in a competitive market for generic Pravastatin.

19.      Plaintiffs bring this action against Defendants on account of their past and ongoing violations of Sections 1 and 3 of the Sherman Act (15 U.S.C. §§ 1, 3) and the state laws set forth below. Plaintiffs bring this action both individually and on behalf of (a) a national injunctive class of persons or entities in the United States and its territories who indirectly purchased, paid and/or provided reimbursement for some or all of the purchase price of generic Pravastatin products manufactured by any Defendant, other than for resale, from June 1, 2013 to the present ("Class Period"), and (b) a damages class of persons or entities in the states and territories identified herein who indirectly purchased, paid and/or provided reimbursement for some or all of the purchase price of generic Pravastatin products manufactured by any Defendant, other than for resale, from June 1, 2013 to the present.

## II.      <u>ONGOING FEDERAL AND STATE INVESTIGATIONS</u>

20.      Now in its third year, the federal criminal investigation into generic drug price-fixing has begun to bear fruit. On December 12 and 13, 2016, DOJ filed criminal charges against former Heritage executives Jeffrey Glazer (CEO) and Jason Malek (President). The government

---

[11] Morgan Lewis, *2015 Global Cartel Enforcement Report* 13, *available at* https://www.morganlewis.com/~/media/files/document/cartel-enforcement-report-year-end-2015.ashx?la=en.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

alleged that they conspired with others "to allocate customers, rig bids, and fix and maintain prices" of glyburide and doxycycline hyclate in violation of the Sherman Act (15 U.S.C. § 1).[12]

21.     On January 9, 2017, Glazer and Malek pleaded guilty to those charges.[13]  Deputy Assistant Attorney General Brent Snyder of the Justice Department's Antitrust Division explained: "These charges are an important step in correcting that injustice and in ensuring that generic pharmaceutical companies compete vigorously to provide these essential products at a price set by the market, not by collusion."[14]  As they await sentencing, Glazer and Malek are cooperating with DOJ's continuing investigation. More criminal charges and guilty pleas are expected to follow.[15]

22.     Although initial public disclosures suggested that the federal and state investigations were focused on one or two drugs, it is now clear that both investigations are much, much broader. The investigations reportedly cover two dozen drugs and more than a dozen manufacturers.[16]  Press reports indicate that "[t]he Department of Justice (DoJ) believes price-fixing between makers of generic pharmaceuticals is widespread."[17]

---

[12] Information ¶ 6, *United States v. Glazer*, No. 2:16-cr-00506-RBS (E.D. Pa. Dec. 12, 2016) (ECF No. 1); Information ¶ 6, *United States v. Malek*, No. 2:16-cr-00508-RBS (E.D. Pa. Dec. 13, 2016) (ECF No. 1).

[13] *See* Tr. of Plea Hearing, *United States v. Glazer*, No. 2:16-cr-00506-RBS (E.D. Pa. Jan. 9, 2017) (ECF No. 24); *see also* Tr. of Plea Hearing, *United States v. Malek*, No. 2:16-cr-00508-RBS (E.D. Pa. Jan. 9, 2017) (ECF No. 24).

[14] DOJ Press Release (Dec. 14, 2016), *available at* https://www.justice.gov/opa/pr/former-top-generic-pharmaceutical-executives-charged-price-fixing-bid-rigging-and-customer.

[15] *See, e.g.,* Eric Kroh, *Generic Drug Price-Fixing Suits Just Tip Of The Iceberg,* Law360 (Jan. 6, 2017) ("'Once somebody starts cooperating, it leads to many more indictments.'"), *available at* https://www.law360.com/articles/877707/generic-drug-price-fixing-suits-just-tip-of-the-iceberg.

[16] David McLaughlin & Caroline Chen, *U.S. Charges in Generic-Drug Probe to Be Filed by Year-End,* Bloomberg (Nov. 3, 2016), *available at*

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

23. According to one report, prosecutors see the investigation of the generic drug industry much like DOJ's antitrust probe of the auto parts industry, which has morphed into DOJ's largest criminal antitrust probe ever. *See In re Automotive Parts Antitrust Litig.*, No. 2:12-md-02311 (E.D. Mich.). As in that case, prosecutors expect "to move from one drug to another in a similar cascading fashion."[18]

24. DOJ and a federal grand jury empaneled in the Eastern District of Pennsylvania have focused on at least seventeen generic drug manufacturers as part of the growing investigation, including: Actavis Holdco U.S., Inc. ("Actavis"); Aurobindo Pharma USA, Inc. ("Aurobindo"); Citron Pharma LLC ("Citron"); Dr. Reddy's Laboratories, Inc. ("Dr. Reddy's"); Heritage Pharmaceuticals, Inc. ("Heritage"); Impax Laboratories, Inc. ("Impax"); Lannett Company, Inc. ("Lannett"); Mayne Pharma, Inc. ("Mayne"); Mylan Inc. ("Mylan"); Par Pharmaceutical, Inc. ("Par"); Perrigo New York, Inc. ("Perrigo"); Sandoz, Inc. ("Sandoz"); Sun Pharmaceutical Industries, Inc. ("Sun"); Taro Pharmaceuticals USA, Inc. ("Taro"); Teva Pharmaceuticals USA, Inc. ("Teva"); and Zydus Pharmaceuticals USA, Inc. ("Zydus"). And as recently as August 10, 2017, Pfizer, Inc. ("Pfizer") also disclosed that DOJ is investigating its Greenstone generics business.[19]

25. The fact that these companies and/or their employees received subpoenas from a federal grand jury is significant. DOJ does not empanel grand juries lightly. The *Antitrust*

---

http://www.bloomberg.com/news/articles/2016-11-03/u-s-charges-in-generic-drug-probe-said-to-be-filed-by-year-end.

[17] PaRR Report, *DoJ Believes Collusion over Generic Drug Prices Widespread* (June 26, 2015) ("PaRR Report"), *available at* http://www.mergermarket.com/pdf/DoJ-Collusion-Generic-Drug-Prices-2015.pdf.

[18] *Id.*

[19] Further discussion of these generic drug manufacturers and their receipt of subpoenas or other inquiries from DOJ is included *infra* at ¶ 223.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

*Division Manual* admonishes that "staff should consider carefully the likelihood that, if a grand jury investigation developed evidence confirming the alleged anticompetitive conduct, the Division would proceed with a criminal prosecution." Accordingly, before a grand jury investigation proceeds, it requires a series of approvals, first by the relevant field chief, who then sends the request to the Antitrust Criminal Enforcement Division. "The DAAG [Deputy Assistant Attorney General] for Operations, the Criminal DAAG, and the Director of Criminal Enforcement will make a recommendation to the Assistant Attorney General[,]" who must give final approval and authorize all attorneys who will participate in the investigation.[20]

26.     As Mark Rosman, former assistant chief of the National Criminal Enforcement Section of DOJ's Antitrust Division, noted in an article on the "unusual" nature of the criminal subpoenas, "A DOJ investigation into the alleged exchange of pricing information in the pharmaceutical industry likely indicates that the agency anticipates uncovering criminal antitrust conduct in the form of price-fixing or customer allocation."[21]

27.     Another significant indication of criminal price-fixing in the generic drug industry is that DOJ has received assistance from a privately-held company that came forward as a leniency applicant:  "It is understood that Heritage is cooperating with prosecutors in exchange for amnesty from criminal prosecution under DOJ's leniency program[.]"[22]  As explained on DOJ's website, an applicant for amnesty "must admit its participation in a criminal antitrust violation involving price fixing, bid rigging, capacity restriction, or allocation of markets,

---

[20] DOJ, Antitrust Division Manual (5th ed. 2015) at Ch. III-81 to 83, *available at* http://www.justice.gov/atr/public/divisionmanual/chapter3.pdf.

[21] Mark Rosman & Seth Silber, *DOJ's Investigation Into Generic Pharma Pricing Is Unusual,* Law360 (Nov. 12, 2014), *available at* https://www.wsgr.com/publications/PDFSearch/rosman-1114.pdf.

[22] Richard Vanderford, *Generic Pharma Investigation Still Broad, Prosecutor Says,* mLex (Feb. 21, 2017).

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

customers, or sales or production volumes, before it will receive a conditional leniency letter." The applicant must also establish that "[t]he confession of wrongdoing is truly a corporate act, as opposed to isolated confessions of individual executives or officials."[23]

28.     In addition to the federal criminal investigation, the Connecticut AG began an investigation in July 2014 into the dramatic price increases in generic drugs. Now joined by the Attorneys General of 43 other states and the District of Columbia, the Connecticut AG has filed a civil complaint in the U.S. District Court for the District of Connecticut alleging price-fixing and customer allocation.[24] Although the States' present complaint focuses on two drugs (doxycycline hyclate delayed release and glyburide), the States make clear that they have "uncovered wide-ranging conduct implicating numerous different drugs and competitors" and suggest that additional drugs and manufacturers will be added "at the appropriate time."[25]

29.     The publicly available version of the State AG Complaint is heavily redacted. Among the obscured portions are the contents of conspiratorial communications, which the Connecticut AG has described as "mind-boggling."[26]  The State AG Complaint explains that the generic drug industry is structured in a way that facilitates these types of collusive communications. "Generic drug manufacturers operate, through their respective senior leadership and marketing and sales executives, in a manner that fosters and promotes routine and

---

[23] DOJ, *Frequently Asked Questions about the Antitrust Division's Leniency Program* (updated Jan. 26, 2017), *available at* https://www.justice.gov/atr/page/file/926521/download

[24] On August 3, 2017, the U.S. Judicial Panel on Multidistrict Litigation ("JPML") issued an order directing that the State AG case be transferred to this Court and coordinated as part of MDL 2724 (ECF No. 417).

[25] *State of Connecticut v. Aurobindo Pharma USA, Inc.*, No. 3:16-cv-2056 (VLB) (D. Conn.) (ECF No. 168 at ¶ 9) (State AG Complaint), *available at* http://www.ct.gov/ag/lib/ag/press_releases/2016/20161215_gdms_complain.pdf.

[26] Mark Pazniokus, *How a small-state AG's office plays in the big leagues,* CT Mirror (Jan. 27, 2017), *available at* http://ctmirror.org/2017/01/27/how-a-small-state-ags-office-plays-in-the-big-leagues/

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

direct interaction among their competitors." This affords them opportunities to "exploit their interactions at various and frequent industry trade shows, customer conferences and other similar events, to develop relationships and sow the seeds for their illegal agreements."[27]

30.     The criminal informations and guilty pleas relating to Glazer and Malek, the grand jury subpoenas, and evidence divulged in the State AG Complaint are merely the tip of the iceberg. The government investigations have uncovered the existence of "a broad, well-coordinated and long-running series of schemes to fix the prices and allocate markets for a number of generic pharmaceuticals in the United States."[28]

31.     Plaintiffs do not yet have access to all of the information available to the government enforcement agencies. What is known is that the large and unprecedented price increases for generic Pravastatin cannot be explained by normal, competitive market forces. The explanation is collusion.

### III.     JURISDICTION AND VENUE

32.     Plaintiffs bring Count One of this action under Section 16 of the Clayton Act (15 U.S.C. § 26) for injunctive relief and costs of suit, including reasonable attorneys' fees, against Defendants for the injuries sustained by Plaintiffs and the members of the Classes described herein by reason of the violations of Sections 1 and 3 of the Sherman Act (15 U.S.C. §§ 1, 3).

33.     This action is also instituted under the antitrust, consumer protection, and common laws of various states and territories for damages and equitable relief, as described in Counts Two through Four below.

---

[27] State AG Complaint ¶ 7.

[28] State AG Complaint ¶ 1.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

34.     Jurisdiction is conferred upon this Court by 28 U.S.C. §§ 1331 and 1337 and by Section 16 of the Clayton Act (15 U.S.C. § 26). In addition, jurisdiction is conferred upon this Court by 28 U.S.C. §§ 1332(d) and 1367.

35.     Venue is proper in this District pursuant to 15 U.S.C. §§ 15(a) and 22 and 28 U.S.C §§ 1391(b), (c) and (d); and 1407 and MDL Order dated April 6, 2017 (ECF No. 291), and because, during the Class Period, Defendants resided, transacted business, were found, or had agents in this District, and a substantial portion of the affected interstate trade and commerce described below has been carried out in this District. Venue is also proper in this District because the federal grand jury investigating the pricing of generic drugs is empaneled here and therefore it is likely that acts in furtherance of the alleged conspiracy took place here. According to DOJ guidelines, an "investigation should be conducted by a grand jury in a judicial district where venue lies for the offense, such as a district from or to which price-fixed sales were made or where conspiratorial communications occurred."[29]

36.     This Court has personal jurisdiction over each Defendant because, *inter alia*, each Defendant: (a) transacted business throughout the United States, including in this District; (b) marketed and sold Pravastatin throughout the United States, including in this District; (c) had substantial contacts with the United States, including in this District; (d) was engaged in an illegal scheme and nationwide price-fixing conspiracy that was directed at, had the intended effect of causing injury to, and did cause injury to persons residing in, located in, or doing business throughout the United States, including in this District; and/or (e) took overt action in furtherance of the conspiracy in this District or conspired with someone who did, and by doing

---

[29] DOJ, Antitrust Division Manual at III-83.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

so could reasonably have expected to be sued in this District. In addition, nationwide personal jurisdiction was authorized by Congress pursuant to the Clayton Act and by 28 U.S.C. § 1407.

## IV.   PLAINTIFFS

37.     Plaintiff American Federation of State, County and Municipal Employees District Council 37 Health & Security Plan ("DC 37") is a health and welfare benefit plan headquartered in New York, New York.  District Council 37 (the "Union") is New York City's largest public employee union.  The Union includes 51 local unions, representing public sector employees serving in thousands of job titles from Accountants to Zoo Keepers.  Members covered by DC 37's benefit plan work in almost every agency in New York City, including but not limited to the City's police and fire departments, hospitals, schools, libraries, social service centers, water treatment facilities, and city colleges.  DC 37 provides supplemental health benefits, including a prescription drug benefit, to approximately 313,000 individuals, including both active members and their families and 50,000 retirees, who reside in numerous locations in the United States. During the Class Period, DC 37 indirectly purchased and paid for some or all of the purchase price for one or more generic Pravastatin prescriptions, other than for resale, manufactured by the Defendants.  Plaintiff made such payments and/or reimbursements in Alabama, Arizona, California, Connecticut, Delaware, Florida, Georgia, Illinois, Indiana, Iowa, Kansas, Kentucky, Louisiana, Maryland, Massachusetts, Michigan, Missouri, Nevada, New Hampshire, New Jersey, New York, North Carolina, Ohio, Pennsylvania, South Carolina, Tennessee, Texas, Vermont, Virginia, Washington, and Puerto Rico, thereby suffering injury to its business and property. During the Class Period, DC 37 paid and reimbursed more for these products than it would have absent Defendants' anticompetitive conduct to fix, raise, maintain, and stabilize the prices and allocate markets and customers for those products.  As a result of the alleged conspiracy, DC 37

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

was injured in its business or property by reason of the violations of law alleged herein.  DC 37 intends to continue purchasing and/or reimbursing for these drugs and will continue to be injured unless the Defendants are enjoined from their unlawful conduct as alleged herein.

38.     Plaintiff The City of Providence, Rhode Island ("Providence") is a municipal corporation.  Its principal office is located in Providence, Rhode Island.  Providence is a self-insured health and welfare benefit plan, and purchases, pays and/or provides reimbursement for its employees, retirees, and/or plan beneficiaries, who reside in numerous locations in the United States, for some or all of the purchase price of prescription drugs.  During the Class Period, Providence indirectly purchased, paid, and/or provided reimbursement for some or all of the purchase price for one or more generic Pravastatin prescriptions, other than for resale, manufactured by the Defendants.  Providence made such payments and/or reimbursements in California, Connecticut, Florida, Illinois, Maine, Massachusetts, Nevada, New Hampshire, New York, North Carolina, Pennsylvania, Puerto Rico, Rhode Island, South Carolina and Texas, thereby suffering injury to its business and property. During the Class Period, Providence paid and/or reimbursed more for these products than it would have absent Defendants' anticompetitive conduct to fix, raise, maintain, and/or stabilize the prices and allocate markets and customers for those products.  As a result of the alleged conspiracy, Providence was injured in its business or property by reason of the violations of law alleged herein.  Providence intends to continue purchasing and/or reimbursing for these drugs and will continue to be injured unless the Defendants are enjoined from their unlawful conduct as alleged herein.

39.     Plaintiff Louisiana Health Service & Indemnity Company d/b/a Blue Cross and Blue Shield of Louisiana and HMO Louisiana, Inc. (collectively, "BCBS-LA") is headquartered in Baton Rouge, Louisiana, and is Louisiana's oldest and largest domestic health insurer, with

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

over 1 million members.  During the Class Period, BCBS-LA indirectly purchased, paid, and/or provided reimbursement on behalf of its members for some or all of the purchase price for one or more generic Pravastatin prescriptions, other than for resale, manufactured by the Defendants. Plaintiff made such payments and/or reimbursements in Alabama, Alaska, Arizona, Arkansas, California, Colorado, Connecticut, Florida, Georgia, Illinois, Indiana, Iowa, Kansas, Kentucky, Louisiana, Maryland, Massachusetts, Michigan, Minnesota, Mississippi, Missouri, Nebraska, Nevada, New Hampshire, New Jersey, New Mexico, New York, North Carolina, North Dakota, Ohio, Oklahoma, Oregon, Pennsylvania, South Carolina, Tennessee, Texas, Virginia, West Virginia and Wyoming, thereby suffering injury to its business and property. During the Class Period, BCBS-LA paid and reimbursed more for these products than it would have absent Defendants' anticompetitive conduct to fix, raise, maintain, and stabilize the prices and allocate markets and customers for those products. As a result of the alleged conspiracy, BCBS-LA was injured in its business or property by reason of the violations of law alleged herein. BCBS-LA intends to continue purchasing and/or reimbursing for these drugs and will continue to be injured unless the Defendants are enjoined from their unlawful conduct as alleged herein.

40.    Plaintiff Self-Insured Schools of California ("SISC") is a Joint Powers Authority under California law that serves the interests of California public school district members. It is headquartered in Bakersfield, California.  It provides health benefit plans to approximately 300,000 members who reside in numerous locations in the United States. During the Class Period, SISC indirectly purchased and paid for some or all of the purchase price for one or more generic Pravastatin prescriptions, other than for resale, manufactured by the Defendants. SISC made such payments and/or reimbursements in Arizona, Arkansas, California, Colorado, Florida, Georgia, Idaho, Illinois, Indiana, Iowa, Kansas, Louisiana, Maryland, Massachusetts, Michigan,

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

Minnesota, Mississippi, Missouri, Montana, Nebraska, Nevada, New Hampshire, New Jersey, New Mexico, New York, North Carolina, Ohio, Oklahoma, Oregon, Rhode Island, South Carolina, Tennessee, Texas, Utah, Virginia, Washington, and Wisconsin thereby suffering injury to its business and property. During the Class Period, SISC paid and reimbursed more for these products more than it would have absent Defendants' anticompetitive conduct to fix, raise, maintain, and stabilize the prices and allocate markets and customers for those products. As a result of the alleged conspiracy, SISC was injured in its business or property by reason of the violations of law alleged herein. SISC intends to continue purchasing and/or reimbursing for these drugs and will continue to be injured unless the Defendants are enjoined from their unlawful conduct as alleged herein.

41.    Sergeants Benevolent Association of the Police Department of the City of New York Health and Welfare Fund (SBA Fund) is a citizen of the State of New York, and has its principal place of business at 35 Worth Street, New York, New York.  SBA Fund is an independent labor organization operating under Internal Revenue Code section 501(c)(5), and is sponsored and administered by a Board of Trustees.  As such, SBA Fund is a legal entity entitled to bring suit in its own name.  SBA Fund is an "employee welfare benefit plan" and an "employee benefit plan" with membership of approximately 36,000 active and retired sergeants of the New York City Police Department and their dependents.  It provides health care benefits, including prescription drug benefits, to participants and their dependents.  During the Class Period, SBA Fund indirectly purchased and paid for some or all of the purchase price for one or more generic Pravastatin prescriptions, other than for resale, manufactured by the Defendants. SBA Fund made such payments and/or reimbursements in Alabama, Arizona, California, Colorado, Connecticut, Delaware, Florida, Georgia, Hawaii, Illinois, Indiana, Kansas, Louisiana,

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

Maryland, Massachusetts, Michigan, Mississippi, Nevada, New Hampshire, New Jersey, New Mexico, New York, North Carolina, Pennsylvania, South Carolina, Tennessee, Texas, Utah and Virginia.  During the Class Period, SBA Fund paid and reimbursed more for these products than it would have absent Defendants' anticompetitive conduct to fix, raise, maintain, and stabilize the prices and allocate markets and customers for these products.  As a result of the alleged conspiracy, SBA Fund was injured in its business or property by reasons of the violations of law alleged herein.  SBA Fund intends to continue paying and/or reimbursing for these drugs and will continue to be injured unless the Defendants are enjoined from their unlawful conduct as alleged herein.

42.     Plaintiff Unite Here Health ("UHH") is a multi-employer trust fund composed of union and employer representatives, whose mission is to provide health benefits that offer high quality, affordable healthcare to its participants at a better value and with a better service than is otherwise available in the market. Headquartered in Aurora, Illinois, UHH has served union workers in the hospitality, food service, and gaming industries for the past several decades. During the Class Period, UHH indirectly purchased and paid for some or all of the purchase price for one or more generic Pravastatin prescriptions, other than for resale, manufactured by the Defendants. Plaintiff made such payments and/or reimbursements in Alabama, Arizona, California, Colorado, Connecticut, Florida, Georgia, Illinois, Indiana, Iowa, Louisiana, Maryland, Massachusetts, Michigan, Minnesota, Mississippi, Missouri, Nevada, New Hampshire, New Jersey, New Mexico, New York, Ohio, Oklahoma, Pennsylvania, Rhode Island, South Carolina, Tennessee, Texas, Utah, Virginia, Washington, West Virginia, Wisconsin, Washington, D.C., and Puerto Rico.  During the Class Period, UHH purchased and paid more for these products than it would have absent Defendants' anticompetitive conduct to fix, raise,

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

maintain, and stabilize the prices and allocate markets and customers for these products. As a result of the alleged conspiracy, Plaintiff UHH was injured in its business or property by reason of the violations of law alleged herein. UHH intends to continue purchasing and/or reimbursing for these drugs and will continue to be injured unless the Defendants are enjoined from their unlawful conduct as alleged herein.

43.    Plaintiff Robby Johnson ("Johnson") is an individual and resident of Stevenson, Alabama. During the Class Period, Johnson indirectly purchased generic Pravastatin manufactured by the Defendants. He purchased Pravastatin in Alabama for his personal use and was not reimbursed for his purchases, thereby suffering injury to his property. During the Class Period, Johnson paid more for generic Pravastatin than he would have absent Defendants' anticompetitive conduct to fix, raise, maintain, and stabilize the prices and allocate markets and customers for generic Pravastatin. As a result of the alleged conspiracy, Plaintiff Johnson was injured by reason of the violations of law alleged herein.  Johnson intends to continue purchasing these drugs and will continue to be injured unless the Defendants are enjoined from their unlawful conduct as alleged herein.

44.    Plaintiff David Sherman ("Sherman") is an individual and resident of Milford, Massachusetts. During the Class Period, Sherman indirectly purchased generic Pravastatin manufactured by the Defendants.  He purchased Pravastatin in Massachusetts for his personal use and was not reimbursed for his purchases, thereby suffering injury to his property. During the Class Period, Sherman paid more for generic Pravastatin than he would have absent Defendants' anticompetitive conduct to fix, raise, maintain, and stabilize the prices and allocate markets and customers for generic Pravastatin.  As a result of the alleged conspiracy, Plaintiff Sherman was injured by reason of the violations of law alleged herein.  Sherman intends to

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

continue purchasing these drugs and will continue to be injured unless the Defendants are enjoined from their unlawful conduct as alleged herein.

## V. **DEFENDANTS**

45. Defendant Apotex Corp. ("Apotex") is a Florida corporation with its principal place of business in Weston, Florida. During the Class Period, Apotex sold generic Pravastatin in this District and other locations in the United States.

46. Defendant Glenmark Pharmaceuticals, Inc. ("Glenmark") is a Delaware corporation with its principal place of business is Mahwah, NJ.  It is a wholly-owned subsidiary of Glenmark Pharmaceuticals Ltd., headquartered in Mumbai, India. During the Class Period, Glenmark sold generic Pravastatin in this District and other locations in the United States.

47. Defendant Lupin Pharmaceuticals, Inc. ("Lupin") is a Delaware corporation with its principal place of business in Baltimore, MD. It is a wholly-owned subsidiary of Lupin Ltd., an Indian company with its principal place of business in Mumbai, India. Lupin is registered with the Pennsylvania Department of State as a foreign corporation and maintains a registered agent in Pennsylvania.  During the Class Period, Lupin sold generic Pravastatin to customers in this District and other locations in the United States.

48. Defendant Sandoz, Inc. ("Sandoz") is a Colorado corporation with its principal place of business in Princeton, New Jersey.  Sandoz is a subsidiary of Novartis AG, a global pharmaceutical company based in Basel, Switzerland.  Sandoz is registered with the Pennsylvania Department of State as a foreign corporation and maintains a registered agent in Pennsylvania. During the Class Period, Sandoz sold generic Pravastatin in this District and other locations in the United States.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

49.     Defendant Teva Pharmaceuticals USA, Inc. ("Teva") is a Delaware corporation with its principal place of business in North Wales, Pennsylvania. It is a subsidiary of Teva Pharmaceutical Industries Ltd., an Israeli entity.  Teva is registered with the Pennsylvania Department of State as a foreign corporation.  During the Class Period, Teva sold generic Pravastatin to customers in this District and other locations in the United States.

50.     Defendant Zydus Pharmaceuticals (USA), Inc. ("Zydus") is a New Jersey corporation with its principal place of business in Pennington, NJ. It is a subsidiary of Cadila HealthCare, and Indian company headquartered in Mumbai. Zydus is registered with the Pennsylvania Department of State as a foreign corporation and maintains a registered agent in Pennsylvania.  During the Class Period, Zydus sold generic Pravastatin to customers in this District and other locations in the United States.

## VI.   CO-CONSPIRATORS

51.     Various other persons, firms, corporations and entities have participated as co-conspirators with Defendants in the violations and conspiracy alleged herein. In order to engage in the violations alleged herein, these co-conspirators have performed acts and made statements in furtherance of the antitrust violations and conspiracies alleged herein. Plaintiffs may amend this Complaint to allege the names of additional co-conspirators as they are discovered.

## VII.   INTERSTATE AND INTRASTATE TRADE AND COMMERCE

52.     During the Class Period, Defendants sold and distributed generic Pravastatin in a continuous and uninterrupted flow of interstate commerce to customers throughout the United States, including in this District.

53.     Defendants' and their co-conspirators' conduct, including the marketing and sale of generic Pravastatin, took place within the United States and, has had, and was intended to

have, a direct, substantial, and reasonably foreseeable anticompetitive effect upon interstate commerce within the United States.

54.     Defendants' anticompetitive conduct occurred in part in trade and commerce within the states and territories set forth herein, and also had substantial intrastate effects in that, *inter alia*, retailers within each state and territory were foreclosed from offering less expensive generic Pravastatin to Plaintiffs inside each respective state and territory. The foreclosure of these less expensive generic products directly impacted and disrupted commerce for Plaintiffs within each state and territory and forced Plaintiffs to pay supracompetitive prices.

## VIII.   BACKGROUND OF THE GENERIC DRUG INDUSTRY

### A.     Generic Drugs Are Commodity Products

55.     Approximately 88% of all pharmaceutical prescriptions in the United States are filled with a generic drug.[30] In 2015, generic drug sales in the United States were estimated at $74.5 billion.[31]

56.     According to the U.S. Food & Drug Administration ("FDA"), a generic drug is "the same as a brand name drug in dosage, safety, strength, how it is taken, quality, performance, and intended use."[32] Once the FDA approves a generic drug as "therapeutically equivalent" to a brand drug, the generic version "can be expected to have equal effect and no difference when substituted for the brand name product."[33]

---

[30] GPhA, *Generic Drug Savings in the U.S.* 1 (2015) ("GPhA Report"), *available at* http://www.gphaonline.org/media/wysiwyg/PDF/GPhA_Savings_Report_2015.pdf.

[31] Connecticut AG, Press Release (Dec. 15, 2016), *available at* http://www.ct.gov/ag/cwp/view.asp?Q=588538&A=2341.

[32] FDA, Drugs@FDA Glossary of Terms, *available at* http://www.fda.gov/Drugs/InformationOnDrugs/ucm079436.htm.

[33] *Id.*

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

57.     In a competitive market, generic drugs cost substantially less than branded drugs. The U.S. Congressional Budget Office ("CBO") estimates that, "[o]n average, the retail price of a generic drug is 75 percent lower than the retail price of a brand-name drug."[34]  And that may be conservative. According to a Federal Trade Commission ("FTC") study, in a "mature generic market, generic prices are, on average, 85% lower than the pre-entry branded drug price."[35] Mature generic markets—like that of Pravastatin—typically have several manufacturers that compete for sales, hence keeping prices in check.

58.     Generic drug price competition provides enormous savings to consumers, pharmacies, and other drug purchasers, as well as to private health insurers, health and welfare funds, and state Medicaid programs. Indeed, one study found that the use of generic medicines saved the United States healthcare system $254 billion in 2014 alone, and $1.68 trillion between 2005 and 2014.[36]

59.     The significant cost savings provided by generic drugs motivated Congress to enact the Drug Price Competition and Patent Term Restoration Act of 1984, more commonly known as the "Hatch-Waxman Act" (Pub. L. No. 98-417, 98 Stat. 1585). The Act streamlines the regulatory hurdles that generic drug manufacturers have to clear prior to marketing and selling generic drugs. Generic drug manufacturers may obtain FDA approval in an expedited fashion through the filing of an Abbreviated New Drug Application ("ANDA") that establishes that its product is bioequivalent to the branded counterpart.

---

[34] CBO, *Effects of Using Generic Drugs on Medicare's Prescription Drug Spending* (Sep. 15, 2010), *available at* https://www.cbo.gov/publication/21800.

[35] FTC, *Pay-For-Delay: How Drug Company Pay-offs Cost Consumers Billions* (Jan. 2010), *available at* http://www.ftc.gov/os/2010/01/100112payfordelayrpt.pdf.

[36] GPhA Report at 1.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

60.     Since passage of the Hatch-Waxman Act, every state has adopted substitution laws requiring or permitting pharmacies to substitute generic drug equivalents for branded drug prescriptions (unless the prescribing physician specifically orders otherwise by writing "dispense as written" or similar language on the prescription).

61.     Because each generic is readily substitutable for another generic of the same brand drug, pricing is the main differentiating feature. As recognized by the FTC, "generic drugs are commodity products" and, as a consequence of that, are marketed "primarily on the basis of price."[37]  In a competitive market, generic manufacturers cannot significantly increase prices (or maintain high prices in the face of a competitor's lower price) without losing a significant volume of sales.

62.     It is well-established that competition among generic manufacturers drives down price. Before generic drugs enter a market, the brand drug has a monopoly and captures 100% of sales. When lower-priced generics become available, the brand drug quickly loses market share as purchasers switch to the less expensive alternatives. Over time, the price of a generic drug approaches the manufacturers' marginal costs. As illustrated in the following chart, the price of a generic drug tends to decrease as more generic drug manufacturers enter the market:

---

[37] FTC, *Authorized Generic Drugs: Short-Term Effects and Long-Term Impact* (Aug. 2011), *available at* http://www.ftc.gov/os/2011/08/2011genericdrugreport.pdf

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER



**Generic Competition and Drug Prices**

Source: FDA analysis of retail sales data from IMS Health, IMS National Sales
Perspective (TM), 1999-2004, extracted February 2005

63.     When new entrants join a competitive generic market, they typically will price their product below the prevailing market price in order to gain market share. A recent government report confirmed this phenomenon in interviews with generic manufacturers: "manufacturers said that if a company is bringing a generic drug into an established drug market, it typically offers a price that is lower than the current market price in order to build its customer base. Manufacturers also said that as each new manufacturer enters an established generic drug market the price of that generic will fall, with one manufacturer noting that it is typically a 20 percent price decline per entrant."[38]

64.     When there are multiple generic manufacturers in an established generic market— as with generic Pravastatin—prices should remain low and stable, and should not increase significantly (and stay there) absent a market disruption or, as is the case here, anticompetitive conduct.

---

[38] GAO Report 23.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

**B.      Pricing in the U.S. Prescription Drug Industry**

65.      In simple terms, the generic pharmaceutical supply chain flows as follows: Manufacturers sell drugs to wholesalers. Wholesalers sell drugs to pharmacies. Pharmacies dispense the drugs to consumers, who pay the full retail price if they are uninsured, or a portion of the retail price (e.g., a co-pay or co-insurance) if they are insured.  The insured consumers' health plans then pay the pharmacies additional amounts that are specified in agreements between them and the pharmacies.  These agreements are sometimes arranged by middlemen known as Pharmacy Benefit Managers ("PBMs").

66.      Because the prices paid by purchasers of generic drugs differ at different levels of the market and most of the transactions occur between private parties according to terms that are not publicly disclosed, the price of a given drug is not always obvious.  Market-wide pricing for a given drug, however, may be observed through the Centers for Medicare & Medicaid Services ("CMS") survey of National Average Drug Acquisition Cost ("NADAC").  NADAC was "designed to create a national benchmark that is reflective of the prices paid by retail community pharmacies to acquire prescription . . . drugs."[39]   "NADAC is a simple average of the drug acquisition costs submitted by retail pharmacies."[40]   In effect, NADAC is "a single national average." [41]  Thus, NADAC is one way to track general price trends in the marketplace.

67.      While NADAC provides the average price level across all manufacturers of a given drug, other prices are manufacturer specific. Drug manufacturers typically report benchmarks-like WACs (Wholesale Acquisition Costs)-for their drugs, which are then published

---

[39] CMS, Methodology for Calculating the National Average Drug Acquisition Cost (NADAC) for Medicaid Covered Outpatient Drugs at 5, *available at* https://www.medicaid.gov/medicaid-chip-program-information/by-topics/prescription-drugs/ful-nadac-downloads/nadacmethodology.pdf.

[40] *Id.* at 15.

[41] *Id.*

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

in compendia used by participants in the pharmaceutical industry.  The benchmarks are not actual transaction prices; rather, they are the manufacturer's reported list price.  Accordingly, WAC prices do not take into account discounts that may be provided, e.g., for volume sales.[42]

68.     The amount that an end-payer will pay a pharmacy for a generic drug typically is determined with reference to a benchmark or list price like a WAC.  The end-payer pays the pharmacy an amount based on the manufacturer's list price for the drug, plus a small mark-up or dispensing fee.  Over time, third-party payers and PBMs have learned that manufacturers' list prices for some generic drugs can be substantially higher than the actual costs incurred by certain pharmacies to acquire the drugs.  As a consequence, end-payers were paying more than simply the acquisition cost plus a small amount.

69.     To combat this, some third-party payers and PBMs have implemented their own proprietary benchmark prices-Maximum Allowable Costs ("MACs")-that set the amounts they will pay pharmacies for some generic drugs.  A MAC caps the amount that an end-payer will pay a pharmacy for a given strength and dosage of a generic drug, regardless of the pharmacy's acquisition costs.

70.     Third-party payers and PBMs set the MAC of a drug based on several factors, one of which is believed to be the lowest acquisition cost in the market for that generic drug.  So, for example, if there are three manufacturers offering the same generic drug at three different prices, a PBM or third-party payer might set the MAC price at or near the lowest of the three prices.  A

---

[42] Average Wholesale Price ("AWP") is another benchmark price that is used in the pharmaceutical industry.  And QuintilesIMS's National Sales Perspectives ("NSP") is another measure of manufacturer specific pricing.  NSP data "captures 100% of the total U.S. pharmaceutical market, measuring sales at actual transaction prices rather than using an average wholesale price" and includes sales by manufacturers into various outlets.  IMS Institute for Healthcare Informatics, HSRN Data Brief: National Sales Perspectives at 1, *available at* https://www.imshealth.com/files/web/IMSH%20Institute/NSP_Data_Brief-.pdf.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

pharmacy could elect to buy from a manufacturer with a higher price, but upon resale to a customer of the PBM or third-party payer, the pharmacy would only be paid the MAC price.

Drug purchasers always should have an incentive to buy the least expensive available drug. Because MAC prices further incentivize pharmacies to choose the lowest priced option, a generic manufacturer that increases its price for a drug should expect to lose sales to a competitor with a lower price.   Consequently, in the absence of coordinated pricing activity among generic manufacturers, an individual manufacturer should not be able to significantly increase its price (or maintain a higher price in the face of a significantly lower competitor price) without incurring the loss of a significant volume of sales.  A manufacturer can only raise its price if it knows its competitors will raise their prices, too, e.g., if they are conspiring.

## IX.    THE GENERIC PRAVASTATIN CONSPIRACY

### A.    Congressional Responses to Generic Drug Price Increases

71.    In addition to the investigations by DOJ and the Connecticut AG, Congress has raised concerns about the alarming price spikes for numerous generic pharmaceuticals— including Pravastatin specifically.   These concerns were prompted in part by the very real hardship suffered by end-payers as a result of the unprecedented price increases.

72.    In the fall of 2014, Representative Elijah E. Cummings, the former Ranking Member of the House Committee on Oversight and Government Reform and Senator Bernie Sanders, the former Chairman of the Subcommittee on Primary Health and Aging, requested information from manufacturers of 10 drugs that had experienced extraordinary price increases. Six of those drugs are now the subject of complaints in this MDL.[43]  In November 2014, Senator

---

[43] Senator Sanders, Press Release, *Congress Investigating Why Generic Drug Prices Are Skyrocketing* (Oct. 2, 2014), *available at* https://www.sanders.senate.gov/newsroom/press-releases/congress-investigating-why-generic-drug-prices-are-skyrocketing.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

Sanders conducted a hearing entitled, "Why Are Some Generic Drugs Skyrocketing in Price?" ("Senate Hearing"). Various witnesses discussed the price hikes for generic drugs, but none of the industry executives that were invited to testify—including Arthur Bedrosian ("Bedrosian"), the CEO of Lannett, and Erez Vigodman, the CEO of Teva—appeared.[44]

73.     Senator Sanders and Representative Cummings followed up with a request to the Office of the Inspector General of the Department of Health & Human Services ("OIG"), asking it to investigate the effect that price increases of generic drugs have had on the Medicare and Medicaid programs. The OIG issued its report in December 2015, confirming that price increases for numerous generic drugs far outpaced inflation.[45]

74.     In response to another Congressional request—this one from Senators Susan Collins, Claire McCaskill, Bill Nelson and Mark Warner—the United States Government Accountability Office ("GAO") issued a report in August 2016 entitled "Generic Drugs Under Medicare: Part D Generic Drug Prices Declined Overall, but Some Had Extraordinary Price Increases."[46] The GAO investigation confirmed that in a competitive market, generic drug prices decline and remain stable, absent shortages or other market disruptions.[47] And this was the case for most generics. But it identified numerous drugs that experienced "extraordinary" increases, which it defined as an increase of more than 100%.[48] Pravastatin is among the drugs identified

---

[44] Senate Hearing (Nov. 20, 2014), *available at* https://www.help.senate.gov/hearings/why-are-some-generic-drugs-skyrocketing-in-priced.

[45] HHS OIG, *Average Manufacturer Prices Increased Faster than Inflation for Many Generic Drugs* (Dec. 2015), *available at* https://oig.hhs.gov/oas/reports/region6/61500030.pdf.

[46] GAO Report.

[47] *Id.* at 23-25.

[48] *Id.* at 1 & Appendix III.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

by the GAO, which concluded that Pravastatin, in both the 10mg and 40mg tablet form, "[e]xperienced an extraordinary price increase" in 2013-2014.[49]

      **B.**      **The Generic Pravastatin Market**

75.      Pravastatin is marketed and sold throughout the United States and its territories.

76.      At all relevant times, Defendants had substantial market power with respect to generic Pravastatin. Defendants exercised this power to maintain supracompetitive prices for Pravastatin without losing so many sales as to make the elevated price unprofitable.

77.      Defendants sold generic Pravastatin at prices in excess of marginal costs, in excess of a competitive price, and enjoyed high profit margins.

78.      Bristol Myers Squibb manufactures and sells a branded version of Pravastatin under the brand name Pravachol®. Bristol Myers Squibb received approval for Pravachol (NDA 019898) on October 31, 1991, and began selling its Pravastatin product soon thereafter. Pravachol was a blockbuster drug for Bristol Myers Squibb, generating $1.3 billion in sales in 2005 before generic forms of Pravastatin were approved by the FDA.

79.      Defendants are leaders in the market for generic drugs. Defendants Teva, Sandoz, and Lupin are among the top five U.S. corporations selling generic prescription drugs, with Teva leading the pack.

80.      Each Defendant manufactures, markets, and sells Pravastatin, entering the market after the FDA approved their respective ANDA applications:

      (a)      Apotex received approval to manufacture, market, and sell Pravastatin in October 2006.

      (b)      Glenmark received approval to manufacture, market, and sell Pravastatin in May 2007.

---

[49] *Id.*

29

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

      (c)     Teva received approval to manufacture, market, and sell Pravastatin in April 2006.

      (d)     Lupin received approval to manufacture, market, and sell Pravastatin in January 2008.

      (e)     Sandoz received approval to manufacture, market, and sell Pravastatin in October 2006.

      (f)     Zydus received approval to manufacture, market, and sell Pravastatin in April 2008.

81.     Sun Pharma's subsidiary, Ranbaxy Laboratories, also manufactured and sold generic Pravastatin in the United States through 2012. But significant compliance issues at one of Ranbaxy's Indian manufacturing plants resulted in the FDA withdrawing approval of 27 Ranbaxy ANDAs—including its ANDA for Pravastatin—as part of a 2012 consent decree between Ranbaxy, the FDA, and DOJ.

82.     By 2007, as Defendants were receiving their approvals, the U.S. market for Pravastatin tablets was estimated at $1.9 billion annually.[50]

**C.    Defendants' Collective Market Dominance Permitted Them to Collude.**

83.     During the Class Period, the Defendants dominated the market with about a ▮ share. Likewise, from December 2010 through April 2013, their sales accounted for about ▮ of all United States sales of Pravastatin. In 2013, when the price hikes were first implemented, Apotex, Glenmark, Lupin, Teva, and Zydus collectively held approximately ▮ of market for Pravastatin.

---

[50] Generic Pharmaceuticals and Patents, *Zydus Cadila gets four US FDA approvals*, GenericsPatent Blog (May 15, 2008), *available at* http://genericspatent.blogspot.kr/2008/05/zydus-cadila-gets-four-us-fda-approvals.html.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

84.     In terms of revenue, in 2014, Apotex's sales were at least ████████ Glenmark about $████████ Lupin about ████████, Teva about ████████ Zydus ████████ and Sandoz ████████.

85.     Defendants continued to dominate the market throughout the Class Period.

86.     Defendant Sandoz entered the Pravastatin market in early 2014 shortly after the price hikes were implemented.

87.     While there are a few smaller companies operating in the market, they do not now and have never posed a competitive threat to the Defendants or operated as a constraint on Defendants' pricing activities.

88.     The market for Pravastatin is mature, and drug manufacturers that operate in that market can only gain market share by competing on price. Yet, as demonstrated below, none of the Defendants chose to do so.

89.     Through their market dominance, Defendants have successfully foreclosed the market to rival competition, thereby maintaining and enhancing market power and enabling Defendants to charge Plaintiffs supracompetitive prices for generic Pravastatin.

**D.     Generic Pravastatin Price Increases**

90.     There are no legitimate reasons or explanations for Defendants' unprecedented and dramatic price increases for Pravastatin.

91.     Prices for Pravastatin were stable (and low) for many years—hovering at or below 10 cents per 10, 20, 40 mg tablets, and between 10 and 20 cents for 80 mg tablets, from 2010 to mid-2013.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

92.     But that soon changed. As part of their conspiracy, Defendants agreed to raise the prices of Pravastatin sold in the United States, and beginning in or around May 2013, prices for Pravastatin soared.

93.     On October 2, 2014, Senator Sanders and Representative Cummings sent letters to a number of the Defendants.[51] The letter to Zydus, Teva, and Apotex contained this chart showing drastic increases in the average market prices of various dosages of and package sizes for Pravastatin between October 2013 and April 2014:

| Drug | SKU | Average Market Price, October 2013 | Average Market Price, April 2014 | Cost Increase | Percentage Increase |
|---|---|---|---|---|---|
| Pravastatin Sodium | bottle of 1000, 20mg tablets | $77 | $368 | $291 | 447% |
| Pravastatin Sodium | bottle of 1000, 40mg tablets | $114 | $540 | $426 | 528% |
| Pravastatin Sodium | bottle of 500, 10mg tablets | $27 | $196 | $169 | 573% |
| Pravastatin Sodium | bottle of 500, 80mg tablets | $59 | $299 | $240 | 365% |
| Pravastatin Sodium | bottle of 90, 10mg tablets | $6 | $34 | $28 | 420% |
| Pravastatin Sodium | bottle of 90, 20mg tablets | $7 | $35 | $28 | 446% |
| Pravastatin Sodium | bottle of 90, 40mg tablets | $9 | $51 | $42 | 473% |
| Pravastatin Sodium | bottle of 90, 80mg tablets | $14 | $52 | $39 | 334% |

94.     The October Letter to Apotex, for example, states,

> We are writing to your company to request information about the escalating prices it has been charging for Pravastatin Sodium, which is used to treat hypercholesterolemia—high cholesterol—and for the prevention of cardiovascular disease.  According to data provided by the Healthcare Supply Chain Association (HSCA), the average price charged for this drug has increased as much as 573 percent from October 2013 to April 2014.  Over that time period, the average market price went up by as much as $426.

---

[51] The October Letters may be found at http://www.sanders.senate.gov/newsroom/press-releases/congress-investigating-why-generic-drug-prices-are-skyrocketing.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

95.     The National Average Drug Acquisition Cost ("NADAC") data[52] for Pravastatin likewise illustrates this drastic increase. The NADAC data show the average increase in the price of Pravastatin across the major manufacturers and demonstrate that price hikes for Pravastatin were industry-wide. For example, NADAC data for the 10 mg dosage of Pravastatin sodium manufactured and sold by Defendants Teva, Glenmark, Lupin, Cadila (Zydus), Lek (Sandoz), and Apotex depict the following:



---

[52] The NADAC data is a pricing reference file published by the Centers for Medicare and Medicaid Services that is based on average actual acquisition costs of various outpatient drugs collected from a monthly survey of retail community pharmacies across the United States. *See* Ctrs. for Medicare & Medicaid Servs., *Methodology for Calculating the National Average Drug Acquisition Cost (NADAC) for Medicaid Covered Outpatient Drugs, available at* https://www.medicaid.gov/medicaid-chip-program-information/by-topics/prescription-drugs/ful-nadac-downloads/nadacmethodology.pdf.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

96.     NADAC data for the 20, 40, and 80 mg dosages illustrate similar hikes:







97.    As the following charts demonstrate, the increase in average prices was not the result of one dominant manufacturer raising the price while others kept prices in check and sought to capture market share. ████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

██████████████  [redact charts]





PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER





PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

98.     The sustained price elevation reflected in the data, across Pravastatin in various dosages, was the result of a conspiracy among Defendants to allocate customers, rig bids, and artificially raise, fix, maintain, and/or stabilize the price of Pravastatin sold in the United States.

99.     These extraordinary price increases were not the result of supply shortages, demand spikes, increased input costs, or other competitive market conditions. There were no relevant labelling changes or reported drug shortages that might have led to price increases. Nor was there a spike in demand that could explain the price hikes.

100.     ██████████████████████ the quantity of Pravastatin sold and the total associated Pravastatin revenue moved in tandem. After the price hike, however, ████████



██████, in defiance of previous competitive norms.

**E.     Defendants' Effective Prices Were Remarkably Stable before Skyrocketing in The Class Period.**

101.     From December 2010 through April 2013, *i.e.*, for over two years leading up to the price-fixing conspiracy, the standard deviation percentage of mean prices for Defendants Glenmark, Lupin, and Teva was no more than ████ for Apotex it was no more than ██████

102.     **Glenmark**: For over two years before the Class Period began, the average effective price per unit of its products was: ████ for its 10g tablet; ██████ for its 20g tablet; ████ for its 40g tablet; and ██████ for its 80g tablet.

103. ████████████████████████████████████████████████████

████████████████████████████████████.[53]

| Product | Price Apr. 2013 | Hike Date | Hike Price | Percentage Increase |
|---------|-----------------|-----------|------------|---------------------|
| TAB 10GM | | | | |
| TAB 20GM | | | | |
| TAB 40GM | | | | |
| TAB 80GM | | | | |

104. ████████████████████████████████████████████████████

████████████████████████████████

| Product | Price Date | Peak Price | Percentage Increase |
|---------|------------|------------|---------------------|
| TAB 10GM | | | |
| TAB 20GM | | | |
| TAB 40GM | | | |
| TAB 80GM | | | |

105. ████████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████

---

[53] Plaintiffs calculate Defendants' effective prices based on IMS Health's National Sales Perspectives (NSP) data, which "captures 100% of the total U.S. pharmaceutical market, measuring sales at actual transaction prices[.]" IMS Institute for Healthcare Informatics, HSRN Data Brief: National Sales Perspectives at 1, *available at* https://www.imshealth.com/files/web/IMSH%20Institute/NSP_Data_Brief-.pdf. Effective prices are calculated to multiple decimals. For ease of reference, prices in this complaint are rounded to the nearest cent. However, percentage increases are calculated based on the more precisely calculated price.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

| Product | Price Apr. 2013 | Price Nov. 2016 | Percentage Increase |
|---------|-----------------|-----------------|---------------------|
| TAB 10GM | | | |
| TAB 20GM | | | |
| TAB 40GM | | | |
| TAB 80GM | | | |

106.   **Apotex:** For over two years before the Class Period began, the average effective price per unit of its products was: ▮▮▮▮ for its 10g tablet; ▮▮▮▮▮ for its 20g tablet; ▮▮▮▮ or its 40g tablet; and $▮▮▮ or its 80g tablet.

107.   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮   ▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

| Product | Price Apr. 2013 | Hike Date | Hike Price | Percentage Increase |
|---------|-----------------|-----------|------------|---------------------|
| TAB 10GM | | | | |
| TAB 20GM | | | | |
| TAB 40GM | | | | |
| TAB 80GM | | | | |

108.   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮:

| Product | Price Date | Peak Price | Percentage Increase |
|---------|-----------|------------|---------------------|
| TAB 10GM | | | |
| TAB 20GM | | | |
| TAB 40GM | | | |
| TAB 80GM | | | |

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

109.   ████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████

| Product | Price Apr. 2013 | Price Nov. 2016 | Percentage Increase |
|---|---|---|---|
| TAB 10GM | | | |
| TAB 20GM | | | |
| TAB 40GM | | | |
| TAB 80GM | | | |

110.   **Lupin:** For over two years before the Class Period began, the average effective price per unit of its products was: ████ for its 10g tablet; ████ for its 20g tablet; ████ or its 40g tablet; and ████ for its 80g tablet.

111.   ████████████████████████████████   ████████████

████████████████████████████████████████:

| Product | Price Apr. 2013 | Hike Date | Hike Price | Percentage Increase |
|---|---|---|---|---|
| TAB 10GM | | | | |
| TAB 20GM | | | | |
| TAB 40GM | | | | |
| TAB 80GM | | | | |

112.   ████████████████████████████████████████████

████████████████████████████████

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

| Product | Price Date | Peak Price | Percentage Increase |
|---|---|---|---|
| TAB 10GM | | | |
| TAB 20GM | | | |
| TAB 40GM | | | |
| TAB 80GM | | | |

113. ███████████████████████████████████

███████████████████████████████████████

███████████████████████████████

| Product | Price Apr. 2013 | Price Nov. 2016 | Percentage Increase |
|---|---|---|---|
| TAB 10GM | | | |
| TAB 20GM | | | |
| TAB 40GM | | | |
| TAB 80GM | | | |

114.   **Teva:** For over two years before the Class Period began, the average effective price per unit of its products was: ██████ for its 10g tablet; ██████ for its 20g tablet; ██████ or its 40g tablet; and ██████ for its 80g tablet.

115. ████████████████████████████   ████████████

█████████████████████████████

| Product | Price Apr. 2013 | Hike Date | Hike Price | Percentage Increase |
|---|---|---|---|---|
| TAB 10GM | | | | |
| TAB 20GM | | | | |
| TAB 40GM | | | | |
| TAB 80GM | | | | |

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

116. ████████████████████████████████████████

████████████████████████████████████████████

| Product | Price Date | Peak Price | Percentage Increase |
|---------|------------|------------|---------------------|
| TAB 10GM | | | |
| TAB 20GM | | | |
| TAB 40GM | | | |
| TAB 80GM | | | |

117. ████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████

| Product | Price Apr. 2013 | Price Nov. 2016 | Percentage Increase |
|---------|-----------------|-----------------|---------------------|
| TAB 10GM | | | |
| TAB 20GM | | | |
| TAB 40GM | | | |
| TAB 80GM | | | |

118. **Zydus**: Over ████████████████████████████

████████████████████████████████████████████

████████████████████████  ██████████████████████

████████████████████████  ██████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

██████████

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

119. ████████████████████████████████████████████████████

████████████████████████████████████████████████

| Product | Price Date | Peak Price | Percentage Increase |
|---------|-----------|-----------|---------------------|
| TAB 10GM | | | |
| TAB 20GM | | | |
| TAB 40GM | | | |
| TAB 80GM | | | |

120. ████████████████████████████████████████████████████

████████████████████████████████████████████████████████

███████████████████████████████████

| Product | Price Apr. 2013 | Price Nov. 2016 | Percentage Increase |
|---------|-----------------|-----------------|---------------------|
| TAB 10GM | | | |
| TAB 20GM | | | |
| TAB 40GM | | | |
| TAB 80GM | | | |

**F.     As Part of The Conspiracy, Several Defendants Increased Their WAC Benchmarks in Lockstep.**

121.    Defendants Zydus, Lupin, and Teva, who dominated the Pravastatin market in 2013, reported identical WACs for all four dosages—even though it meant roughly doubling or tripling their previous benchmarks.

| Product | Defendant | NDC | Old WAC | New WAC | Date of Increase | Percentage Increase |
|---------|-----------|-----|---------|---------|------------------|---------------------|
| 10 mg., 90 ct. | ZYDUS | 68382007016 | $0.17 | $0.48 | 14-Jun-13 | 189% |
| 10 mg., 500 ct., | ZYDUS | 68382-007005 | $0.15 | $0.48 | 14-Jun-13 | 222% |
| 10 mg., 90 ct. | TEVA | 00093077198 | $0.17 | $0.48 | 9-Aug-13 | 189% |

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

| 10 mg., 1,000 ct. | TEVA | 00093077110 | $0.15 | $0.48 | 9-Aug-13 | 221% |
| 10 mg., 90 ct. | LUPIN | 68180048509 | $0.17 | $0.48 | 28-Aug-13 | 190% |
| 10 mg., 500 ct. | LUPIN | 68180048502 | $0.15 | $0.48 | 28-Aug-13 | 222% |

| Product | Defendant | NDC | Old WAC | New WAC | Date of Increase | Percentage Increase |
| --- | --- | --- | --- | --- | --- | --- |
| 20 mg., 90 ct. | ZYDUS | 68382-007116 | $0.19 | $0.49 | 14-Jun-13 | 152% |
| 20 mg., 500 ct. | ZYDUS | 68382-007105 | $0.18 | $0.49 | 14-Jun-13 | 180% |
| 20 mg., 90 ct. | TEVA | 00093720198 | $0.19 | $0.49 | 9-Aug-13 | 152% |
| 20 mg., 1,000 ct. | TEVA | 00093720110 | $0.18 | $0.49 | 9-Aug-13 | 180% |
| 20 mg., 90 ct. | LUPIN | 68180048609 | $0.19 | $0.49 | 28-Aug-13 | 152% |
| 20 mg., 500 ct. | LUPIN | 68180048602 | $0.18 | $0.49 | 28-Aug-13 | 180% |

| Product | Defendant | NDC | Old WAC | New WAC | Date of Increase | Percentage Increase |
| --- | --- | --- | --- | --- | --- | --- |
| 40 mg., 90 ct. | ZYDUS | 68382007216 | $0.24 | $0.72 | 14-Jun-13 | 201% |
| 40 mg., 500 ct. | ZYDUS | 68382007205 | $0.22 | $0.72 | 14-Jun-13 | 234% |
| 40 mg., 90 ct. | TEVA | 00093720298 | $0.24 | $0.72 | 9-Aug-13 | 201% |
| 40 mg., 1,000 ct. | TEVA | 00093720210 | $0.22 | $0.72 | 9-Aug-13 | 235% |
| 40 mg., 90 ct. | LUPIN | 68180048709 | $0.24 | $0.72 | 28-Aug-13 | 201% |
| 40 mg., 500 ct. | LUPIN | 68180048702 | $0.22 | $0.72 | 28-Aug-13 | 235% |

| Product | Defendant | NDC | Old WAC | New WAC | Date of Increase | Percentage Increase |
| --- | --- | --- | --- | --- | --- | --- |
| 80 mg., 90 ct. | ZYDUS | 68382007316 | $0.38 | $0.72 | 14-Jun-13 | 88% |
| 80 mg., 500 ct. | ZYDUS | 68382-007305 | $0.30 | $0.72 | 14-Jun-13 | 140% |
| 80 mg., 90 ct. | TEVA | 00093727098 | $0.38 | $0.72 | 9-Aug-13 | 88% |
| 80 mg., 1,000 ct. | TEVA | 00093727010 | $0.36 | $0.72 | 9-Aug-13 | 97% |
| 80 mg., 90 ct. | LUPIN | 68180048809 | $0.38 | $0.72 | 28-Aug-13 | 88% |
| 80 mg., 500 ct. | LUPIN | 68180048802 | $0.36 | $0.72 | 28-Aug-13 | 98% |

122.    Likewise, Apotex, who with Defendants Zydus, Lupin, and Teva, collectively represented approximately ▮ of the market in 2013, approximately doubled its WACs at the start of the Class Period:

| Product | Defendant | NDC | Old WAC | New WAC | Date of Increase | Percentage Increase |
|---|---|---|---|---|---|---|
| 10 mg., 90 ct. | APOTEX | 60505-0168-09 | $0.26 | $0.56 | 28-May-13 | 119% |
| 10 mg., 500 ct. | APOTEX | 60505-0168-05 | $0.26 | $0.56 | 28-May-13 | 119% |
| 20 mg., 90 ct. | APOTEX | 60505-0169-09 | $0.26 | $0.57 | 28-May-13 | 120% |
| 20 mg., 1,000 ct. | APOTEX | 60505-0169-07 | $0.26 | $0.57 | 28-May-13 | 119% |
| 40 mg., 90 ct. | APOTEX | 60505-0170-09 | $0.38 | $0.84 | 28-May-13 | 119% |
| 40 mg., 1,000 ct. | APOTEX | 60505-0170-07 | $0.38 | $0.84 | 28-May-13 | 119% |
| 40 mg., 9,000 ct. | APOTEX | 60505-0170-08 | $0.38 | $0.84 | 31-May-13 | 119% |
| 80 mg., 90 ct. | APOTEX | 60505-1323-09 | $0.38 | $0.85 | 28-May-13 | 122% |

**G.      There Were No Shortages That Could Explain the Price Increases.**

123.     Federal law requires drug manufacturers to report potential drug shortages to the FDA, the reasons therefor, and the expected duration of the shortage. The Defendants reported no Pravastatin-related supply disruptions or shortages to the FDA during the relevant period. The American Society of Health-System Pharmacists, which maintains bulletins of current and resolved drug shortages, likewise has no record of a Pravastatin shortage during the relevant period.

124.     And because generic pharmaceutical manufacturers do not need to incur the large research and development costs that brand manufacturers absorb in developing new drugs, the price increases cannot be attributed to the need to fund research and development. Indeed, Pravastatin had been available in generic form for nearly a decade at the time of the 2013 price spikes.

125.     Industry analysts have also suggested that recent price increases for Pravastatin and other generic drugs are the result of collusion among manufacturers. Richard Evans at *Sector & Sovereign Research* wrote in 2015: "[a] plausible explanation [for price increases of generic drugs] is that generic manufacturers, having fallen to near historic low levels of financial

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

performance are cooperating to raise the prices of products whose characteristics – low sales due to either very low prices or very low volumes – accommodate price inflation."[54]

126.   This abrupt shift in the pricing of Pravastatin has had a catastrophic effect on consumers, particularly those with life-threatening cardiac conditions, and has caused extreme hardship to end-payers, including Plaintiffs. As noted in letters sent to generic drug manufacturers as part of a Congressional investigation into unexplained price increases:

> This dramatic increase in generic drug prices results in decreased access for patients. According to the National Community Pharmacists Association (NCPA), a 2013 member survey found that pharmacists across the country "have seen huge upswings in generic drug prices that are hurting patients and pharmacies ability to operate" and "77% of pharmacists reported 26 or more instances over the past six months of a large upswing in a generic drug's acquisition price." These price increases have a direct impact on patients' ability to purchase their needed medications. The NCPA survey found that "pharmacists reported patients declining their medication due to increased co-pays," and "84% of pharmacists said that the acquisition price/lagging reimbursement trend is having a 'very significant' impact on their ability to remain in business to continue serving patients."[55]

127.   And, as the AARP reported:[56]

> When Carol Ann Riha, 57, filled her prescription for the generic cholesterol-lowering drug Pravastatin, she was in for sticker shock. For months she'd been paying $4 for a 30-day supply. Suddenly the price had climbed more than four times as high, to nearly $19. "I asked my pharmacist why, and she had no answer," says Riha, a retired journalist who lives with her husband in West Des Moines, Iowa.

---

[54] Ed Silverman, *Generic Drug Prices Keep Rising, but is a Slowdown Coming?*,WSJ Blog (Apr. 22, 2015), *available at* http://blogs.wsj.com/pharmalot/2015/04/22/generic-drug-prices-keep-rising-but-is-a-slowdown-coming/.

[55] Footnotes omitted. The letters sent to generic drug manufacturers may be found at http://www.sanders.senate.gov/newsroom/press-releases/congress-investigating-why-generic-drug-prices-are-skyrocketing.

[56] Peter Jaret, *Prices Spike for Some Generic Drugs*, AARP Bulletin (July/Aug. 2015), *available at* http://www.aarp.org/health/drugs-supplements/info-2015/prices-spike-for-generic-drugs.html.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

128.    Although Pravastatin prices began easing somewhat in late 2014, as noted above, they remained well above their levels prior to the conspiracy and Defendants continue to enjoy supracompetitive profits today.

129.    The overcharges resulting from Defendants' conduct are directly traceable through the pharmaceutical distribution chain to End-Payers. A manufacturer first sells the drug to direct purchaser wholesalers based on the listed WAC, minus applicable discounts. Wholesalers then sell the drug to pharmacies, which in turn sell the drugs to End-Payers. The WAC serves as the benchmark for prices throughout the distribution chain.

130.    Defendants' price increases for Pravastatin resulted in corresponding increases to the prices paid by Plaintiffs and members of the proposed Classes. Corresponding increases in Pravastatin's transactional prices demonstrate that increased WAC prices translate to increases in the prices paid by End-Payers.

**H.      Defendants' Conspiracy.**[57]

131.    During the Class Period and beginning in or around 2013, the Defendants, through their sales representatives and senior management, met in person and/or otherwise communicated by phone, email, text message, and other means to discuss pricing and pricing strategies for Pravastatin, ultimately agreeing to forgo competition, allocate customers and business segments, rig bids, and fix the prices at which Pravastatin would be sold in its various dosages. This unlawful agreement accounts for the sharp and otherwise unexplained break in the Defendants' historic Pravastatin price levels, beginning in or around May 2013.

---

[57] The allegations included in this section pertaining to the HDMA, MMCAP, NACDS, and ECRM are based in part upon documents produced to plaintiffs pursuant to subpoenas *duces tecum* issued in *In re: Propranolol Antitrust Litigation*, No. 16-cv-9901 (S.D.N.Y.).

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

132.    The conspiracy had the intended and actual effect of causing Plaintiffs and the other members of the proposed Class to pay artificially inflated prices above prices that would exist if a competitive market had determined prices for Pravastatin.

133.    Defendants' conduct cannot be explained by normal competitive forces.  It was the result of an agreement among Defendants to increase pricing and restrain competition for the sale of Pravastatin in the United States.  The agreement was furthered by discussions held at meetings and industry events hosted by the GPhA, HDMA, MMCAP, NACDS, and ECRM, as well as other meetings and communications.

134.    The industry intelligence-gathering reporting firm *Policy and Regulatory Report* has reportedly obtained information regarding the investigation of generic drug companies by DOJ, and has indicated that DOJ is investigating the extent to which trade associations and industry conferences have been used as forums for collusion among competing generic drug companies.[58]  The State AGs have similarly noted the centrality of trade associations and industry conferences in their investigation, stating that they have uncovered evidence that certain generic drug companies "routinely coordinated their schemes through direct interaction with their competitors at industry trade shows, customer conferences, and other events, as well as through direct email, phone, and text message communications."[59]

135.    Defendants were members of numerous trade associations, which they used to facilitate their conspiratorial communications and implement their anticompetitive scheme to raise, maintain, and stabilize the prices of Pravastatin, and to engage in market and customer

---

[58] Eric Palmer, *Actavis gets subpoena as DOJ probe of generic pricing moves up food chain*, FIERCEPHARMA (Aug. 7, 2015), *available at* http://www.fiercepharma.com/story/actavis-gets-subpoena-doj-probe-generic-pricing-moves-food-chain/2015-08-07.

[59] CTAG Website, Press Release, *40 State Attorneys General Now Plaintiffs in Federal Generic Drug Antitrust Lawsuit* (Mar. 1, 2017), *available at* http://www.ct.gov/ag/cwp/view.asp?Q=590616&A=2341 .

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

allocation for Pravastatin, including, but not limited to, GPhA, the NACDS, and HDMA. In addition, Defendants regularly attended industry events hosted by the MMCAP and the ECRM.

136. The GPhA (now called the Association for Accessible Medicines) is the "leading trade association for manufacturers and distributors of prescription drugs."[60]  GPhA was formed in 2000 from the merger of three industry trade associations: the Generic Pharmaceutical Industry Association, the National Association of Pharmaceutical Manufacturers, and the National Pharmaceutical Alliance.

137. GPhA's website touts, "[b]y becoming part of GPhA, you can participate in shaping the policies that govern the generic industry" and lists its "valuable membership services, such as business networking opportunities, educational forums, access to lawmakers and regulators, and peer-to-peer connections."[61]   GPhA's "member companies supply approximately 90 percent of the generic prescription drugs dispensed in the U.S. each year."

138. Defendants Apotex, Glenmark, Lupin, Sandoz, Teva, and Zydus were regular members of the GPhA during the Class Period.  Regular members "are corporations, partnerships or other legal entities whose primary United States business derives the majority of its revenues from sales of (1) finished dose drugs approved via ANDAs; (2) products sold as authorized generic drugs; (3) biosimilar/biogeneric products; or (4) DESI products."[62]

139. Several of Defendants high-ranking corporate officers have served on GPhA's Board of Directors before and during the Class Period:

---

[60] GPhA, Membership, *available at*
http://web.archive.org/web/20150413013008/http://www.gphaonline.org:80/about/membership
[61] *Id.*
[62] *Id.*

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

(a)      **2012 Board of Directors**: Joseph Renner, President & CEO of Zydus; Debra Barrett, Senior Vice President ("SVP") of Government and Public Affairs for Teva; Jeff Watson, Chief Commercial Officer ("CCO") of Apotex; and Don DeGolyer, President of Sandoz;

(b)      **2013 Board of Directors:** Joseph Renner, President & CEO of Zydus; Debra Barrett, SVP of Global Government Affairs and Public Policy for Teva; Jeff Watson, Chief Commercial Officer of Apotex; and Don DeGolyer, President of Sandoz;

(c)      **2014 Board of Directors:** Joseph Renner, President & CEO of Zydus; Allan Oberman, President & CEO of Teva Americas Generics; Jeff Watson, CCO of Apotex; Paul McGarty, President of Lupin; and Peter Goldschmidt, President of Sandoz US;

(d)      **2015 Board of Directors:** Joseph Renner, President & CEO of Zydus; Debra Barrett, SVP Global Government Affairs for Teva; Jeff Watson, CCO of Apotex; and Paul McGarty, President of Lupin; and Peter Goldschmidt, President of Sandoz US;

(e)      **2016 Board of Directors:** Joseph Renner, President & CEO of Zydus; Debra Barrett, Sr. VP Global Government Affairs for Teva; Jeff Watson, CCO of Apotex; Paul McGarty, President of Lupin; and Peter Goldschmidt, President of Sandoz US.

140.    Former Heritage CEO, Jeffrey Glazer, who pleaded guilty to federal criminal charges relating to price fixing and other anticompetitive activity concerning generic drugs, also served on GPhA's board of directors.

141.    The NACDS is a national trade association representing chain community pharmacies.  Its members include generic drug manufacturers, wholesalers, and retail chain pharmacies. NACDS holds regular industry events, including annual and regional conferences,

which Defendants and other generic drug manufacturers attended, including the annual Total Store Expo.

142.    The HDMA (now the HDA) is a national trade association that represents "primary pharmaceutical distributors" which links the nation's drug manufacturers and more than 200,000 pharmacies, hospitals, long-term care facilities, and clinics.[63]   It holds regular conferences where its members, including generic drug manufacturers, meet to discuss various issues affecting the pharmaceutical industry.  During the Class Period its members have included Defendants Apotex, Lupin, Sandoz, Teva and Zydus.

143.    According to its website, MMCAP is a "free, voluntary group purchasing organization for government facilities that provide healthcare services.  MMCAP has been delivering pharmacy and healthcare value to members since 1985.  MMCAP's membership extends across nearly every state in the nation, delivering volume buying power.  Members receive access to a full range of pharmaceuticals and other healthcare products and services; such as, medical supplies, influenza vaccine, dental supplies, drug testing, wholesaler invoice auditing and returned goods processing."

144.    MMCAP's Charter provides that "[i]n 1989, the Minnesota Department of Administration, an agency of the State of Minnesota, began a cooperative purchasing venture program to procure pharmaceutical products at the best price possible for the benefit of any other state interested in participating in the program . . . In 1996, the cooperative purchasing venture was named Minnesota Multistate Contracting Alliance for Pharmacy . . . and currently provide healthcare-related contracting to state and local government members located across the United

---

[63] HDA website, About, https://www.healthcaredistribution.org/about.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

State of America.  Total purchasers by MMCAP member facilities for all MMCAP programs exceed $1 billion annually . . . ."

145.    Representatives of Defendants Apotex and Teva regularly attended MMCAP meetings during the Class Period.

146.    According to its website, ECRM conducts Efficient Program Planning Sessions that are made up of one-on-one strategic meetings that connect decision makers in an effort to maximize time, grow sales, and uncover industry trends.

147.    At annual meetings organized by ECRM, generic drug manufacturers have scheduled meetings with generic drug buyers at chain drug stores, supermarkets, mass merchants, wholesalers, distributors, and buy groups for independents.

148.    ████████████████████████████████████████████

████████

149.    As set forth below, meetings and events hosted by the GPhA, HDMA, NACDS, MMCAP, and ECRM were frequently held during the Class Period and attended by high-level representatives from each Defendant, including employees with price-setting authority.

150.    For example, on October 1-3, 2012, GPhA held a meeting in Bethesda, Maryland that was attended by representatives from each of the Defendants, including at least the following key executives:

a.      **Sandoz**: Don DeGolyer, President; and

b.      **Teva**: Allan Oberman, President & CEO.

151.    On February 20-22, 2013, GPhA held its annual meeting in Orlando, Florida, which was attended by representatives from each of the Defendants, including Apotex, Glenmark, Lupin, Sandoz, Teva, and Zydus.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

152.



153.    On April 20-23, 2013, NACDS held its 2013 Annual Meeting at The Breakers in Palm Beach, Florida. NACDS's  2013 Annual Meeting was attended by representatives from each of the Defendants, including at least the following key executives for generic drug sales and pricing:

a.    **Apotex**: Corey Anquetil, Director Strategic Sales, North America; Buddy Bertucci, VP, Institutional Sales; Sam Boulton, Director, National Accounts; Lyndon Johnson, SVP, Sales & Marketing; Jeff Watson, President Global

Generics; Beth Hamilton, VP, Marketing & Portfolio Strategy (Sales & Marketing); David Kohler, VP & General Manager;

b.    **Glenmark**: Jim Brown, VP, Sales; Mitchell Blashinsky, VP, Sales & Marketing; Paul Dutra, EVP;

c.    **Lupin**: Dave Berthold, SVP, Generics; Vinita Gupta, CEO; Robert Hoffman, EVP, U.S. Generics; Paul McGarty, President;

d.    **Sandoz**: Don DeGolyer, CEO; Jeff George, Global Head of Sandoz; Richard Tremonte, SVP, Global Generic Pharmaceuticals; and

e.    **Teva**: Jeremy Levin, President and CEO; Theresa Coward, Senior Director of Sales; David Rekenthaler, VP, Sales; Maureen Cavanaugh, SVP & COO N.A. Generics; Allan Oberman, President & CEO Teva Americas Generics; and Jonathan Kafer, EVP, Sales & Marketing; and

f.    **Zydus:** Michael Keenley, President; Joseph Renner, President & CEO; Kristy Ronco, VP, Sales; Laura Short, VP, Sales; Karen Strelau, EVP Sales & Marketing.

154.   On June 2-5, 2013, HDMA held its 2013 Business and Leadership Conference ("BLC") in Orlando, Florida. HDMA's June 2013 Business and Leadership Conference was attended by at least the following representatives from each of the Defendants, who were key executives for generic drug sales and pricing:

a.    **Apotex**: Jeffrey Hampton, VP, Commercial Operations; Beth Hamilton, National Sales Director; James Van Lieshout, VP, Sales; David Rekenthaler, National Accounts Director; Jane Williams, VP Specialty Generic Sales;

b.    **Glenmark**: Christopher Bihari, Director National Accounts;

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

    c.      **Lupin**: Dave Berthold, VP, Sales, U.S. Generics; David Shirkey, National Accounts Manager; Lauren Walten, National Account Manager;

    d.      **Sandoz**: Alan Ryan, Associate Director, National Accounts; Dawn Doggett, National Trade Affairs Executive, Managed Markets;

    e.      **Teva**: Theresa Coward, Sr.  Director, National Sales; Sal Cuomo, Trade Account Director; Jeffrey Herzfeld, SVP, Commercial Operations & America Strategy; Jessica Peters, National Accounts Manager; and Teri Sherman, National Accounts Director; and

    f.      **Zydus:** Scott Goldy, Director, National Accounts; Kevin Green, National Accounts Manager; Marc Kikuchi, Senior Vice President, Global Generics.

155.    On June 4-5, 2013, GPhA held a meeting in Bethesda, Maryland that was attended by representatives from at least Defendants Apotex, Glenmark, Sandoz, Teva and Zydus, including at least the following key executives:

    a.      **Apotex**: Kiran Krishnan, Vice President, Regulatory Affairs; and

    b.      **Sandoz**: Alison Sherwood, Associate Director, Regulatory Affairs.

156.    On August 10-13, 2013, NACDS held its 2013 Total Store Expo at the Sands Expo Convention Center in Las Vegas, Nevada. NACDS's August 2013 Total Store Expo was attended by at least the following representatives from each of the Defendants, who were key executives for generic drug sales and pricing:

    a.      **Apotex**: Tom Axner, National Sales Director, Distribution; Tim Berry, National Account Manager; Gwen Copeland, Manager, National Accounts; John Crawford, National Account Director; Sam Boulton, Director, National Accounts; Jeffrey Hampton, SVP & National Manager, U.S. & Latin America; Niki Hinman-

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

Smock, National Account Manager; David Kohler, VP & General Manager; Chirag Patel, Marketing Director, N.A.; Shannon Price, Sr. Marketing Director; Bob Simmons, National Accounts Director; Debbie Veira, National Accounts Manager; Pat Walden, Sr. Marketing Manager; Corey Anquetil, Director, Strategic Sales NA; Beth Hamilton, VP, Marketing & Portfolio Strategy (Sales & Marketing); Tina Kaus, National Accounts Director; James Van Lieshout, Senior Director, Commercial Operations; Pat Walden, Sr. Marketing Manager;

b.  **Glenmark**: Jim Brown, VP, Sales; Mitchell Blashinsky, VP, Sales & Marketing; Paul Dutra, EVP; Jessica Cangemi, Director, Sales & Marketing; Jeff Johnson, Director, Sales & Marketing; David Irwin, Director, Sales; Stephanie Picca, Manager, Sales & Marketing; Terry Coughlin, EVP & COO;

c.  **Lupin**: Dave Berthold, SVP, Generics; Robert Hoffman, EVP, U.S. Generics; Paul McGarty, President; Steve Randazzo, SVP; David Shirkey, National Account Manager; Lauren Walten, National Account Manager;

d.  **Sandoz**: Peter Goldschmidt, President Sandoz US & Head NA; Armando Kellum, VP, Sales and Marketing; Paul Krauthauser, SVP, Sales & Marketing; Della Lubke, National Account Executive; Steven Greenstein, Director, Key Customers;

e.  **Teva**: Theresa Coward, Senior Director of Sales; David Rekenthaler, Vice President, Sales; Maureen Cavanaugh, SVP & COO North America Generics; Kevin Galowina, Head of Marketing Operations; Jessica Peters, Manager of Corporate Accounts; Allan Oberman, President & CEO Teva Americas Generics; Jennifer Chang, Director, Marketing; Scott Goldy, Director, National Accounts;

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

Kevin Green, AVP, National Accounts; Jonathan Kafer, EVP, Sales & Marketing; and Kayla Kelnhofer, National Account Executive; Teri Sherman, Director, National Accounts; and

f.   **Zydus**: Michael Keenley, President; Joseph Renner, President & CEO; Kristy Ronco, VP, Sales; Laura Short, VP, Sales; Karen Strelau, EVP Sales & Marketing; Elizabeth Purcell, Sr. Director, Marketing and Pportfolio Management; Ganesh Nyak, COO & Executive Director; Daniel Lukasiewicz, Sr. Manager, Marketing Ops; Sharvil Patel, Deputy Managing Director.

157.   On October 28-30, 2013, GPhA held a meeting in Bethesda, Maryland that was attended by representatives from all Defendants, including Apotex, Glenmark, Lupin, Teva and Zydus.

158.   On September 29-October 2, 2013, HDMA held its 2013 Annual Board and Membership Meeting ("ABMM") in White Sulphur Springs, West Virginia. HDMA's 2013 ABMM was attended by at least the following representatives from Defendants, who were key executives for generic drug sales and pricing:

a.   **Apotex:** Beth Hamilton, Director, National Sales; Jeffrey Hampton, VP, Commercial Operations; James Van Lieshout, VP, Sales-Retail Division; Jeff Watson, President; and

b.   **Teva:** Robert Tighe, Chief Financial Officer, N.A.; Teri Coward, Senior Director, National Sales; Christopher Doerr, Director, Trade Operations; David Rekenthaler, Vice President Sales, U.S. Generics.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

159.    On December 3, 2013, NACDS held its 2013 NYC Week and annual foundation dinner in New York City, which was attended by at least the following representatives from Defendants:

a.      **Apotex**: Jeff Watson, President, Global Generics; Tim Berry, National Account Manager; Sam Boulton, Director of National Accounts; Jeffrey Hampton, SVP & General Manager, U.S. & Latin America; Beth Hamilton, VP, Marketing & Portfolio Strategy (Sales & Marketing); James Van Lieshout, Senior Director, Commercial Operations;

b.      **Sandoz**: Peter Goldschmidt, President Sandoz US & Head NA; Armando Kellum, VP, Sales and Marketing; Kirko Kirkov, Executive Director, Key Customers; and

c.      **Teva**: Theresa Coward, Senior Director of Sales; David Rekenthaler, VP, Sales; Maureen Cavanaugh, SVP & COO, North America Generics.

160.    On February 19-21, 2014, GPhA held its Annual Meeting in Orlando, Florida that was attended by representatives from at least Defendants Apotex, Lupin, Sandoz, Teva, and Zydus, including at least the following key executives:

a.      **Apotex**: Jeff Watson, President, North America;

b.      **Sandoz**: Carlos Sattler, Vice President, Clinical Development & Medical Affairs; and

c.      **Teva**: Allan Oberman, President & CEO.

161.    ████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER



162.    On April 1, 2014, HDMA held its Sixth Annual CEO Roundtable Fundraiser in New York, HDMA's 2014 Sixth Annual CEO Roundtable Fundraiser was attended by at least the following representatives of Defendants, who were key executives for generic drug sales and pricing:

    a.    **Apotex:** Beth Hamilton, Director, National Sales; Jeffrey Hampton, SVP, Commercial Operations; James Van Lieshout, VP, Sales; Jeff Watson, President, U.S. & Canada Commercial;

    b.    **Sandoz:** Anju Hasija, Executive Director, Key Accounts; Armando Kellum, Vice President, Contracts, Pricing, and Business Analytics; Kirko Kirkov, Executive Director, Key Accounts; Scott Smith, Vice President, Commercial Operations; and

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

c.     **Teva:** Maureen Cavanaugh, SVP, Sales & Marketing; Christopher Doerr, Director, Trade Operations; Jeffrey Herzfeld, SVP, U.S. Trade Relations, Specialty Medicines; David Rekenthaler, Generic Sales.

163.   On April 26-29, 2014, NACDS held its 2014 annual meeting in Scottsdale, Arizona. NACDS's 2014 annual meeting was attended by at least the following representatives of Defendants, who were key executives for generic drug sales and pricing:

a.     **Apotex**: Jeff Watson, President, Global Generics; Sam Boulton, Director of National Accounts; Jeremy Desai, President & CEO; Jeffrey Hampton, Senior Vice President & General Manager, U.S. & Latin America; David Kohler, VP & General Manager; Corey Anquetil, Director, Strategic Sales NA; Buddy Bertucci, VP, Institutional Sales; Beth Hamilton, VP, Marketing & Portfolio Strategy (Sales & Marketing); James Van Lieshout, Sr. Director, Commercial Operations;

b.     **Glenmark:** Jim Brown, Vice President of Sales; James Grauso, EVP, N.A. Sales;

c.     **Lupin**: Dave Berthold, SVP, Generics; Robert Hoffman, EVP, U.S. Generics; Paul McGarty, President;

d.     **Sandoz**: Peter Goldschmidt, President Sandoz, US & Head, North America; Steven Greenstein, Director, Key Customers; Anuj Hasija, Executive Director Key Customers; Armondo Kellum, Vice President, Sales and Marketing; Kirko Kirkov, Executive Director, Key Customers; Scott Smith, VP Sales & Marketing;

e.     **Teva**: Theresa Coward, Sr. Director of Sales; David Rekenthaler, VP, Sales; Maureen Cavanaugh, SVP & COO N.A. Generics; and Allan Oberman, President & CEO Teva Americas Generics; and

     f.    **Zydus:** Michael Keenley, President; Joseph Renner, President & CEO; Kristy Ronco, VP, Sales; Scott Goldy, Director, National Account; Kevin Green, AVP, National Accounts.

164.    On May 12-15, 2014, MMCAP held its National Member Conference in Bloomington, Minnesota. At MMCAP's 2014 National Member Conference, topics included "RFPs under consideration for Pharmacy," "contract evaluation," and "pharmaceutical price increases."

165.    MMCAP's May 12-15, 2014 National Member Conference was attended by the following representatives from Defendants, who were key executives for generic drug sales and pricing:

     a.    **Apotex:** Bob Simmons, National Account Director; and

     b.    **Teva**: Nick Gerebi, National Account Manager.

166.    On June 1-4, 2014, the HDMA held a BLC at the JW Marriott Desert Ridge in Phoenix, Arizona. The June 1-4, 2014 BLC was attended by the following representatives from each of the Defendants, including at least the following key executives for generic drug sales and pricing:

     a.    **Apotex**: Jeffrey Hampton, VP, Commercial Operations; Beth Hamilton, National Sales Director; Tina Kaus, National Accounts Director; James Van Lieshout, VP, Sales; David Rekenthaler, National Accounts Director; Jane Williams, VP Specialty Generic Sales;

     b.    **Glenmark**: Christopher Bihari, Director National Accounts;

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

c. **Lupin**: Dave Berthold, VP, Sales, U.S. Generics; David Shirkey, National Accounts Director; Lauren Walten, National Account Manager; Kevin Walker, National Accounts Manager;

d. **Sandoz:** Lisa Badura, Director National Accounts – Sales; Anuj Hasija, Key Account Executive Director; Kirko Kirkov, Executive Director, Key Accounts; Ryan Alan, Associate Director, National Accounts; Sean Walsh, Key Account Manager;

e. **Teva**: Theresa Coward, Sr. Director, National Sales; Sal Cuomo, Trade Account Director; Christopher Doerr, Director, Trade Operations; Danial Driscoll, VP Institutional Sales & Marketing; Jeffrey Herzfeld, SVP; Jeff McClard, Senior Director, National Accounts; Jessica Peters, Director, National Accounts; Teri Sherman, National Accounts Director; and

f. **Zydus:** Scott Goldy, Director, National Accounts; Kevin Green, National Accounts Manager; Marc Kikuchi, Senior Vice President, Global Generics; Maria MvManus, Corporate Account Manager; Jodi Weber, Corporate Account Manager.

167.    On June 3-4, 2014, GPhA held a meeting in Bethesda, Maryland that was attended by representatives from all Defendants.

168.    On August 23-26, 2014, NACDS held its 2014 Total Store Expo at the Boston Convention Center in Boston, Massachusetts. NACDS's August 2014 Total Store Expo was attended by at least the following representatives from each of the Defendants, who were key executives for generic drug sales and pricing:

a. **Apotex**: Carlo Berardi, Sales; Tim Berry, National Account Manager; Gwen Copeland, National Accounts Manager; John Crawford, National Account Director; Sam Boulton, Director of National Accounts; Jeffrey Hampton, SVP & General Manager, U.S. & Latin America; David Kohler, VP & General Manager; Doug Kinna, Sales; Chirag Patel, Marketing Director, N.A.; Debbie Veira, National Account Manager; Beth Hamilton, VP, Marketing & Portfolio Strategy (Sales & Marketing); Tina Kaus, National Account Director; James Van Lieshout, Senior Director, Commercial Operations;

b. **Glenmark**: Jim Brown, VP, Sales; Jessica Cangemi, Director, Sales & Marketing; Jeff Johnson, Director, Sales & Marketing; David Irwin, Director, Sales; Robert Matsuk, President, N.A.; James Grauso, EVP, N.A. Commercial Operations; Matt Van Allen, Senior Drector, Commercial Operations;

c. **Lupin**:  Alicia Evolga, Director of Marketing; Robert Hoffman, EVP, U.S. Generics; Paul McGarty, President; Lauren Walten, National Account Manager;

d. **Sandoz**: Lisa Badura, Director, Key Customers; Christopher Bihari, Director, Key Customers; Steven Greenstein, Director, Key Customers; Anuj Hasija, Executive Director Key Customers; Armondo Kellum, Vice President, Sales and Marketing; Della Lubke, National Account Executive; Scott Smith, VP Sales & Marketing; Arunesh Verma, Executive Director Marketing; Sean Walsh, Director, Key Customers;

e. **Teva**: David Rekenthaler, VP, Sales; Maureen Cavanaugh, SVP & COO N.A. Generics; Kevin Galowina, Head of Marketing Operations; Jessica Peters, Manager of Corporate Accounts; Nisha Patel, Director of National Accounts;

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

Jocelyn Baker, Director, National Accounts; Jennifer Chang, Director, Marketing; Teri Coward, Senior Director Sales & Trade Relationsl; Dan Driscoll, VP Institutional Sales & Marketing; Cassie Dunrud, Associate Director, National Accounts; Kayla Kelnhofer, National Account Executive; Tim McFadden, VP, Marketing; and

f.    **Zydus:** Scott Goldy, Director, National Accounts; Kevin Green, Associate Vice President, National Accounts; Michael Keenley, President; Ganesh Nayak, Chief Operating Officer & Executive Director; Elizabeth Purcell, Sr. Director, Marketing and Portfolio Management; Joseph Renner, President and Chief Executive Officer; Kristy Ronco, Vice President, Sales; Maria Bianco-Falcone, Senior Director Contracting.

169.    On September 27-October 1, 2014, HDMA held its 2014 Annual Board and Membership Meeting ("ABMM") at the Montage in Laguna Beach, California. HDMA's 2014 ABMM was attended by at least the following representatives from Defendants, who were key executives for generic drug sales and pricing:

c.    **Apotex:** Beth Hamilton, Director, National Sales; Jeffrey Hampton, VP, Commercial Operations; James Van Lieshout, VP, Sales-Retail Division; and

d.    **Teva:** Maureen Cavanaugh, COO, Teva US Generics; Christopher Doerr, Director, Trade Operations; David Rekenthaler, Vice President Sales, U.S. Generics.

170.    On October 27-29, 2014, GPhA held a meeting in Bethesda, Maryland that was attended by representatives from each of the Defendants.

65

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

171.    On December 3, 2014, NACDS held its 2014 NYC Week and annual foundation dinner in New York City, which was attended by at least the following representatives from Defendants, who were key executives for generic drug sales and pricing:

a.    **Apotex:** James Van Lieshout, VP Sales and Senior Director, Commercial Operations;

b.    **Sandoz:** Armando Kellum, VP, Sales & Marketing; Scott Smith, VP, Sales & Marketing; and

c.    **Teva**: Theresa Coward, Senior Director of Sales; David Rekenthaler, Vice President, Sales; Maureen Cavanaugh, Senior Vice President and Chief Operating Officer N.A. Generics; and Jessica Peters, Director National Accounts.

172.    In 2015, and 2016, Defendants continued to regularly attend trade-association meetings, conferences and events, including: (i) the February 9-11, 2015 GPhA Annual Meeting in Miami, Florida; (ii) ████████████████████████████████████████

████████████████████████████████████████████████████████████████

(iii) the April 14, 2015 HDMA Seventh Annual CEO Roundtable Fundraiser in New York City; (iv) the April 25-28, 2015 NACDS Annual Meeting in Palm Beach, Florida; (v) the June 7-10, 2015 HDMA BLC in San Antonio, Texas; (vi) the June 9-10, 2015 GPhA meeting in Bethesda, Maryland; (vii) the August 22-25, 2015 NACDS Total Store Expo in Denver, Colorado; (viii) the November 2-4, 2015 GPhA meeting in Bethesda, Maryland; (ix) the December 3, 2015 NACDS 2015 Week in NYC Foundation Reception Dinner; (x) the April 10-14, 2016 MMCAP meeting in Minneapolis, Minnesota; (xi) the April 12, 2016 HDMA Eighth Annual CEO Roundtable Fundraiser in New York City; (xii) the April 16-19, 2016 NACDS 2016 Annual Meeting in Palm Beach, Florida; (xiii) the June 12-16, 2016 HDMA BLC in Colorado Springs, Colorado; (xiv)

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

the August 6-9, 2016, NACDS 2016 Total Store Expo in Boston, Massachusetts; and (xv) the December 1, 2016 NACDS 2016 Week in NYC Foundation Reception Dinner.

173.   As uncovered in the State AGs' ongoing investigation, at these various conferences and trade shows, representatives from Defendants, as well as other generic drug manufacturers, discussed their respective businesses and customers.   These discussions would occur at social events, including lunches, cocktail parties, dinners, and golf outings, that usually accompanied these conferences and trade shows.   Defendants' employees used these opportunities to discuss and share upcoming bids, specific generic drug markets, pricing strategies, and pricing terms in their contracts with customers.[64]

174.   In conjunction with meetings at conferences and trade shows, representatives of generic drug manufacturers get together separately, in more limited groups, allowing them to further meet face-to-face with their competitors and discuss their business.   In fact, high-level executives of many generic drug manufacturers get together periodically for what at least some of them refer to as "industry dinners."[65]

175.   A large number of generic drug manufacturers, including Defendants Glenmark, Sandoz, and Teva, are headquartered in close proximity to one another in New Jersey, and eastern Pennsylvania, giving them easier and more frequent opportunities to meet and collude. For example, in January 2014, at a time when the prices of a number of generic drugs were reportedly soaring, at least thirteen high-ranking male executives, including CEOs, Presidents, and Senior Vice Presidents of various generic drug manufacturers, met at a steakhouse in Bridgewater, New Jersey.

---

[64] *See, e.g.*, State AG Complaint ¶¶ 50-52.

[65] *Id.* ¶¶ 53-60.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

176.    Generic drug manufacturer employees also get together regularly for what is referred to as a "Girls' Night Out" ("GNO"), or alternatively "Women in the Industry" meetings and dinners.  During these GNOs, meetings, and dinners, these employees meet with their competitors and discuss competitively sensitive information.  Several different GNOs were held in 2015, including: (1) in Baltimore, Maryland in May, and (2) at the NACDS conference in August.

177.    Through these various interactions, Defendants' employees are often acutely aware of their competition and, more importantly, each other's current and future business plans. This familiarity and opportunity often leads to agreements among competitors to fix prices or to allocate a given market so as to avoid competing with one another on price.

178.    Defendants also routinely communicate and share information with each other about bids and pricing strategy.  This can include forwarding bid packages received from a customer (*e.g.*, a Request for Proposal or "RFP") to a competitor, either on their own initiative, at the request of a competitor, or by contacting a competitor to request that the competitor share that type of information.

179.    Additionally, Defendants share information regarding the terms of their contracts with customers, including various terms relating to pricing, price protection, and rebates. Defendants use this information from their competitors to negotiate potentially better prices or terms with their customers, which could be to the ultimate detriment of consumers.

**I.    Defendants' Concerted Efforts to Increase Prices for Generic Pravastatin Yielded Supracompetitive Profits**

180.    Defendants' agreement to allocate customers, rig bids, and fix the price of Pravastatin resulted in increased revenues and higher profits.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

181.    Defendants' combined total Pravastatin sales revenues increased by nearly ▇▇▇▇ between 2013 and 2015. In 2012, before the conspiracy began, the combined annual sales of Pravastatin in the United States for Defendants Apotex, Glenmark, Lupin, Teva and Zydus was approximately ▇▇▇▇▇▇ before skyrocketing to nearly ▇▇▇▇▇▇ in 2013 and more than ▇▇▇▇▇▇ in 2014.

182.    Teva, Glenmark, Sandoz, Lupin, and Zydus all reported rising revenues in the United States during the Class Period.

183.    **Apotex:** Apotex is privately held and thus does not generally provide public communications to investors.

184.    **Glenmark:** In Glenmark's FY 2013-14 Annual Report, it reported: "another year of strong growth fueled by good performances across our markets like the US[.]"

185.    **Teva:** During a May 2, 2013 earnings call, just as the Pravastatin price hikes were being implemented, the President and CEO of Teva Americas Generics Allan Oberman stated: "We have continued to aggressively take pricing looking to lead the industry forward on products that are low margin products to try and return a decent value to our company, to our shareholders."

186.    Later that year, during an August 1, 2013 earnings call, after the Pravastatin price hikes had been effectuated, Oberman noted the company was not seeking to obtain market share, as any rational competitor would do in the face of competitor price increases:

> Then I will just marry that with the comments that we have made about our generic strategy earlier in the year that we are focused on creating shareholder value and not necessarily driving after volume share. I mentioned in the past, we have taken price increases in order to enhance value.

187.    Early the following year, during a February 6, 2014 earnings call, Teva's President and CEO Eyal Desheh stated that Teva's "U.S. generic business is definitely the most

69

profitable part with gross margin of about 50%." Mr. Desheh went on to comment that the "U.S. generic business is highly profitable" and Mr. Oberman added that "at the gross profit levels that Eyal was talking about, [the U.S. generics business] is a very valuable business to Teva and we see it continuing to be on a go-forward basis."

188.    On a May 1, 2014 earnings call, Teva also reported it enjoyed 17% growth in the U.S. generic market compared to the first quarter of 2013 and that its profitability was driven by its global generics business, with 31% improvement resulting from the strong performance in the U.S. market, resulting in its generics business contributing 30% to its total profit.

189.    During a July 31, 2014 earnings call, Teva's President and CEO of the Global Generic Medicines Group Sigurdur Olafsson stated, in response to a question from an analyst concerning the sustainability of pricing in the United States:

> Pricing is very important today. Maybe five, six, seven years ago there was never a pricing crisis, especially in the U.S. in the industry, and I think the company due to the consolidation and due to the environment, company take pricing actions whenever they can.
>
> The same applies a little bit outside now. We have taken the decision that in some of our markets we look at the portfolio and we take a pricing decision and see if we stay for this molecule or not. So I think the size of Teva helps us in this. This is very important part of the commercial execution going forward to keep this in mind. There has to be a balance in the whole thing, but [by] being the largest company, being probably [indiscernible] of the overall generic business, this is a very important tool today to maximize the value of the business. . . . [C]learly it's important and Teva is probably in back to position than any other company to explore this possibility.

190.    On October 29, 2015, Mr. Olafsson stated during an earnings call that the "pricing environment has been quite favorable for generics versus six years ago."

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

191.    **Lupin**: On October 27, 2015, Lupin's Group President and CEO Vinita Gupta, during an earnings call, in response to a question regarding whether the industry would become more competitive, noted his expectation that his competitors would be "rational[]" with respect to pricing generic products:

> My sense that most of our competitors have similar challenges that they have that they have had a lot of competitive pressures, they have had a lot of margin pressures coming out of consolidation and because of the fact that companies have been lacking meaningful product approvals, I think the majority of the industry is looking forward to more approvals when I look at some of our peers in the industry, all of them talk about similar challenges. So one would think that our competitors or peers would be rationale and be strategic in the way they price products.

192.    Lupin reported rising revenues in its United States generics business during the Class Period.

193.    **Sandoz:** On January 29, 2014, the Division Head of Sandoz Jeffrey George stated:

> So I think overall what I would say is that we've been quite pleased with the acquisition of Fougera. It is a business that has performed very well for us, with strong double-digit growth and very good margins given the limited competition nature of a lot of these markets.

194.    On April 23, 2015, Novartis CEO Joe Jiminez stated that Sandoz had "strong financial results" and "the U.S. was up 13% . . . driven by . . . our Fougera dermatology business."

195.    On July 21, 2015, Jiminez, stated: "Sandoz delivered very strong financial results with sales and profit up double-digit; as you can see this is driven by the division increased focus on core markets particularly the U.S., which is up 23%."

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

196.    **Zydus:** During an October 31, 2013 earnings call, Cadila (Zydus's parent company) Executive Director Ganesh Nayak stated during an earning call: "This quarter, the major growth has come from price improvement and not actually from new product."

197.    During the same call, Cadila's Chairman and Managing Director Pankaj Patel noted that pricing pressure had eased since the second quarter of 2013 as opportunities for price increases presented themselves and the industry had gained some "revised wisdom":

> Up to last quarter, we were [seeing] pricing pressure, but now we see that, on selective products we are able to actually up the price. So it is the kind of a mixed scenario at this moment. We are seeing some visibility where pricing are firming up given the kind of challenges companies are facing, many players are going out of the market, and as a result there are opportunities to basically products with low margins to increase prices. So at least in 3 or 4 products, we have seen price being better and increases are ranging between 10-15% and we also see that the trend is likely to continue given the revised wisdom the industry is getting.

**J.      Factors Increasing the Market's Susceptibility to Collusion**

198.    Publicly available data on the generic Pravastatin market in the United States demonstrate that it is susceptible to collusion by Defendants. Factors that make a market susceptible to collusion include: (1) a high degree of industry concentration; (2) significant barriers to entry; (3) inelastic demand; (4) the lack of available substitutes for the goods involved; (5) a standardized product with a high degree of interchangeability between the products of cartel participants; and (6) inter-competitor contacts and communication.

**1.      Industry Concentration**

199.    A high degree of concentration facilitates the operation of a cartel because it makes it easier to coordinate behavior among co-conspirators.

200.    In the United States Pravastatin market, at the time of the conspiracy, the Defendants named here accounted for about ████ of the Pravastatin market. This remained true throughout the Class Period.

201.    While the market for Pravastatin is sufficiently concentrated to facilitate collusion, the years of low and stable pricing in the market establish that the number of manufacturers in the market was sufficient to drive competition. Absent collusion, prices would have remained at competitive levels.

202.    No market exit by a Pravastatin manufacturer can explain the price increases either.

203.    Defendants have been able to maintain supracompetitive prices for Pravastatin without significant loss of market share to non-conspirators. Thus, Defendants have oligopolistic market power in the market for Pravastatin.

204.    The magnitude of Defendants' price increases for Pravastatin distinguishes them from non-collusive oligopolistic pricing. Non-collusive oligopolistic pricing would be expected to proceed incrementally, as manufacturers test the waters to see if competitors will follow a price increase. But here the increases are extreme – jumping as much as 300-600% in one fell swoop. Such extreme pricing moves are not rational in the absence of advance knowledge that competitors will join the increase.

### 2.    Barriers to Entry

205.    Supracompetitive pricing in a market normally attracts additional competitors who want to avail themselves of the high levels of profitability that are available. However, the presence of significant barriers to entry makes this more difficult and helps to facilitate the operation of a cartel.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

206.    There are significant capital, regulatory, and intellectual property barriers to entry in the generic Pravastatin markets that make such entry time-consuming and expensive.

207.    Start-up costs and regulatory oversight represent substantial barriers to entry in the generic Pravastatin markets.

208.    In addition to the significant out-of-pocket costs required to bring a drug to market, the approval process for generic drugs takes significant time. As Kansas Senator Jerry Moran commented on September 21, 2016 during Congressional hearings on the FDA's role in the generic drug market, "there are more than 4,000 generic drug applications currently awaiting approval, and the median time it takes for the FDA to approve a generic is now 47 months or nearly four years."[66] This significant delay for new market entrants effectively precludes new competition from eroding the supracompetitive prices imposed by the conspiracy.

### 3.    Demand Inelasticity

209.    Price elasticity of demand is defined as the measure of responsiveness in the quantity demanded for a product as a result of change in price of the same product. It is a measure of how demand for a product reacts to a change in price. The basic necessities of life— food, water, and shelter—are examples of goods that experience nearly perfectly inelastic demand at or near the minimums necessary to sustain life. In other words, a person on the verge of dying of thirst will pay almost anything for water.

210.    In order for a cartel to profit from raising prices above competitive levels, demand for the product must be sufficiently inelastic such that any loss in sales will be more than offset by increases in revenue on those sales that are made. Otherwise, increased prices would result in

---

[66] Senator Moran, Statement (Sep. 21, 2016), *available at* http://www.appropriations.senate.gov/imo/media/doc/092116-Chairman-Moran-Opening-Statement.pdf.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

declining sales, revenues, and profits as customers purchased substitute products or declined to buy altogether. Inelastic demand is a market characteristic that facilitates collusion, allowing producers to raise their prices without triggering customer substitution and lost sales revenue.

211.    Demand for generic Pravastatin is highly inelastic. Pravastatin is used to treat high cholesterol, and it is critical to the health of patients with cholesterol issues; it is considered a medical necessity that must be purchased at whatever cost the Defendants offer them for sale.

212.    Thus, generic Pravastatin is an excellent candidate for cartelization because price increases will result in more revenue, rather than less, provided that most or all manufacturers participate.

### 4.    Lack of Substitutes

213.    Pravastatin has no viable substitutes. Other statins are not reasonable substitutes because they have different chemistry, pharmacokinetics, potency, and approved indications as compared to Pravastatin. As a result, other statins, such as atorvastatin (Lipitor), rosuvastatin (Crestor), and simvastatin (Zocor), are not therapeutically equivalent to Pravastatin. This lack of viable substitutes for Pravastatin is evidenced by data showing that during the Class Period, patients (and their prescribing physicians) did not switch from Pravastatin to another statin despite significant price increases.

214.    Branded Pravastatin does not serve as an economic substitute for generic Pravastatin either. This is because branded products generally maintain substantial price premiums over their generic counterparts, making them inapt substitutes even when generic prices soar.

215.    For example, other lipid control drugs do not constrain the prices of Pravastatin. Indeed, even compounds within the same drug class (statins) have no apparent effects on

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

Pravasttin Prices. A study by Dr. David Belk found that while Pravastatin's prices rose on average *four-fold* across all strengths to $0.60 per tablet, the prices of other statins—including Lipitor (atorvastatin), which only went generic in late 2011—remained around $0.15 per tablet:[67]



216.    As the chart above demonstrates, no other statin's prices moved similarly to Pravastatin's prices. Further, the relatively low prices of these other statins had no apparent effect on Pravastatin prices, which remained at or above $0.45 per tablet or *three times* the prices for atorvastatin, simvastatin, and lovastatin. These price trends confirm that other statins do not serve as competitive restraints on Defendants' pricing of Pravastatin.

217.    Thus, purchasers of generic Pravastatin were held captive to the supracompetitive prices that resulted from Defendants' conspiracy to fix prices, rig bids, and allocate markets and customers.

---

[67] David Belk, M.D., *Generic Medication Prices*, *available at* http://truecostofhealthcare.net/wp-content/uploads/2015/01/Generic-Medication-Prices.pdf.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

### 5.    Standardized Product with High Degree of Interchangeability

218.    A commodity-like product is one that is standardized across suppliers and allows for a high degree of substitutability among different suppliers in the market. When products offered by different suppliers are viewed as interchangeable by purchasers, it is easier for the suppliers to agree on prices for the goods in question and to monitor those prices effectively.

219.    Generic drugs of the same chemical composition are effectively commodity products because the primary mechanism through which they compete is price. When approving an ANDA, the FDA confirms that a generic drug product is bioequivalent to the branded version of the drug. This allows pharmacists to substitute that generic for the branded counterpart, as well as for any other generic that also is bioequivalent to the branded product.

220.    Defendants' generic Pravastatin products are bioequivalent across manufacturers and bioequivalent to the branded counterpart, which enables pharmacists to substitute them (any of them) widely.

221.    Moreover, because generic Pravastatin products are interchangeable, there is little utility in attempting to distinguish the products based on quality, branding or service. Accordingly, manufacturers generally spend little effort advertising or detailing (the practice of providing promotional materials and free samples to physicians) their generic compounds. The primary means for one generic manufacturer to differentiate its product from another's is through price competition.[68] The need to compete on price can drive producers of commodity products to conspire—as they did here—to fix prices.

---

[68] *See, e.g.,* GAO Report 23 ("If another manufacturer offers a lower price to a customer, manufacturers we interviewed indicated that they are usually asked to match it or risk losing market share to the other manufacturer.").

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

### 6.  Inter-Competitor Contacts and Communications

222.  As discussed above, Defendants' representatives met at conferences convened by customers and trade associations of customers (such as the ECRM and NACDS), private industry dinners, and similar events. Moreover, Defendants are members of and/or participants of the GPhA; thus, their representatives have many opportunities to meet and conspire at industry meetings. As noted in press reports, "prosecutors are taking a close look at trade associations as part of their investigation as having been one potential avenue for facilitating the collusion between salespeople at different generic producers."[69]

223.  The State AG Complaint alleges that Defendants routinely coordinated their schemes through direct interaction with their competitors at industry trade shows, customer conferences, and other events. For example, Defendants Glazer and Malek admitted at their guilty plea hearings to engaging in discussions and attending meetings with competitors, during which they reached agreements to allocate customers, rig bids, and fix prices of doxycycline hyclate and glyburide.

224.  DOJ's and the Connecticut AG's investigations, and the grand jury subpoenas and investigative demands that have issued in conjunction with them, focus on inter-competitor communications. These types of communications are not unique or isolated, but are rampant; "[g]eneric drug manufacturers operate, through their respective senior leadership and marketing and sales executives, in a manner that fosters and promotes routine and direct interaction among their competitors."[70] The sheer number of companies implicated in the investigations highlights the prevalence in the generic drug industry of the types of contacts and communications that facilitate collusion:

---

[69] PaRR Report.

[70] State AG Complaint ¶ 7.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

(a)     **Actavis**: In February 2016, Actavis's former corporate parent, Allergan plc, disclosed that it received a DOJ subpoena "seeking information relating to the marketing and pricing of certain of the Company's generic products and communications with competitors about such products."[71]

(b)     **Aurobindo**: Aurobindo has disclosed receipt of a subpoena relating to DOJ's generic drug investigation.[72] The company stated that it "received a subpoena in Mar[ch] 2016 requesting non-product specific information."[73]

(c)     **Citron**: In December 2016, Aceto Corporation (which purchased Citron's generic drugs assets) disclosed that DOJ "executed a search warrant against the Company and also served a subpoena requesting documents and other information concerning potential antitrust violations in the sale of Glyburide, Glyburide/Metformin, and Fosinopril HCTZ products." The Connecticut AG requested that Citron produce all documents produced to DOJ.[74]

(d)     **Dr. Reddy's**: In November 2016, Dr. Reddy's disclosed that it received subpoenas from DOJ and the Connecticut AG "seeking information relating to the marketing,

---

[71] Allergan, SEC 2015 Form 10-K (Feb. 26, 2016), at F-106, *available at* https://www.sec.gov/Archives/edgar/data/1578845/000156459016013478/agn-10k_20151231.htm.

[72] Zeba Siddiqui, *India's Aurobindo shares hit nine-month low on US price-fixing lawsuit,* Reuters (Dec 16, 2016), *available at* http://www.reuters.com/article/us-aurobindo-pharm-stocks-idUSKBN1450DV.

[73] Aurobindo Pharma, Ltd., BSE Disclosure (Dec. 16, 2016), *available at* http://www.bseindia.com/xml-data/corpfiling/AttachHis/3C8E03C7_A46F_4792_AED5_197E6961A77E_125855.pdf.

[74] Aceto Corp., SEC Form 8-K, Ex. 99.5, *available at* https://www.sec.gov/Archives/edgar/data/2034/000157104916020771/t1600804_ex99-5.htm.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

pricing and sale of certain . . . generic products and any communications with competitors about such products."[75]

(e)     **Heritage**:  As a private company, Heritage is not required to make public disclosures. Nonetheless, in the wake of the criminal guilty pleas by two of its executives, Heritage confirmed that it is "fully cooperating" with DOJ,[76] and press reports indicate that Heritage has applied to DOJ's leniency program seeking amnesty for a cartel violation.[77]

(f)     **Impax**:  In July 2014, Impax disclosed that it received a subpoena from the Connecticut AG concerning sales of generic digoxin.[78]  In November 2014, Impax disclosed that an employee received a broader federal grand jury subpoena that requested testimony and documents about "any communication or correspondence with any competitor (or an employee of any competitor) in the sale of generic prescription medications."[79] In February 2016, Impax disclosed that it received a DOJ subpoena requesting "information and documents regarding the sales, marketing, and pricing of certain generic prescription medications. In particular…digoxin tablets, terbutaline sulfate tablets, prilocaine/lidocaine cream, and calcipotriene topical solution."[80]

[75] Dr. Reddy's, SEC Form 6-K (Nov. 10, 2016), *available at* http://www.drreddys.com/investors/reports-and-filings/sec-filings/?year=FY17.

[76] Tom Schoenberg , David McLaughlin & Sophia Pearson, *U.S. Generic Drug Probe Seen Expanding After Guilty Pleas,* Bloomberg (Dec. 14, 2016), *available at* https://www.bloomberg.com/news/articles/2016-12-14/u-s-files-first-charges-in-generic-drug-price-fixing-probe.

[77] *See supra*, ¶ 27.

[78] Impax SEC Form 8-K (July 15, 2014), *available at* https://www.sec.gov/Archives/edgar/data/1003642/000143774914012809/ipxl20140715_8k.htm.

[79] Impax SEC Form 8-K (Nov. 6, 2014), *available at* https://www.sec.gov/Archives/edgar/data/1003642/000119312514402210/d816555d8k.htm.

[80] Impax, SEC 2015 Form 10-K (Feb. 22, 2016), at F-53, *available at* https://www.sec.gov/Archives/edgar/data/1003642/000143774916025780/ipxl20151231_10k.htm.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

(g)    **Lannett**: In July 2014, Lannett disclosed that it received a subpoena from the Connecticut AG relating to its investigation into the price-fixing of digoxin.[81] On November 3, 2014, Lannett disclosed that a Senior Vice President of Sales and Marketing was served with a grand jury subpoena "relating to a federal investigation of the generic pharmaceutical industry into possible violations of the Sherman Act." The subpoena also requested "corporate documents of the Company relating to communications or correspondence with competitors regarding the sale of generic prescription medications, but is not specifically directed to any particular product and is not limited to any particular time period."[82]   On August 27, 2015, Lannett further explained that DOJ sought, among other things, "communications or correspondence with competitors regarding the sale of generic prescription medications, and the marketing, sale, or pricing of certain products, generally for the period of 2005 through the dates of the subpoenas."[83]

(h)    **Mayne**:  On August 25, 2016, Mayne Pharma Group Limited (the parent of Mayne) disclosed that it was "one of numerous generic pharmaceutical companies to receive a subpoena…seeking information relating to marketing, pricing and sales of select generic products" and that it had received a subpoena from the Connecticut AG seeking similar information.[84]   On November 4, 2016, Mayne Pharma Group Limited issued a press release stating: "Previously on 28 Jun[e] 2016, Mayne Pharma Group Limited disclosed that it was one

---

[81] Lannett press release (July 16, 2014), *available at* http://lannett.investorroom.com/2014-07-16-Lannett-Receives-Inquiry-From-Connecticut-Attorney-General.

[82] Lannett, SEC Form 10-Q (Nov. 6, 2014) at 16, *available at* https://www.sec.gov/Archives/edgar/data/57725/000110465914077456/a14-20842_110q.htm.

[83] Lannett, SEC Form 10-K (Aug. 27, 2015) at 18, available at http://www.sec.gov/Archives/edgar/data/57725/000110465915062047/a15-13005_110k.htm.

[84] Mayne Pharma, 2016 Annual Report (Aug. 25, 2016), at 75, *available at* https://www.maynepharma.com/media/1788/2016-mayne-pharma-annual-report.pdf.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

of several generic companies to receive a subpoena from the Antitrust Division of the US Department of Justice (DOJ) seeking information relating to the marketing, pricing and sales of select generic products. The investigation relating to Mayne Pharma is focused on doxycycline hyclate delayed-release tablets (generic) and potassium chloride powders."[85]

      (i)    **Mylan**:  In February 2016, Mylan disclosed that it received a DOJ subpoena "seeking information relating to…generic Doxycycline" and a similar subpoena from the Connecticut AG seeking "information relating to…certain of the Company's generic products (including Doxycycline) and communications with competitors about such products."[86] On Nov. 9, 2016, Mylan disclosed that "certain employees and a member of senior management, received subpoenas from DOJ seeking additional information relating to the marketing, pricing and sale of our generic Cidofovir, Glipizide-metformin, Propranolol and Verapamil products" and that "[r]elated search warrants also were executed" in connection with DOJ's investigation.[87]

      (j)    **Par**:  In March 2015, Par disclosed that it received subpoenas from the Connecticut AG and DOJ relating to digoxin and doxycycline.[88]   In November 2015, Endo International plc, the parent company of Par, elaborated: "In December 2014, our subsidiary, Par, received a Subpoena to Testify Before Grand Jury from the Antitrust Division of DOJ and issued by the U.S. District Court for the Eastern District of Pennsylvania. The subpoena requests

---

[85] Mayne Pharma, Update on DOJ Investigation (Nov. 4, 2016), *available at* http://asxcomnewspdfs.fairfaxmedia.com.au/2016/11/04/01798874-137879061.pdf.

[86] Mylan, SEC 2015 Form 10-K (Feb. 16, 2016), at 160, *available at* https://www.sec.gov/Archives/edgar/data/1623613/000162361316000046/myl10k_20151231xdoc.htm.

[87] Mylan SEC Form 10-Q, at 58 (Nov. 9, 2016), *available at* https://www.sec.gov/Archives/edgar/data/1623613/000162361316000071/myl10q_20160930xdoc.htm.

[88] Par Pharmaceuticals Companies, Inc., SEC 2014 Form 10-K (Mar. 12, 2015) at 37, *available at* https://www.sec.gov/Archives/edgar/data/878088/000087808815000002/prx-20141231x10k.htm.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

documents and information focused primarily on product and pricing information relating to Par's authorized generic version of Lanoxin (digoxin) oral tablets and Par's generic doxycycline products, and on communications with competitors and others regarding those products. Par is currently cooperating fully with the investigation."[89] Endo also disclosed that in December 2015 it "received Interrogatories and Subpoena Duces Tecum from the State of Connecticut Office of Attorney General requesting information regarding pricing of certain of its generic products, including Doxycycline Hyclate, Amitriptyline Hydrochloride, Doxazosin Mesylate, Methotrexate Sodium and Oxybutynin Chloride."[90]

> (k) **Perrigo**: On May 2, 2017, Perrigo disclosed that "search warrants were executed at the Company's corporate offices associated with an ongoing investigation by the U.S. Department of Justice Antitrust Division related to drug pricing in the pharmaceutical industry."[91]

> (l) **Pfizer:** On August 10, 2017, Pfizer disclosed: "As of July 2017, the U.S. Department of Justice's Antitrust Division is investigating our Greenstone generics business. We believe this is related to an ongoing antitrust investigation of the generic pharmaceutical industry. The government has been obtaining information from Greenstone."[92]

> (m) **Sandoz**: In March 2016, Sandoz and Fougera Pharmaceuticals Inc. (a wholly-owned subsidiary of Sandoz) "received a subpoena from the Antitrust Division of the US

---

[89] Endo International plc, SEC Form 10-Q (March 31, 2016) at 30, *available at* https://www.sec.gov/Archives/edgar/data/1593034/000159303416000056/endp-3312016x10q.htm.

[90] *Id.* at 31.

[91] Perrigo Press Release (May 2, 2017), *available at* http://perrigo.investorroom.com/2017-05-02-Perrigo-Discloses-Investigation.

[92] Pfizer, SEC Form 10-Q (Aug. 10, 2017) at 37, *available at* https://investors.pfizer.com/financials/sec-filings/sec-filings-details/default.aspx?FilingId=12225193.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

Department of Justice (DoJ) requesting documents related to the marketing and pricing of generic pharmaceutical products…and related communications with competitors."[93]

(n)  **Sun**:  On May 27, 2016, Sun Pharmaceutical Industries, Ltd. (the parent of Sun) stated in a filing with the National Stock Exchange of India that one of its U.S subsidiaries, namely Sun, "received a grand jury subpoena from the United States Department of Justice, Antitrust Division seeking documents…relating to corporate and employee records, generic pharmaceutical products and pricing, communications with competitors and others regarding the sale of generic pharmaceutical products, and certain other related matters."[94]

(o)  **Taro**:  In September 2016, Taro disclosed that the Company "and two senior officers" received DOJ subpoenas seeking documents relating to "generic pharmaceutical products and pricing, communications with competitors and others regarding the sale of generic pharmaceutical products, and certain other related matters."[95]

(p)  **Teva**:  In August 2016, Teva disclosed that it received subpoenas from DOJ and the Connecticut AG seeking documents and other information "relating to the marketing and pricing of certain of Teva USA's generic products and communications with competitors about such products."[96]

---

[93] Novartis 2016 Financial Report at 217, *available at* https://www.novartis.com/sites/www.novartis.com/files/ar-2016-financial-report-en.pdf.

[94] Sun Pharmaceuticals Indus., Ltd., BSE Disclosure (May 27, 2016), *available at* http://www.bseindia.com/xml-data/corpfiling/AttachHis/8E568708_8D00_472E_B052_666C76A4263D_081648.pdf.

[95] Taro, SEC Form 6-K (Sept. 9, 2016), *available at* https://www.sec.gov/Archives/edgar/data/906338/000115752316006685/a51417528.htm.

[96] Teva, SEC Form 6-K at 25 (Aug. 4, 2016), *available at* https://www.sec.gov/Archives/edgar/data/818686/000119312516671785/d187194d6k.htm.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

(q)    **Zydus**:  Press reports have stated the Zydus is a target of DOJ's generic drugs price-fixing investigation.[97]

## X.    THE STATUTES OF LIMITATIONS DO NOT BAR PLAINTIFFS' CLAIMS

### A.    The Statutes of Limitations Did Not Begin to Run Because Plaintiffs Did Not and Could Not Discover Defendants' Unlawful Conspiracy

225.    Plaintiffs had no knowledge of the combination or conspiracy alleged herein, or of facts sufficient to place them on inquiry notice of the claims set forth herein, until (at the earliest) Defendants' disclosures of the existence of the government investigations and subpoenas. Prior to that time, no information in the public domain or available to Plaintiffs suggested that any Defendant was involved in a criminal conspiracy to fix prices for generic Pravastatin.

226.    No information evidencing antitrust violations was available in the public domain prior to the public announcements of the government investigations that revealed sufficient information to suggest that any of the Defendants was involved in a criminal conspiracy to fix prices for generic Pravastatin.

227.    Plaintiffs are purchasers who indirectly purchased generic Pravastatin manufactured by one or more Defendants. They had no direct contact or interaction with any of the Defendants in this case and had no means from which they could have discovered Defendants' conspiracy.

228.    Defendants repeatedly and expressly stated throughout the Class Period, including on their public Internet websites, that they maintained antitrust/fair competition policies which prohibited the type of collusion alleged in this Complaint. For example:

---

[97] *See* Rupali Mukherjeel, *US polls, pricing pressure may hit Indian pharma cos*, The Times of India (Nov. 8, 2016), *available at* http://timesofindia.indiatimes.com/business/india-business/US-polls-pricing-pressure-may-hit-Indian- pharma-cos/articleshow/55301060.cms.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

(a)     Apotex's Code of Conduct and Business Ethics provides: "Apotex supports lawful and ethical competition and complies with antitrust or competition laws which are in place to preserve and foster fair and honest competition in the marketplace."  The policy directs employees: "Do not communicate with competitors about competitive business matters such as prices, costs, discounts, customer suppliers, marketing plans, production capacities or any terms of conditions of sale that could create the appearance of improper agreements or understandings. Do not make agreements or reach understandings with competitors regarding allocation of customers, territories or market share. Do not conspire with other bidders when competing for contracts."[98]

(b)     Teva's Code of Conduct provides: "We believe that customers and society as a whole benefit from fair, free and open markets. Therefore, we compete on the merits of our products and services and conduct business with integrity. We recognize that the potential harm to Teva's reputation and the penalties for breaching competition laws are severe, and can subject Teva, members of the Board of Directors and employees to severe civil fines and criminal penalties."[99]

229.    It was reasonable for members of the Classes to believe that Defendants were complying with their own antitrust policies.

230.    For these reasons, the statutes of limitations as to Plaintiffs' claims under the federal and state common laws identified herein did not begin to run, and have been tolled with respect to the claims that Plaintiffs have alleged in this Complaint.

**B.    Fraudulent Concealment Tolled the Statutes of Limitations**

231.    In the alternative, application of the doctrine of fraudulent concealment tolled the statutes of limitations on the claims asserted by Plaintiffs. Plaintiffs had no knowledge of the combination or conspiracy alleged in this Complaint, or of facts sufficient to place them on inquiry notice of their claims, until Defendants disclosed the existence of government

---

[98] Apotex Code of Conduct and Business Ethics, *available at* https://www.apotex.com/global/ethics/Apotex_Code_of_Conduct_EN.pdf.
[99] Teva Code of Conduct, *available at* http://www.tevapharm.com/files/about/corporate_governance/code_of_conduct/TEVA_CodeOf Conduct_FINAL_111715%5B2%5D.pdf.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

investigations and subpoenas. Prior to that time, no information in the public domain or available to Plaintiffs suggested that any Defendant was involved in a criminal conspiracy to fix prices for generic Pravastatin.

232.    No information evidencing antitrust violations was available in the public domain prior to the public announcements of the government investigations that revealed sufficient information to suggest that any of the Defendants was involved in a criminal conspiracy to fix prices for generic Pravastatin.

233.    As described in more detail below, Defendants actively concealed, suppressed, and omitted to disclose material facts to Plaintiffs and members of the Classes concerning Defendants' unlawful activities to artificially inflate prices for generic Pravastatin. The concealed, suppressed, and omitted facts would have been important to Plaintiffs and members of the Classes as they related to the cost of generic Pravastatin they purchased. Defendants misrepresented the real cause of price increases and/or the absence of price reductions in generic Pravastatin. Defendants' false statements and conduct concerning the prices of generic Pravastatin were deceptive as they had the tendency or capacity to mislead Plaintiffs and members of the Classes to believe that they were purchasing generic Pravastatin at prices established by a free and fair market.

### 1.    Active Concealment of the Conspiracy

234.    Defendants engaged in an illegal scheme to fix prices, allocate customers, and rig bids. Criminal and civil penalties for engaging in such conduct are severe. Not surprisingly, Defendants took affirmative measures to conceal their conspiratorial conduct.

235.    Through their misleading, deceptive, false and fraudulent statements, Defendants effectively concealed their conspiracy, thereby causing economic harm to Plaintiffs and the

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

Classes. Defendants' misrepresentations regarding their price changes were intended to lull Plaintiffs and the Classes into accepting the price hikes as a normal result of competitive and economic market trends rather than as the consequence of Defendants' collusive acts. The public statements made by Defendants were designed to mislead Plaintiffs and the Classes into paying unjustifiably higher prices for generic Pravastatin.

236.    As explained in the State AG Complaint, the nature of the generic drug industry—which allows for frequent and repeated face-to-face meetings among competitors—means that "Most of the conspiratorial communications were intentionally done in person or by cell phone, in an attempt to avoid creating a record of their illegal conduct. The generic drug industry, through the aforementioned opportunities to collude at trade shows, customer events and smaller more intimate dinners and meetings, allowed these communications to perpetuate."[100]

237.    The Defendants also gave pretextual reasons for price increases, which helped conceal the illegal conspiracy entered into by Defendants to allocate customers, rig bids, and fix, stabilize, maintain, and raise the price of generic Pravastatin to inflated, supracompetitive levels.

### 2.    Plaintiffs Exercised Reasonable Diligence

238.    Defendants' anticompetitive conspiracy, by its very nature, was self-concealing. Generic drugs are not exempt from antitrust regulation, and thus, before the disclosure of the government investigations, Plaintiffs reasonably considered the markets to be competitive. Accordingly, a reasonable person under the circumstances would not have been alerted to investigate the legitimacy of Defendants' prices before these disclosures.

239.    Because of the deceptive practices and techniques of secrecy employed by Defendants and their co-conspirators to conceal their illicit conduct, Plaintiffs and the Classes

---

[100] State AG Complaint ¶ 13.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

could not have discovered the conspiracy at an earlier date by the exercise of reasonable diligence.

240.    Therefore, the running of any statutes of limitations has been tolled for all claims alleged by Plaintiffs and the Classes as a result of Defendants' anticompetitive and unlawful conduct. Despite the exercise of reasonable diligence, Plaintiffs and Members of the Classes were unaware of Defendants' unlawful conduct, and did not know that they were paying supracompetitive prices throughout the United States during the Class Period.

241.    For these reasons, Plaintiffs' claims are timely under all of the federal, state and common laws identified herein.

## XI.   <u>CONTINUING VIOLATIONS</u>

242.    This Complaint alleges a continuing course of conduct (including conduct within the limitations periods), and defendants' unlawful conduct has inflicted continuing and accumulating harm within the applicable statutes of limitations. Thus, Plaintiffs and the members of the Damages Class can recover for damages that they suffered during any applicable limitations period.

## XII.   <u>DEFENDANTS' ANTITRUST VIOLATIONS</u>

243.    During the Class Period, set forth below, Defendants engaged in a continuing agreement, understanding, and conspiracy in restraint of trade to allocate customers, rig bids, and fix raise and/or stabilize prices for generic Pravastatin sold in the United States.

244.    In formulating and effectuating the contract, combination or conspiracy, Defendants identified above and their co-conspirators engaged in anticompetitive activities, the purpose and effect of which were to allocate customers, rig bids and artificially fix, raise,

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

maintain, and/or stabilize the price of generic Pravastatin sold in the United States. These activities included the following:

(a)     Defendants participated in meetings and/or conversations regarding the price of generic Pravastatin in the United States;

(b)     Defendants agreed during those meetings and conversations to charge prices at specified levels and otherwise to increase and/or maintain prices of generic Pravastatin sold in the United States;

(c)     Defendants agreed during those meetings and conversations to allocate customers, rig bids, and fix the price of generic Pravastatin; and

(d)     Defendants issued price announcements and price quotations in accordance with their agreements.

245.    Defendants and their co-conspirators engaged in the activities described above for the purpose of effectuating the unlawful agreements described in this Complaint.

246.    During and throughout the period of the conspiracy alleged in this Complaint, Plaintiffs and members of the Classes indirectly purchased generic Pravastatin at inflated and supracompetitive prices.

247.    Defendants' contract, combination and conspiracy constitutes an unreasonable restraint of trade and commerce in violation of Sections 1 and 3 of the Sherman Act (15 U.S.C. §§ 1, 3) and the laws of various End-Payer Damages Jurisdictions enumerated below.

248.    As a result of Defendants' unlawful conduct, Plaintiffs and the other members of the Classes have been injured in their business and property in that they have paid more for generic Pravastatin than they would have paid in a competitive market.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

249.    General economic principles recognize that any overcharge at a higher level of distribution generally results in higher prices at every level below. Moreover, the institutional structure of pricing and regulation in the pharmaceutical drug industry assures that overcharges at the higher level of distribution are passed on to end-payers such as Plaintiffs. Wholesalers and retailers passed on the inflated prices to Plaintiffs and members of the Class. The impairment of generic competition at the direct purchaser level similarly injured Plaintiffs who were equally denied the opportunity to purchase less expensive generic versions of Pravastatin.

250.    The unlawful contract, combination and conspiracy has had the following effects, among others:

(a)    price competition in the market for generic Pravastatin has been artificially restrained;

(b)    prices for generic Pravastatin sold by Defendants have been raised, fixed, maintained, or stabilized at artificially high and non-competitive levels; and

(c)    end-payer purchasers of generic Pravastatin sold by Defendants have been deprived of the benefit of free and open competition in the market for generic Pravastatin.

## XIII.    CLASS ACTION ALLEGATIONS

251.    Plaintiffs bring this action on behalf of themselves and as a class action under Rules 23(a) and (b)(2) of the Federal Rules of Civil Procedure, seeking equitable and injunctive relief on behalf of the following class (the "Nationwide Class"):

> All persons and entities in the United States and its territories who indirectly purchased, paid and/or provided reimbursement for some or all of the purchase price for Defendants' Pravastatin tablets in 10, 20, 40, or 80 mg dosages, other than for resale, from May 1, 2013 through the present.

> This class excludes:   (a) Defendants, their officers, directors, management, employees, subsidiaries, and affiliates; (b) all federal

and state governmental entities except for cities, towns, municipalities, or counties with self-funded prescription drug plans; (c) all persons or entities who purchased Defendants' generic Pravastatin products for purposes of resale or directly from Defendants; (d) fully insured health plans (*i.e.*, health plans that purchased insurance covering 100% of their reimbursement obligation to members); (e) any "flat co-pay" consumers whose purchases of Defendants' generic Pravastatin products were paid in part by a third party payer and whose co-payment was the same regardless of the retail purchase price; (f) pharmacy benefit managers; and (g) any judges or justices involved in this action and any members of their immediate families.

252.     Plaintiffs also bring this action on behalf of themselves and as a class action under Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure seeking damages pursuant to the common law of unjust enrichment and the state antitrust, unfair competition, and consumer protection laws of the states and territories listed below (the "End-Payer Damages Jurisdictions")[101] on behalf of the following class (the "Damages Class"):

> All persons and entities in the End-Payer Damages Jurisdictions who indirectly purchased, paid and/or provided reimbursement for some or all of the purchase price for Defendants' Pravastatin tablets in 10, 20, 40, or 80 mg dosages, other than for resale, from May 1, 2013 through the present.

> This class excludes: (a) Defendants, their officers, directors, management, employees, subsidiaries, and affiliates; (b) all federal and state governmental entities except for cities, towns, municipalities, or counties with self-funded prescription drug plans; (c) all persons or entities who purchased Defendants' generic Pravastatin products for purposes of resale or directly from Defendants; (d) fully insured health plans (i.e., health plans that purchased insurance covering 100% of their reimbursement obligation to members); (e) any "flat co-pay" consumers whose purchases of Defendants' generic Pravastatin products were paid in part by a third party payer and whose co-payment was the same regardless of the retail purchase price; (f) pharmacy benefit managers; and (g) any judges or justices involved in this action and any members of their immediate families.

---

[101] The "End-Payer Damages Jurisdictions" include all States (except Indiana and Ohio), as well as the District of Columbia, Puerto Rico, and the U.S. Virgin Islands.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

253.    The Nationwide Class and the Damages Class are referred to herein as the "Classes."

254.    While Plaintiffs do not know the exact number of the members of the Classes, Plaintiffs believe there are thousands of members in each Class.

255.    Common questions of law and fact exist as to all members of the Classes. This is particularly true given the nature of Defendants' conspiracy, which was generally applicable to all the members of both Classes, thereby making appropriate relief with respect to the Classes as a whole. Such questions of law and fact common to the Classes include, but are not limited to:

(a)    Whether Defendants and their co-conspirators engaged in a combination and conspiracy among themselves to fix, raise, maintain and/or stabilize prices of generic Pravastatin and/or engaged in market allocation for generic Pravastatin sold in the United States;

(b)    The identity of the participants of the alleged conspiracy;

(c)    The duration of the alleged conspiracy and the acts carried out by Defendants and their co-conspirators in furtherance of the conspiracy;

(d)    Whether the alleged conspiracy violated the Sherman Act, as alleged in the First Count;

(e)    Whether the alleged conspiracy violated state antitrust and unfair competition laws, and/or state consumer protection laws, as alleged in the Second and Third Counts;

(f)    Whether Defendants unjustly enriched themselves to the detriment of the Plaintiffs and the members of the Classes, thereby entitling Plaintiffs and the members of the Classes to disgorgement of all benefits derived by Defendants, as alleged in the Fourth Count;

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

(g)     Whether the conduct of Defendants and their co-conspirators, as alleged in this Complaint, caused injury to the business or property of Plaintiffs and the members of the Classes;

(h)     The effect of the alleged conspiracy on the prices of generic Pravastatin sold in the United States during the Class Period;

(i)     Whether the Defendants and their co-conspirators actively concealed, suppressed, and omitted to disclose material facts to Plaintiffs and members of the Classes concerning Defendants' unlawful activities to artificially inflate prices for generic Pravastatin, and/or fraudulently concealed the unlawful conspiracy's existence from Plaintiffs and the other members of the Classes;

(j)     The appropriate injunctive and related equitable relief for the Nationwide Class; and

(k)     The appropriate class-wide measure of damages for the Damages Class.

256.    Plaintiffs' claims are typical of the claims of the members of the Classes. Plaintiffs and all members of the Classes are similarly affected by Defendants' wrongful conduct in that they paid artificially inflated prices for generic Pravastatin purchased indirectly from Defendants and/or their co-conspirators. Plaintiffs' claims arise out of the same common course of conduct giving rise to the claims of the other members of the Classes.

257.    Plaintiffs will fairly and adequately protect the interests of the Classes. Plaintiffs' interests are coincident with, and not antagonistic to, those of the other members of the Classes. Plaintiffs are represented by counsel who are competent and experienced in the prosecution of antitrust and class action litigation.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

258.    The questions of law and fact common to the members of the Classes predominate over any questions affecting only individual members, including legal and factual issues relating to liability and damages.

259.    Class action treatment is a superior method for the fair and efficient adjudication of the controversy, in that, among other things, such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently and without the unnecessary duplication of evidence, effort and expense that numerous individual actions would engender. The benefits of proceeding through the class mechanism, including providing injured persons or entities with a method for obtaining redress for claims that might not be practicable to pursue individually, substantially outweigh any difficulties that may arise in management of this class action.   The prosecution of separate actions by individual members of the Classes would create a risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants.

## XIV.   CAUSES OF ACTION

### FIRST COUNT

**Violation of Sections 1 and 3 of the Sherman Act
(on behalf of Plaintiffs and the Nationwide Class)**

260.    Plaintiffs incorporate by reference the allegations set forth above as if fully set forth herein.

261.    Defendants and their unnamed co-conspirators entered into and engaged in a contract, combination, or conspiracy in unreasonable restraint of trade in violation of Sections 1 and 3 of the Sherman Act (15 U.S.C. § 1, 3).

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

262.    During the Class Period, Defendants and their co-conspirators entered into a continuing agreement, understanding and conspiracy in restraint of trade to artificially allocate customers, rig bids and raise, maintain and fix prices for generic Pravastatin, thereby creating anticompetitive effects.

263.    The conspiratorial acts and combinations have caused unreasonable restraints in the market for generic Pravastatin.

264.    As a result of Defendants' unlawful conduct, Plaintiffs and other similarly situated End-Payers in the Nationwide Class who purchased generic Pravastatin have been harmed by being forced to pay inflated, supracompetitive prices for generic Pravastatin.

265.    In formulating and carrying out the alleged agreement, understanding and conspiracy, Defendants and their co-conspirators did those things that they combined and conspired to do, including, but not limited to, the acts, practices and course of conduct set forth herein.

266.    Defendants' conspiracy had the following effects, among others:

(a)    Price competition in the market for generic Pravastatin has been restrained, suppressed, and/or eliminated in the United States;

(b)    Prices for generic Pravastatin provided by Defendants and their co-conspirators have been fixed, raised, maintained, and stabilized at artificially high, non-competitive levels throughout the United States; and

(c)    Plaintiffs and members of the Nationwide Class who purchased generic Pravastatin indirectly from Defendants and their co-conspirators have been deprived of the benefits of free and open competition.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

267.     Plaintiffs and members of the Nationwide Class have been injured and will continue to be injured in their business and property by paying more for generic Pravastatin purchased indirectly from Defendants and the co-conspirators than they would have paid and will pay in the absence of the conspiracy.

268.     Defendants' contract, combination, or conspiracy is a *per se* violation of the federal antitrust laws.

269.     Plaintiffs and members of the Nationwide Class are entitled to an injunction against Defendants, preventing and restraining the continuing violations alleged herein.

## SECOND COUNT

### Violation of State Antitrust Statutes[102]
### (on behalf of Plaintiffs and the Damages Class)

270.     Plaintiffs incorporate by reference the allegations set forth above as if fully set forth herein.

271.     During the Class Period, Defendants and their co-conspirators engaged in a continuing contract, combination or conspiracy with respect to the sale of generic Pravastatin in unreasonable restraint of trade and commerce and in violation of the various state antitrust and other statutes set forth below.

272.     The contract, combination, or conspiracy consisted of an agreement among Defendants and their co-conspirators to fix, raise, inflate, stabilize, and/or maintain the prices of generic Pravastatin and to allocate customers for generic Pravastatin in the United States.

---

[102] Statutory antitrust violations are alleged herein for the following jurisdictions: Arizona, California, Connecticut, District of Columbia, Hawaii, Illinois, Iowa, Kansas, Maine, Maryland, Michigan, Minnesota, Mississippi, Nebraska, Nevada, New Hampshire, New Mexico, New York, North Carolina, North Dakota, Oregon, Rhode Island, South Dakota, Tennessee, Utah, Vermont, West Virginia and Wisconsin.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

273.    In formulating and effectuating this conspiracy, Defendants and their co-conspirators performed acts in furtherance of the combination and conspiracy, including: (a) participating in meetings and conversations among themselves in the United States and elsewhere during which they agreed to price generic Pravastatin at certain levels, and otherwise to fix, increase, inflate, maintain, or stabilize effective prices paid by Plaintiffs and members of the Damages Class with respect to generic Pravastatin provided in the United States; and (b) participating in meetings and trade association conversations among themselves in the United States and elsewhere to implement, adhere to, and police the unlawful agreements they reached.

274.    Defendants and their co-conspirators engaged in the actions described above for the purpose of carrying out their unlawful agreement to allocate customers, rig bids, and fix prices for generic Pravastatin.

275.    Defendants' anticompetitive acts described above were knowing, willful and constitute violations or flagrant violations of the following state antitrust statutes.

276.    [INTENTIONALLY LEFT BLANK]

**Arizona**

277.    Defendants have entered into an unlawful agreement in restraint of trade in violation of Arizona Revised Statutes, § 44-1401, *et seq*. Defendants' combination and conspiracy had the following effects: (1) price competition for generic Pravastatin was restrained, suppressed, and eliminated throughout Arizona; (2) generic Pravastatin prices were raised, fixed, maintained and stabilized at artificially high levels throughout Arizona; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Pravastatin. During the Class Period, Defendants' illegal conduct substantially

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

affected Arizona commerce. Defendants' violations of Arizona law were flagrant.  As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants entered into an agreement in restraint of trade in violation of Ariz. Rev. Stat. § 44-1401, *et seq*. Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available under Ariz. Rev. Stat. § 44-1401, *et seq*.

**California**

278.    Defendants have entered into an unlawful agreement in restraint of trade in violation of California Business and Professions Code § 16700 *et seq*. During the Class Period, Defendants and their co-conspirators entered into and engaged in a continuing unlawful trust in restraint of the trade and commerce described above in violation of California Business and Professions Code §16720. Defendants, and each of them, have acted in violation of § 16720 to fix, raise, stabilize, and maintain prices of generic Pravastatin at supracompetitive levels. The aforesaid violations of § 16720 consisted, without limitation, of a continuing unlawful trust and concert of action among Defendants and their co-conspirators, the substantial terms of which were to fix, raise, maintain, and stabilize the prices of generic Pravastatin. For the purpose of forming and effectuating the unlawful trust, Defendants and their co-conspirators have done those things which they combined and conspired to do, including, but not limited to, the acts, practices and course of conduct set forth above and creating a price floor, fixing, raising, and stabilizing the price of generic Pravastatin. The combination and conspiracy alleged herein has had, *inter alia*, the following effects: (1) price competition for generic Pravastatin has been restrained, suppressed, and/or eliminated in the State of California; (2) prices for generic Pravastatin provided by Defendants and their co-conspirators have been fixed, raised, stabilized,

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

and pegged at artificially high, non-competitive levels in the State of California; and (3) those who purchased generic Pravastatin indirectly from Defendants and their co-conspirators have been deprived of the benefit of free and open competition. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property in that they paid more for generic Pravastatin than they otherwise would have paid in the absence of Defendants' unlawful conduct. During the Class Period, Defendants' illegal conduct substantially affected California commerce. As a result of Defendants' violation of § 16720, Plaintiffs and members of the Damages Class seek treble damages and their cost of suit, including a reasonable attorney's fee, pursuant to California Business and Professions Code § 16750(a).

**Connecticut**

278(a). Defendants have entered into an unlawful agreement in restraint of trade in violation of the Connecticut Antitrust Act, Conn. Gen. Stat. § 35-35, *et seq*. Defendants' combinations and conspiracy had the following effects: (1) price competition for generic Pravastatin was restrained, suppressed, and eliminated throughout Connecticut; (2) generic Pravastatin prices were raised, fixed, maintained and stabilized at artificially high levels throughout Connecticut; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Pravastatin. During the Class Period, Defendants' illegal conduct substantially affected Connecticut commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants entered into an agreement in restraint of trade in violation of

Conn. Gen. Stat. § 35-35, *et seq*.  Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available under Connecticut law.

### District of Columbia

279.   Defendants have entered into an unlawful agreement in restraint of trade in violation of District of Columbia Code Annotated § 28-4501, *et seq*. Defendants' combination and conspiracy had the following effects: (1) generic Pravastatin price competition was restrained, suppressed, and eliminated throughout the District of Columbia; (2) generic Pravastatin prices were raised, fixed, maintained and stabilized at artificially high levels throughout the District of Columbia; (3) Plaintiffs and members of the Damages Class, including those who resided in the District of Columbia and/or purchased generic Pravastatin in the District of Columbia that were shipped by Defendants or their co-conspirators into the District of Columbia, were deprived of free and open competition, including in the District of Columbia; and (4) Plaintiffs and members of the Damages Class, including those who resided in the District of Columbia and/or purchased generic Pravastatin in the District of Columbia that were shipped by Defendants or their co-conspirators, paid supracompetitive, artificially inflated prices for generic Pravastatin, including in the District of Columbia. During the Class Period, Defendants' illegal conduct substantially affected District of Columbia commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of District of Columbia Code Ann. § 28-4501, *et seq*. Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available under District of Columbia Code Ann. § 28-4501, *et seq*.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

**Hawaii**

280.    Defendants have entered into an unlawful agreement in restraint of trade in violation of Hawaii Revised Statutes Annotated § 480-1, *et seq*. Defendants' unlawful conduct had the following effects: (1) generic Pravastatin price competition was restrained, suppressed, and eliminated throughout Hawaii; (2) generic Pravastatin prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Hawaii; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Pravastatin. During the Class Period, Defendants' illegal conduct substantially affected Hawaii commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of Hawaii Revised Statutes Annotated § 480-4, *et seq*. Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available under Hawaii Revised Statutes Annotated § 480-4, *et seq*.

**Illinois**

281.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the Illinois Antitrust Act (740 Illinois Compiled Statutes 10/1, *et seq*.) Defendants' combination or conspiracy had the following effects: (1) generic Pravastatin price competition was restrained, suppressed, and eliminated throughout Illinois; (2) generic Pravastatin prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Illinois; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

prices for generic Pravastatin. During the Class Period, Defendants' illegal conduct substantially affected Illinois commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available under the Illinois Antitrust Act.

**Iowa**

282.    Defendants have entered into an unlawful agreement in restraint of trade in violation of Iowa Code § 553.1, *et seq*. Defendants' combination or conspiracy had the following effects: (1) generic Pravastatin price competition was restrained, suppressed, and eliminated throughout Iowa; (2) generic Pravastatin prices were raised, fixed, maintained and stabilized at artificially high levels throughout Iowa; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Pravastatin. During the Class Period, Defendants' illegal conduct substantially affected Iowa commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of Iowa Code § 553.1, *et seq*. Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available under Iowa Code § 553, *et seq*.

**Kansas**

283.    Defendants have entered into an unlawful agreement in restraint of trade in violation of Kansas Statutes Annotated, § 50-101, *et seq*. Defendants' combined capital, skills or acts for the purposes of creating restrictions in trade or commerce of generic Pravastatin,

increasing the prices of generic Pravastatin, preventing competition in the sale of generic Pravastatin, or binding themselves not to sell generic Pravastatin, in a manner that established the price of generic Pravastatin and precluded free and unrestricted competition among themselves in the sale of generic Pravastatin, in violation of Kan. Stat. Ann. § 50-101, *et seq*. Defendants' combination or conspiracy had the following effects: (1) generic Pravastatin price competition was restrained, suppressed, and eliminated throughout Kansas; (2) generic Pravastatin prices were raised, fixed, maintained and stabilized at artificially high levels throughout Kansas; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Pravastatin. During the Class Period, Defendants' illegal conduct substantially affected Kansas commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of Kansas Stat. Ann. § 50-101, *et seq*. Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available under Kansas Stat. Ann. § 50-101, *et seq*.

**Maine**

284.    Defendants have entered into an unlawful agreement in restraint of trade in violation of Maine Revised Statutes (Maine Rev. Stat. Ann. 10, § 1101, *et seq*.) Defendants' combination or conspiracy had the following effects: (1) generic Pravastatin price competition was restrained, suppressed, and eliminated throughout Maine; (2) generic Pravastatin prices were raised, fixed, maintained and stabilized at artificially high levels throughout Maine; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4)

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Pravastatin. During the Class Period, Defendants' illegal conduct substantially affected Maine commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of Maine Rev. Stat. Ann. 10, § 1101, *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Maine Rev. Stat. Ann. 10, § 1101, *et seq.*

**Maryland**

284(a). Defendants have entered into an unlawful agreement in restraint of trade in violation of the Maryland Antitrust Act, Maryland Code, Com. Law § 11-204, *et seq.* Defendants' combination or conspiracy had the following effects: (1) generic Pravastatin price competition was restrained, suppressed, and eliminated throughout Maryland; (2) generic Pravastatin prices were raised, fixed, maintained and stabilized at artificially high levels throughout Maryland; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Pravastatin. During the Class Period, Defendants' illegal conduct substantially affected Maryland commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of the Maryland Antitrust Act. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Maryland law.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

**Michigan**

285.    Defendants have entered into an unlawful agreement in restraint of trade in violation of Michigan Compiled Laws Annotated § 445.771, *et seq*. Defendants' combination or conspiracy had the following effects: (1) generic Pravastatin price competition was restrained, suppressed, and eliminated throughout Michigan; (2) generic Pravastatin prices were raised, fixed, maintained and stabilized at artificially high levels throughout Michigan; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Pravastatin. During the Class Period, Defendants' illegal conduct substantially affected Michigan commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of Michigan Comp. Laws Ann. § 445.771, *et seq*. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Michigan Comp. Laws Ann. § 445.771, *et seq*.

**Minnesota**

286.    Defendants have entered into an unlawful agreement in restraint of trade in violation of Minnesota Annotated Statutes § 325D.49, *et seq*. Defendants' combination or conspiracy had the following effects: (1) generic Pravastatin price competition was restrained, suppressed, and eliminated throughout Minnesota; (2) generic Pravastatin prices were raised, fixed, maintained and stabilized at artificially high levels throughout Minnesota; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

for generic Pravastatin. During the Class Period, Defendants' illegal conduct substantially affected Minnesota commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of Minnesota Stat. § 325D.49, *et seq*. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Minnesota Stat. § 325D.49, *et seq*.

**Mississippi**

287.   Defendants have entered into an unlawful agreement in restraint of trade in violation of Mississippi Code Annotated § 75-21-1, *et seq*. Trusts are combinations, contracts, understandings or agreements, express or implied when inimical to the public welfare and with the effect of, *inter alia*, restraining trade, increasing the price or output of a commodity, or hindering competition in the production and sale of a commodity. Miss. Code Ann. § 75-21-1. Defendants' combination or conspiracy was in a manner inimical to public welfare and had the following effects: (1) generic Pravastatin price competition was restrained, suppressed, and eliminated throughout Mississippi; (2) generic Pravastatin prices were raised, fixed, maintained and stabilized at artificially high levels throughout Mississippi; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Pravastatin. During the Class Period, Defendants' illegal conduct substantially affected Mississippi commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

agreement in restraint of trade in violation of Mississippi Code Ann. § 75-21-1, *et seq*. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Mississippi Code Ann. § 75-21-1, *et seq*.

**Nebraska**

288.    Defendants have entered into an unlawful agreement in restraint of trade in violation of Nebraska Revised Statutes § 59-801, *et seq*. Defendants' combination or conspiracy had the following effects: (1) generic Pravastatin price competition was restrained, suppressed, and eliminated throughout Nebraska; (2) generic Pravastatin prices were raised, fixed, maintained and stabilized at artificially high levels throughout Nebraska; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Pravastatin. During the Class Period, Defendants' illegal conduct substantially affected Nebraska commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of Nebraska Revised Statutes § 59-801, *et seq*. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Nebraska Revised Statutes § 59-801, *et seq*.

**Nevada**

289.    Defendants have entered into an unlawful agreement in restraint of trade in violation of Nevada Revised Statutes Annotated § 598A.010, *et seq*. Defendants' combination or conspiracy had the following effects: (1) generic Pravastatin price competition was restrained, suppressed, and eliminated throughout Nevada; (2) generic Pravastatin prices were raised, fixed,

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

maintained and stabilized at artificially high levels throughout Nevada; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Pravastatin. During the Class Period, Defendants' illegal conduct substantially affected Nevada commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of Nevada Rev. Stat. Ann. § 598A.010, *et seq*. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Nevada Rev. Stat. Ann. § 598A.010, *et seq*.

**New Hampshire**

290.   Defendants have entered into an unlawful agreement in restraint of trade in violation of New Hampshire Revised Statutes § 356:1, *et seq*. Defendants' combination or conspiracy had the following effects: (1) generic Pravastatin price competition was restrained, suppressed, and eliminated throughout New Hampshire; (2) generic Pravastatin prices were raised, fixed, maintained and stabilized at artificially high levels throughout New Hampshire; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Pravastatin. During the Class Period, Defendants' illegal conduct substantially affected New Hampshire commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of New Hampshire Revised Statutes §

356:1, *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all relief available under New Hampshire Revised Statutes § 356:1, *et seq.*

**New Mexico**

291.   Defendants have entered into an unlawful agreement in restraint of trade in violation of New Mexico Statutes Annotated § 57-1-1, *et seq.* Defendants' combination or conspiracy had the following effects: (1) generic Pravastatin price competition was restrained, suppressed, and eliminated throughout New Mexico; (2) generic Pravastatin prices were raised, fixed, maintained and stabilized at artificially high levels throughout New Mexico; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Pravastatin. During the Class Period, Defendants' illegal conduct substantially affected New Mexico commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of New Mexico Stat. Ann. § 57-1-1, *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all relief available under New Mexico Stat. Ann. § 57-1-1, *et seq.*

**New York**

292.   Defendants have entered into an unlawful agreement in restraint of trade in violation of New York's Donnelly Act, New York General Business Law § 340, *et seq.* Defendants' combination or conspiracy had the following effects: (1) generic Pravastatin price competition was restrained, suppressed, and eliminated throughout New York; (2) generic Pravastatin prices were raised, fixed, maintained and stabilized at artificially high levels

110

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

throughout New York; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Pravastatin that were higher than they would have been absent Defendants' illegal acts. During the Class Period, Defendants' illegal conduct substantially affected New York commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of the New York's Donnelly Act, New York General Business Law § 340, *et seq*. The conduct set forth above is a *per se* violation of the Act. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under New York Gen. Bus. Law § 340, *et seq*.

**North Carolina**

293.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the North Carolina General Statutes § 75-1, *et seq*. Defendants' combination or conspiracy had the following effects: (1) generic Pravastatin price competition was restrained, suppressed, and eliminated throughout North Carolina; (2) generic Pravastatin prices were raised, fixed, maintained and stabilized at artificially high levels throughout North Carolina; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Pravastatin. During the Class Period, Defendants' illegal conduct substantially affected North Carolina commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

entered into an agreement in restraint of trade in violation of North Carolina Gen. Stat. § 75-1, *et seq*. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under North Carolina Gen. Stat. § 75-1, *et. seq*.

**North Dakota**

294.    Defendants have entered into an unlawful agreement in restraint of trade in violation of North Dakota Century Code § 51-08.1-01, *et seq*. Defendants' combination or conspiracy had the following effects: (1) generic Pravastatin price competition was restrained, suppressed, and eliminated throughout North Dakota; (2) generic Pravastatin prices were raised, fixed, maintained and stabilized at artificially high levels throughout North Dakota; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Pravastatin. During the Class Period, Defendants' illegal conduct had a substantial effect on North Dakota commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of North Dakota Cent. Code § 51-08.1-01, *et seq*. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under North Dakota Cent. Code § 51-08.1-01, *et seq*.

**Oregon**

295.    Defendants have entered into an unlawful agreement in restraint of trade in violation of Oregon Revised Statutes § 646.705, *et seq*. Defendants' combination or conspiracy had the following effects: (1) generic Pravastatin price competition was restrained, suppressed, and eliminated throughout Oregon; (2) generic Pravastatin prices were raised, fixed, maintained

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

and stabilized at artificially high levels throughout Oregon; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Pravastatin. During the Class Period, Defendants' illegal conduct had a substantial effect on Oregon commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of Oregon Revised Statutes § 646.705, *et seq*. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Oregon Revised Statutes § 646.705, *et seq*.

**Rhode Island**

296.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the Rhode Island Antitrust Act, Rhode Island General Laws § 6-36-1, *et seq*. Defendants' combination or conspiracy had the following effects: (1) generic Pravastatin price competition was restrained, suppressed, and eliminated throughout Rhode Island; (2) generic Pravastatin prices were raised, fixed, maintained and stabilized at artificially high levels throughout Rhode Island; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Pravastatin. During the Class Period, Defendants' illegal conduct had a substantial effect on Rhode Island commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property on or after July 15, 2013, and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

restraint of trade in violation of Rhode Island General Laws § 6-36-1, *et seq*. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Rhode Island General Laws § 6-36-1, *et seq*.

**South Dakota**

297.    Defendants have entered into an unlawful agreement in restraint of trade in violation of South Dakota Codified Laws § 37-1-3.1, *et seq*. Defendants' combination or conspiracy had the following effects: (1) generic Pravastatin price competition was restrained, suppressed, and eliminated throughout South Dakota; (2) generic Pravastatin prices were raised, fixed, maintained and stabilized at artificially high levels throughout South Dakota; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Pravastatin. During the Class Period, Defendants' illegal conduct had a substantial effect on South Dakota commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of South Dakota Codified Laws Ann. § 37-1-3.1, *et seq*. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under South Dakota Codified Laws Ann. § 37-1-3.1, *et seq*.

**Tennessee**

298.    Defendants have entered into an unlawful agreement in restraint of trade in violation of Tennessee Code Annotated § 47-25-101, *et seq*. Defendants' combination or conspiracy had the following effects: (1) generic Pravastatin price competition was restrained, suppressed, and eliminated throughout Tennessee; (2) generic Pravastatin prices were raised,

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

fixed, maintained and stabilized at artificially high levels throughout Tennessee; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Pravastatin. During the Class Period, Defendants' illegal conduct had a substantial effect on Tennessee commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of Tennessee Code Ann. § 47-25-101, *et seq*. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Tennessee Code Ann. § 47-25-101, *et seq*.

### Utah

299.    Defendants have entered into an unlawful agreement in restraint of trade in violation of Utah Code Annotated § 76-10-3101, *et seq*. Defendants' combination or conspiracy had the following effects: (1) generic Pravastatin price competition was restrained, suppressed, and eliminated throughout Utah; (2) generic Pravastatin prices were raised, fixed, maintained and stabilized at artificially high levels throughout Utah; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Pravastatin. During the Class Period, Defendants' illegal conduct had a substantial effect on Utah commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of Utah Code Annotated § 76-10-3101, *et seq*. Accordingly, Plaintiffs and

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

members of the Damages Class seek all relief available under Utah Code Annotated § 76-10-3101, *et seq*.

**Vermont**

300.    Defendants have entered into an unlawful agreement in restraint of trade in violation of Vermont Stat. Ann. 9 § 2453, *et seq*. Defendants' combination or conspiracy had the following effects: (1) generic Pravastatin price competition was restrained, suppressed, and eliminated throughout Vermont; (2) generic Pravastatin prices were raised, fixed, maintained and stabilized at artificially high levels throughout Vermont; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Pravastatin. During the Class Period, Defendants' illegal conduct had a substantial effect on Vermont commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of Vermont Stat. Ann. 9 § 2453, *et seq*. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Vermont Stat. Ann. 9 § 2453, *et seq*.

**West Virginia**

301.    Defendants have entered into an unlawful agreement in restraint of trade in violation of West Virginia Code § 47-18-1, *et seq*. Defendants' anticompetitive acts described above were knowing, willful, and constitute violations or flagrant violations of West Virginia Antitrust Act. Defendants' combination or conspiracy had the following effects: (1) generic Pravastatin price competition was restrained, suppressed, and eliminated throughout West

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

Virginia; (2) generic Pravastatin prices were raised, fixed, maintained and stabilized at artificially high levels throughout West Virginia; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Pravastatin. During the Class Period, Defendants' illegal conduct had a substantial effect on West Virginia commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of West Virginia Code § 47-18-1, *et seq*. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under West Virginia Code § 47-18-1, *et seq*.

**Wisconsin**

302.   Defendants have entered into an unlawful agreement in restraint of trade in violation of the Wisconsin Statutes § 133.01, *et seq*. Defendants' and their co-conspirators' anticompetitive activities have directly, foreseeably and proximately caused injury to Plaintiffs and members of the Classes in the United States. Specifically, Defendants' combination or conspiracy had the following effects: (1) generic Pravastatin price competition was restrained, suppressed, and eliminated throughout Wisconsin; (2) generic Pravastatin prices were raised, fixed, maintained and stabilized at artificially high levels throughout Wisconsin; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Pravastatin.  During the Class Period, Defendants' illegal conduct had a substantial effect on the people of Wisconsin and Wisconsin commerce. As a direct and proximate result of

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of Wisconsin Stat. § 133.01, *et seq*. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Wisconsin Stat. § 133.01, *et seq*.

### As to All Jurisdictions Above

303.    Plaintiffs and members of the Damages Class in each of the above jurisdictions have been injured in their business and property by reason of Defendants' unlawful combination, contract, conspiracy and agreement. Plaintiffs and members of the Damages Class have paid more for generic Pravastatin than they otherwise would have paid in the absence of Defendants' unlawful conduct. This injury is of the type the antitrust laws of the above states were designed to prevent and flows from that which makes Defendants' conduct unlawful.

304.    In addition, Defendants have profited significantly from the aforesaid conspiracy. Defendants' profits derived from their anticompetitive conduct come at the expense and detriment of Plaintiffs and members of the Damages Class.

305.    Accordingly, Plaintiffs and members of the Damages Class in each of the above jurisdictions seek damages (including statutory damages where applicable), to be trebled or otherwise increased as permitted by a particular jurisdiction's antitrust law, and costs of suit, including reasonable attorneys' fees, to the extent permitted by the above state laws.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

## THIRD COUNT

### Violation of State Consumer Protection Statutes[103]
### (on behalf of Plaintiffs and the Damages Class)

306.    Plaintiffs incorporate by reference the allegations set forth above as if fully set forth herein.

307.    Defendants engaged in unfair competition or unfair, unconscionable, deceptive or fraudulent acts or practices in violation of the state consumer protection and unfair competition statutes listed below.

**Alaska**

308.    Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of Alaska Statute § 45.50.471, *et seq*.  Defendants knowingly agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling, and/or maintaining at non-competitive and artificially inflated levels, the prices at which generic Pravastatin were sold, distributed, or obtained in Alaska and took efforts to conceal their agreements from Plaintiffs and members of the Damages Class. The aforementioned conduct on the part of Defendants constituted "unconscionable" and "deceptive" acts or practices in violation of Alaska law.  Defendants' unlawful conduct had the following effects: (1) generic Pravastatin price competition was restrained, suppressed, and eliminated throughout Alaska; (2) generic Pravastatin prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Alaska; (3) Plaintiffs and members of the Damages Class were

---

[103] Statutory consumer protection violations are alleged herein for the following jurisdictions: Alaska, Arkansas, California, Colorado, Delaware, District of Columbia, Florida, Georgia, Hawaii, Massachusetts, Michigan, Minnesota, Missouri, Montana, Nebraska, Nevada, New Hampshire, New Jersey, New Mexico, New York, North Carolina, North Dakota, Rhode Island, South Carolina, South Dakota, Utah, Vermont, Virginia, West Virginia, Wisconsin and the U.S. Virgin Islands.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Pravastatin. During the Class Period, Defendants' illegal conduct substantially affected Alaska commerce and consumers. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured and are threatened with further injury. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Alaska Stat. § 45.50.471, *et seq.*, and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

**Arkansas**

309.   Defendants have knowingly entered into an unlawful agreement in restraint of trade in violation of the Arkansas Code Annotated, § 4-88-101, *et seq*. Defendants knowingly agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling, and/or maintaining at non-competitive and artificially inflated levels, the prices at which generic Pravastatin were sold, distributed, or obtained in Arkansas and took efforts to conceal their agreements from Plaintiffs and members of the Damages Class. The aforementioned conduct on the part of Defendants constituted "unconscionable" and "deceptive" acts or practices in violation of Arkansas Code Annotated, § 4-88-107(a)(10). Defendants' unlawful conduct had the following effects: (1) generic Pravastatin price competition was restrained, suppressed, and eliminated throughout Arkansas; (2) generic Pravastatin prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Arkansas; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Pravastatin. During the Class Period, Defendants' illegal conduct substantially affected Arkansas commerce

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

and consumers. As a direct and proximate result of the unlawful conduct of Defendants, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Arkansas Code Annotated, § 4-88-107(a)(10) and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

**California**

310.    Defendants have engaged in unfair competition or unfair, unconscionable, deceptive or fraudulent acts or practices in violation of California Business and Professions Code § 17200, *et seq*. During the Class Period, Defendants manufactured, marketed, sold, or distributed generic Pravastatin in California, and committed and continue to commit acts of unfair competition, as defined by § 17200, *et seq*. of the California Business and Professions Code, by engaging in the acts and practices specified above. This claim is instituted pursuant to §§ 17203 and 17204 of the California Business and Professions Code, to obtain restitution from these Defendants for acts, as alleged herein, that violated § 17200 of the California Business and Professions Code, commonly known as the Unfair Competition Law. Defendants' conduct as alleged herein violated § 17200. The acts, omissions, misrepresentations, practices and non-disclosures of Defendants, as alleged herein, constituted a common, continuous, and continuing course of conduct of unfair competition by means of unfair, unlawful, and/or fraudulent business acts or practices within the meaning of California Business and Professions Code §17200, *et seq*., including, but not limited to, the following: (1) the violations of Section 1 of the Sherman Act, as set forth above; (2) the violations of § 16720, *et seq*. of the California Business and Professions Code, set forth above. Defendants' acts, omissions, misrepresentations, practices,

and non-disclosures, as described above, whether or not in violation of § 16720, *et seq*. of the California Business and Professions Code, and whether or not concerted or independent acts, are otherwise unfair, unconscionable, unlawful or fraudulent; (3) Defendants' acts or practices are unfair to purchasers of generic Pravastatin in the State of California within the meaning of § 17200, California Business and Professions Code; and (4) Defendants' acts and practices are fraudulent or deceptive within the meaning of Section 17200 of the California Business and Professions Code. Plaintiffs and members of the Damages Class are entitled to full restitution and/or disgorgement of all revenues, earnings, profits, compensation, and benefits that have been obtained by Defendants as a result of such business acts or practices. During the Class Period, Defendants' illegal conduct substantially affected California commerce and consumers. The illegal conduct alleged herein is continuing and there is no indication that Defendants will not continue such activity into the future. The unlawful and unfair business practices of Defendants, and each of them, as described above, have caused and continue to cause Plaintiffs and members of the Damages Class to pay supracompetitive and artificially-inflated prices for generic Pravastatin. Plaintiffs and members of the Damages Class suffered injury in fact and lost money or property as a result of such unfair competition. The conduct of Defendants as alleged in this Complaint violates § 17200 of the California Business and Professions Code. As alleged in this Complaint, Defendants and their co-conspirators have been unjustly enriched as a result of their wrongful conduct and by Defendants' unfair competition. Plaintiffs and members of the Damages Class are accordingly entitled to equitable relief including restitution and/or disgorgement of all revenues, earnings, profits, compensation, and benefits that may have been obtained by Defendants as a result of such business practices, pursuant to the California Business and Professions Code, §§17203 and 17204.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

**Colorado**

311.    Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of Colorado Consumer Protection Act, Colorado Rev. Stat. § 6-1-101, *et seq*.  Defendants engaged in an unfair and deceptive trade practices during the course of their business dealings, which significantly impacted Plaintiffs as actual or potential consumers of the Defendants' goods and which caused Plaintiffs to suffer injury. Defendants took efforts to conceal their agreements from Plaintiffs. Defendants' unlawful conduct had the following effects: (1) generic Pravastatin price competition was restrained, suppressed, and eliminated throughout Colorado; (2) generic Pravastatin prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Colorado; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Pravastatin. During the Class Period, Defendants' illegal conduct substantially affected Colorado commerce and consumers. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured and are threatened with further injury. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Colorado Rev. Stat. § 6-1-101, *et seq*., and, accordingly, Plaintiffs and members of the Class seek all relief available under that statute and as equity demands.

**Delaware**

312.    Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Delaware Consumer Fraud Act, 6 Del. Code § 2511, *et seq*.  Defendants agreed to, and did in fact, act in restraint of trade or commerce in Delaware, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

levels, the prices at which generic Pravastatin were sold, distributed, or obtained in Delaware. Defendants deliberately failed to disclose material facts to Plaintiffs and members of the Damages Class concerning Defendants' unlawful activities and artificially inflated prices for generic Pravastatin. Defendants misrepresented to all purchasers during the Class Period that Defendants' generic Pravastatin prices were competitive and fair. Defendants' unlawful conduct had the following effects: (1) generic Pravastatin price competition was restrained, suppressed, and eliminated throughout Delaware; (2) generic Pravastatin prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Delaware; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Pravastatin. During the Class Period, Defendants' illegal conduct had a substantial effect on Delaware commerce and consumers. As a direct and proximate result of Defendants' violations of law, Plaintiffs and members of the Damages Class suffered an ascertainable loss of money or property as a result of Defendants' use or employment of unconscionable and deceptive commercial practices as set forth above. That loss was caused by Defendants' willful and deceptive conduct, as described herein. Defendants' deception, including their affirmative misrepresentations and omissions concerning the price of generic Pravastatin, likely misled all purchasers acting reasonably under the circumstances to believe that they were purchasing generic Pravastatin at prices set by a free and fair market. Defendants' misleading conduct and unconscionable activities constitute violations of 6 Del. Code § 2511, *et seq.*, and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

**District of Columbia**

313.    Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of District of Columbia Code § 28-3901, *et seq*. Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining, at artificial and/or non-competitive levels, the prices at which generic Pravastatin were sold, distributed or obtained in the District of Columbia. During the Class Period, Defendants' illegal conduct substantially affected District of Columbia commerce and consumers. The foregoing conduct constitutes "unlawful trade practices," within the meaning of D.C. Code § 28-3904. Plaintiffs and members of the Damages Class were not aware of Defendants' price-fixing conspiracy and were therefore unaware that they were being unfairly and illegally overcharged. Defendants had the sole power to set that price and Plaintiffs and members of the Damages Class had no power to negotiate a lower price. Moreover, Plaintiffs and members of the Damages Class lacked any meaningful choice in purchasing generic Pravastatin because they were unaware of the unlawful overcharge, and there was no alternative source of supply through which Plaintiffs and members of the Damages Class could avoid the overcharges. Defendants' conduct with regard to sales of generic Pravastatin, including their illegal conspiracy to secretly fix the price of generic Pravastatin at supracompetitive levels and overcharge consumers, was substantively unconscionable because it was one-sided and unfairly benefited Defendants at the expense of Plaintiffs and the public. Defendants took grossly unfair advantage of Plaintiffs and members of the Damages Class. The suppression of competition that has resulted from Defendants' conspiracy has ultimately resulted in unconscionably higher prices for purchasers so that there was a gross disparity between the price paid and the value received for generic Pravastatin. Defendants' unlawful conduct had the following effects: (1) generic

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

Pravastatin price competition was restrained, suppressed, and eliminated throughout the District of Columbia; (2) generic Pravastatin prices were raised, fixed, maintained, and stabilized at artificially high levels throughout the District of Columbia; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Pravastatin. As a direct and proximate result of Defendants' conduct, Plaintiffs and members of the Damages Class have been injured and are threatened with further injury. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of District of Columbia Code § 28-3901, *et seq.*, and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

**Florida**

314.    Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. § 501.201, *et seq.* Defendants' unlawful conduct had the following effects: (1) generic Pravastatin price competition was restrained, suppressed, and eliminated throughout Florida; (2) generic Pravastatin prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Florida; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Pravastatin. During the Class Period, Defendants' illegal conduct substantially affected Florida commerce and consumers. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured and are threatened with further injury. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Florida Stat. § 501.201, *et seq.*, and,

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

**Georgia**

315.    Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Georgia Uniform Deceptive Trade Practices Act, Georgia Code § 10-1-370, *et seq*. and the Georgia Fair Businesses Practices Act, Georgia Code Ann. § 10-1-390, *et seq*. Defendants agreed to, and did in fact, act in restraint of trade or commerce in Georgia, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which generic Pravastatin were sold, distributed, or obtained in Georgia. Defendants deliberately failed to disclose material facts to Plaintiffs and members of the Damages Class concerning Defendants' unlawful activities and artificially inflated prices for generic Pravastatin. Defendants misrepresented to all purchasers during the Class Period that Defendants' generic Pravastatin prices were competitive and fair. Defendants' unlawful conduct had the following effects: (1) generic Pravastatin price competition was restrained, suppressed, and eliminated throughout Georgia; (2) generic Pravastatin prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Georgia; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Pravastatin. During the Class Period, Defendants' illegal conduct had a substantial effect on Georgia commerce and consumers. As a direct and proximate result of Defendants' violations of law, Plaintiffs and members of the Damages Class suffered an ascertainable loss of money or property as a result of Defendants' use or employment of unconscionable and deceptive commercial practices as set forth above and are threatened with further injury. That loss was caused by

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

Defendants' willful and deceptive conduct, as described herein. Defendants' deception, including their affirmative misrepresentations and omissions concerning the price of generic Pravastatin, likely misled all purchasers acting reasonably under the circumstances to believe that they were purchasing generic Pravastatin at prices set by a free and fair market. Defendants' misleading conduct and unconscionable activities constitute violations of Georgia law, and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute and as equity demands.

**Hawaii**

316.   Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Hawaii Revised Statutes Annotated § 480-1, *et seq*. Defendants' unlawful conduct had the following effects: (1) generic Pravastatin price competition was restrained, suppressed, and eliminated throughout Hawaii; (2) generic Pravastatin prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Hawaii; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Pravastatin. During the Class Period, Defendants' illegal conduct substantially affected Hawaii commerce and consumers. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured and are threatened with further injury. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Hawaii Rev. Stat. § 480-1 *et seq*., and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

**Massachusetts**

317.  Defendants have engaged in unfair competition or unlawful, unfair, unconscionable, or deceptive acts or practices in violation of the Massachusetts Gen. Laws, Ch 93A, § 1, *et seq*. Defendants were engaged in trade or commerce as defined by G.L. 93A. Defendants, in a market that includes Massachusetts, agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling, and/or maintaining at non-competitive and artificially inflated levels, the prices at which generic Pravastatin were sold, distributed, or obtained in Massachusetts and took efforts to conceal their agreements from Plaintiffs and members of the Damages Class. The aforementioned conduct on the part of Defendants constituted "unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce," in violation of Massachusetts Gen. Laws, Ch 93A, § 2, 11. Defendants' unlawful conduct had the following effects: (1) generic Pravastatin price competition was restrained, suppressed, and eliminated throughout Massachusetts; (2) generic Pravastatin prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Massachusetts; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and the members of the Damages Class paid supracompetitive, artificially inflated prices for generic Pravastatin. During the Class Period, Defendants' illegal conduct substantially affected Massachusetts commerce and consumers. As a direct and proximate result of the unlawful conduct of Defendants, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Massachusetts Gen. Laws, Ch 93A, § 2, 11, that were knowing or willful, and,

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute, including multiple damages.

**Michigan**

318.    Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Michigan Consumer Protection Statute, Mich. Compiled Laws § 445.903, *et seq*.  Defendants agreed to, and did in fact, act in restraint of trade or commerce in Michigan, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which generic Pravastatin were sold, distributed, or obtained in Michigan. Defendants deliberately failed to disclose material facts to Plaintiffs and members of the Damages Class concerning Defendants' unlawful activities and artificially inflated prices for generic Pravastatin. Defendants misrepresented to all purchasers during the Class Period that Defendants' generic Pravastatin prices were competitive and fair. Defendants' unlawful conduct had the following effects: (1) generic Pravastatin price competition was restrained, suppressed, and eliminated throughout Michigan; (2) generic Pravastatin prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Michigan; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Pravastatin. During the Class Period, Defendants' illegal conduct had a substantial effect on Michigan commerce and consumers. As a direct and proximate result of Defendants' violations of law, Plaintiffs and members of the Damages Class suffered an ascertainable loss of money or property as a result of Defendants' use or employment of unconscionable and deceptive commercial practices as set forth above. That loss was caused by Defendants' willful and deceptive conduct, as described herein. Defendants' deception, including their affirmative

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

misrepresentations and omissions concerning the price of generic Pravastatin, likely misled all purchasers acting reasonably under the circumstances to believe that they were purchasing generic Pravastatin at prices set by a free and fair market. Defendants' misleading conduct and unconscionable activities constitute violations of Mich. Compiled Laws § 445.903, *et seq*., and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

**Minnesota**

319.    Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Minnesota Uniform Deceptive Trade Practices Act, Minn. Stat. § 325D.43, *et seq*.  Defendants engaged in an unfair and deceptive trade practices during the course of their business dealings, which significantly impacted Plaintiffs as actual or potential consumers of the Defendants' goods and which caused Plaintiffs to suffer injury. Defendants took efforts to conceal their agreements from Plaintiffs. Defendants' unlawful conduct had the following effects: (1) generic Pravastatin price competition was restrained, suppressed, and eliminated throughout Minnesota; (2) generic Pravastatin prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Minnesota; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Pravastatin. During the Class Period, Defendants' illegal conduct substantially affected Minnesota commerce and consumers. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured and are threatened with further injury. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Minn. Stat. § 325D.43, *et seq*., and, accordingly,

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

Plaintiffs and members of the Class seek all relief available under that statute and as equity demands.

**Missouri**

320.    Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Missouri Merchandising Practices Act, Mo. Rev. Stat. § 407.010, *et seq*. Plaintiffs and members of the Damages Class purchased generic Pravastatin for personal or family purposes. Defendants engaged in the conduct described herein in connection with the sale of generic Pravastatin in trade or commerce in a market that includes Missouri. Defendants agreed to, and did in fact affect, fix, control, and/or maintain, at artificial and non-competitive levels, the prices at which generic Pravastatin were sold, distributed, or obtained in Missouri, which conduct constituted unfair practices in that it was unlawful under federal and state law, violated public policy, was unethical, oppressive and unscrupulous, and caused substantial injury to Plaintiffs and members of the Damages Class. Defendants concealed, suppressed, and omitted to disclose material facts to Plaintiffs and members of the Damages Class concerning Defendants' unlawful activities and artificially inflated prices for generic Pravastatin. The concealed, suppressed, and omitted facts would have been important to Plaintiffs and members of the Damages Class as they related to the cost of generic Pravastatin they purchased. Defendants misrepresented the real cause of price increases and/or the absence of price reductions in generic Pravastatin by making public statements that were not in accord with the facts. Defendants' statements and conduct concerning the price of generic Pravastatin were deceptive as they had the tendency or capacity to mislead Plaintiffs and members of the Damages Class to believe that they were purchasing generic Pravastatin at prices established by a free and fair market. Defendants' unlawful conduct had the following effects: (1) generic

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

Pravastatin price competition was restrained, suppressed, and eliminated throughout Missouri; (2) generic Pravastatin prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Missouri; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Pravastatin. The foregoing acts and practices substantially affected Missouri commerce and consumers and constituted unlawful practices in violation of the Missouri Merchandising Practices Act. As a direct and proximate result of the above-described unlawful practices, Plaintiffs and members of the Damages Class suffered ascertainable loss of money or property. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Missouri's Merchandising Practices Act, specifically Mo. Rev. Stat. § 407.020, which prohibits "[t]he act, use or employment by any person of any deception, fraud, false pretense, false promise, misrepresentation, unfair practice or the concealment, suppression, or omission of any material fact in connection with the sale or advertisement of any merchandise in trade or commerce…", as further interpreted by the Missouri Code of State Regulations, 15 CSR 60-7.010, *et seq*., 15 CSR 60-8.010, *et seq*., and 15 CSR 60-9.010, *et seq*., and Mo. Rev. Stat. § 407.025.

**Montana**

321. Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Montana Unfair Trade Practices and Consumer Protection Act of 1970, Mont. Code, § 30-14-103, *et seq*., and § 30-14-201, *et seq*. Defendants' unlawful conduct had the following effects: (1) generic Pravastatin price competition was restrained, suppressed, and eliminated throughout Montana; (2) generic Pravastatin prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Montana; (3)

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Pravastatin. During the Class Period, Defendants marketed, sold, or distributed generic Pravastatin in Montana, and Defendants' illegal conduct substantially affected Montana commerce and consumers. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured and are threatened with further injury. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Mont. Code, § 30-14-103, *et seq.*, and § 30-14-201, *et. seq.*, and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

**Nebraska**

322.    Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Nebraska Consumer Protection Act, Neb. Rev. Stat. § 59-1601, *et seq.*  Defendants' unlawful conduct had the following effects: (1) generic Pravastatin price competition was restrained, suppressed, and eliminated throughout Nebraska; (2) generic Pravastatin prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Nebraska; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Pravastatin. During the Class Period, Defendants marketed, sold, or distributed generic Pravastatin in Nebraska, and Defendants' illegal conduct substantially affected Nebraska commerce and consumers. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured and are threatened with further injury. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Neb. Rev. Stat. § 59-1601, *et*

*seq.*, and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

**Nevada**

323.     Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Nevada Deceptive Trade Practices Act, Nev. Rev. Stat. § 598.0903, *et seq.*   Defendants agreed to, and did in fact, act in restraint of trade or commerce in Nevada, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which generic Pravastatin were sold, distributed, or obtained in Nevada. Defendants deliberately failed to disclose material facts to Plaintiffs and members of the Damages Class concerning Defendants' unlawful activities and artificially inflated prices for generic Pravastatin. Defendants misrepresented to all purchasers during the Class Period that Defendants' generic Pravastatin prices were competitive and fair. Defendants' unlawful conduct had the following effects: (1) generic Pravastatin price competition was restrained, suppressed, and eliminated throughout Nevada; (2) generic Pravastatin prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Nevada; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Pravastatin. During the Class Period, Defendants' illegal conduct had a substantial effect on Nevada commerce and consumers. As a direct and proximate result of Defendants' violations of law, Plaintiffs and members of the Damages Class suffered an ascertainable loss of money or property as a result of Defendants' use or employment of unconscionable and deceptive commercial practices as set forth above. That loss was caused by Defendants' willful and deceptive conduct, as described herein. Defendants' deception, including their affirmative misrepresentations and

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

omissions concerning the price of generic Pravastatin, likely misled all purchasers acting reasonably under the circumstances to believe that they were purchasing generic Pravastatin at prices set by a free and fair market. Defendants' misleading conduct and unconscionable activities constitute violations of Nev. Rev. Stat. § 598.0903, *et seq*., and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.**New Hampshire**

324.    Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the New Hampshire Consumer Protection Act, N.H. Rev. Stat. § 358-A:1, *et seq*.  Defendants' unlawful conduct had the following effects: (1) generic Pravastatin price competition was restrained, suppressed, and eliminated throughout New Hampshire; (2) generic Pravastatin prices were raised, fixed, maintained, and stabilized at artificially high levels throughout New Hampshire; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Pravastatin. During the Class Period, Defendants marketed, sold, or distributed generic Pravastatin in New Hampshire, and Defendants' illegal conduct substantially affected New Hampshire commerce and consumers. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of N.H. Rev. Stat. § 358-A:1, *et seq*., and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

**New Jersey**

325.    Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the New Jersey Consumer Fraud Act, N.J. Statutes §

56:8-1, *et seq*.  Defendants agreed to, and did in fact, act in restraint of trade or commerce in New Jersey, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which generic Pravastatin were sold, distributed, or obtained in New Jersey. Defendants deliberately failed to disclose material facts to Plaintiffs and members of the Damages Class concerning Defendants' unlawful activities and artificially inflated prices for generic Pravastatin. Defendants misrepresented to all purchasers during the Class Period that Defendants' generic Pravastatin prices were competitive and fair. Defendants' unlawful conduct had the following effects: (1) generic Pravastatin price competition was restrained, suppressed, and eliminated throughout New Jersey; (2) generic Pravastatin prices were raised, fixed, maintained, and stabilized at artificially high levels throughout New Jersey; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Pravastatin. During the Class Period, Defendants' illegal conduct had a substantial effect on New Jersey commerce and consumers. As a direct and proximate result of Defendants' violations of law, Plaintiffs and members of the Damages Class suffered an ascertainable loss of money or property as a result of Defendants' use or employment of unconscionable and deceptive commercial practices as set forth above. That loss was caused by Defendants' willful and deceptive conduct, as described herein. Defendants' deception, including their affirmative misrepresentations and omissions concerning the price of generic Pravastatin, likely misled all purchasers acting reasonably under the circumstances to believe that they were purchasing generic Pravastatin at prices set by a free and fair market. Defendants' misleading conduct and unconscionable activities constitute violations of N.J. Statutes § 56:8-1, *et seq*., and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

**New Mexico**

326.    Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the New Mexico Stat. § 57-12-1, *et seq*. Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining at non-competitive and artificially inflated levels, the prices at which generic Pravastatin were sold, distributed or obtained in New Mexico and took efforts to conceal their agreements from Plaintiffs and members of the Damages Class. The aforementioned conduct on the part of Defendants constituted "unconscionable trade practices," in violation of New Mexico Stat. § 57-12-3, in that such conduct, *inter alia*, resulted in a gross disparity between the value received by Plaintiffs and members of the Damages Class and the prices paid by them for generic Pravastatin as set forth in New Mexico Stat. § 57-12-2E. Plaintiffs and members of the Damages Class were not aware of Defendants' price-fixing conspiracy and were therefore unaware that they were being unfairly and illegally overcharged. Defendants had the sole power to set that price, and Plaintiffs and members of the Damages Class had no power to negotiate a lower price. Moreover, Plaintiffs and members of the Damages Class lacked any meaningful choice in purchasing generic Pravastatin because they were unaware of the unlawful overcharge, and there was no alternative source of supply through which Plaintiffs and members of the Damages Class could avoid the overcharges. Defendants' conduct with regard to sales of generic Pravastatin, including their illegal conspiracy to secretly fix the price of generic Pravastatin at supracompetitive levels and overcharge consumers, was substantively unconscionable because it was one-sided and unfairly benefited Defendants at the expense of Plaintiffs and the public. Defendants took grossly unfair advantage of Plaintiffs and members of the Damages Class. The suppression of competition that has resulted from Defendants' conspiracy has ultimately resulted

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

in unconscionably higher prices for consumers so that there was a gross disparity between the price paid and the value received for generic Pravastatin. Defendants' unlawful conduct had the following effects: (1) generic Pravastatin price competition was restrained, suppressed, and eliminated throughout New Mexico; (2) generic Pravastatin prices were raised, fixed, maintained, and stabilized at artificially high levels throughout New Mexico; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Pravastatin. During the Class Period, Defendants' illegal conduct substantially affected New Mexico commerce and consumers. As a direct and proximate result of the unlawful conduct of Defendants, Plaintiffs and members of the Damages Class have been injured and are threatened with further injury. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of New Mexico Stat. § 57-12-1, *et seq.*, and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

**New York**

327.    Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of N.Y. Gen. Bus. Law § 349, *et seq*. Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining, at artificial and non-competitive levels, the prices at which generic Pravastatin were sold, distributed or obtained in New York and took efforts to conceal their agreements from Plaintiffs and members of the Damages Class. Defendants and their co-conspirators made public statements about the prices of generic Pravastatin that either omitted material information that rendered the statements that they made materially misleading or affirmatively misrepresented the real cause of price increases for generic Pravastatin; and Defendants alone possessed material

information that was relevant to consumers, but failed to provide the information. Because of Defendants' unlawful trade practices in the State of New York, New York class members who indirectly purchased generic Pravastatin were misled to believe that they were paying a fair price for generic Pravastatin or the price increases for generic Pravastatin were for valid business reasons; and similarly situated consumers were affected by Defendants' conspiracy. Defendants knew that their unlawful trade practices with respect to pricing generic Pravastatin would have an impact on New York consumers and not just Defendants' direct customers. Defendants knew that their unlawful trade practices with respect to pricing generic Pravastatin would have a broad impact, causing consumer class members who indirectly purchased generic Pravastatin to be injured by paying more for generic Pravastatin than they would have paid in the absence of Defendants' unlawful trade acts and practices. The conduct of Defendants described herein constitutes consumer-oriented deceptive acts or practices within the meaning of N.Y. Gen. Bus. Law § 349, which resulted in consumer injury and broad adverse impact on the public at large, and harmed the public interest of consumers in New York State in an honest marketplace in which economic activity is conducted in a competitive manner. Defendants' unlawful conduct had the following effects: (1) generic Pravastatin price competition was restrained, suppressed, and eliminated throughout New York; (2) generic Pravastatin prices were raised, fixed, maintained, and stabilized at artificially high levels throughout New York; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Pravastatin. During the Class Period, Defendants marketed, sold, or distributed generic Pravastatin in New York, and Defendants' illegal conduct substantially affected New York commerce and consumers. During the Class Period, each of Defendants named herein, directly,

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

or indirectly and through affiliates they dominated and controlled, manufactured, sold and/or distributed generic Pravastatin in New York. Plaintiffs and members of the Damages Class seek all relief available pursuant to N.Y. Gen. Bus. Law § 349(h).

**North Carolina**

328.    Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of North Carolina Gen. Stat. § 75-1.1, *et seq*. Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining, at artificial and non-competitive levels, the prices at which generic Pravastatin were sold, distributed or obtained in North Carolina and took efforts to conceal their agreements from Plaintiffs and members of the Damages Class. Defendants' price-fixing conspiracy could not have succeeded absent deceptive conduct by Defendants to cover up their illegal acts. Secrecy was integral to the formation, implementation and maintenance of Defendants' price-fixing conspiracy. Defendants committed inherently deceptive and self-concealing actions, of which Plaintiffs and members of the Damages Class could not possibly have been aware. Defendants and their co-conspirators publicly provided pretextual and false justifications regarding their price increases. Defendants' public statements concerning the price of generic Pravastatin created the illusion of competitive pricing controlled by market forces rather than supracompetitive pricing driven by Defendants' illegal conspiracy. Moreover, Defendants deceptively concealed their unlawful activities by mutually agreeing not to divulge the existence of the conspiracy to outsiders. The conduct of Defendants described herein constitutes consumer-oriented deceptive acts or practices within the meaning of North Carolina law, which resulted in consumer injury and broad adverse impact on the public at large, and harmed the public interest of North Carolina consumers in an honest marketplace in which

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

economic activity is conducted in a competitive manner. Defendants' unlawful conduct had the following effects: (1) generic Pravastatin price competition was restrained, suppressed, and eliminated throughout North Carolina; (2) generic Pravastatin prices were raised, fixed, maintained, and stabilized at artificially high levels throughout North Carolina; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Pravastatin. During the Class Period, Defendants marketed, sold, or distributed generic Pravastatin in North Carolina, and Defendants' illegal conduct substantially affected North Carolina commerce and consumers. During the Class Period, each of Defendants named herein, directly, or indirectly and through affiliates they dominated and controlled, manufactured, sold and/or distributed generic Pravastatin in North Carolina. Plaintiffs and members of the Damages Class seek actual damages for their injuries caused by these violations in an amount to be determined at trial and are threatened with further injury. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of North Carolina Gen. Stat. § 75-1.1, *et seq*., and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

**North Dakota**

329.    Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the North Dakota Unlawful Sales or Advertising Practices Statute, N.D. Century Code § 51-15-01, *et seq.* Defendants agreed to, and did in fact, act in restraint of trade or commerce in North Dakota, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which generic Pravastatin were sold, distributed, or obtained in North Dakota. Defendants deliberately failed to disclose material

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

facts to Plaintiffs and members of the Damages Class concerning Defendants' unlawful activities and artificially inflated prices for generic Pravastatin. Defendants misrepresented to all purchasers during the Class Period that Defendants' generic Pravastatin prices were competitive and fair. Defendants' unlawful conduct had the following effects: (1) generic Pravastatin price competition was restrained, suppressed, and eliminated throughout North Dakota; (2) generic Pravastatin prices were raised, fixed, maintained, and stabilized at artificially high levels throughout North Dakota; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Pravastatin. During the Class Period, Defendants' illegal conduct had a substantial effect on North Dakota commerce and consumers. As a direct and proximate result of Defendants' violations of law, Plaintiffs and members of the Damages Class suffered an ascertainable loss of money or property as a result of Defendants' use or employment of unconscionable and deceptive commercial practices as set forth above. That loss was caused by Defendants' willful and deceptive conduct, as described herein. Defendants' deception, including their affirmative misrepresentations and omissions concerning the price of generic Pravastatin, likely misled all purchasers acting reasonably under the circumstances to believe that they were purchasing generic Pravastatin at prices set by a free and fair market. Defendants' misleading conduct and unconscionable activities constitute violations of N.D. Century Code § 51-15-01, *et seq*., and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

**Rhode Island**

330.   Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Rhode Island Unfair Trade Practice and Consumer

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

Protection Act, R.I. Gen. Laws § 6-13.1-1, *et seq.* Members of the Damages Class purchased generic Pravastatin for personal, family, or household purposes. Defendants agreed to, and did in fact, act in restraint of trade or commerce in a market that includes Rhode Island, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which generic Pravastatin were sold, distributed, or obtained in Rhode Island. Defendants deliberately failed to disclose material facts to Plaintiffs and members of the Damages Class concerning Defendants' unlawful activities and artificially inflated prices for generic Pravastatin. Defendants owed a duty to disclose such facts, and considering the relative lack of sophistication of the average, non-business purchaser, Defendants breached that duty by their silence. Defendants misrepresented to all purchasers during the Class Period that Defendants' generic Pravastatin prices were competitive and fair. Defendants' unlawful conduct had the following effects: (1) generic Pravastatin price competition was restrained, suppressed, and eliminated throughout Rhode Island; (2) generic Pravastatin prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Rhode Island; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Pravastatin. Defendants' illegal conduct substantially affected Rhode Island commerce and consumers. As a direct and proximate result of Defendants' violations of law, Plaintiffs and members of the Damages Class suffered an ascertainable loss of money or property as a result of Defendants' use or employment of unconscionable and deceptive commercial practices as set forth above. That loss was caused by Defendants' willful and deceptive conduct, as described herein. Defendants' deception, including their affirmative misrepresentations and omissions concerning the price of generic Pravastatin, likely misled all purchasers acting reasonably under the circumstances to

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

believe that they were purchasing generic Pravastatin at prices set by a free and fair market. Defendants' affirmative misrepresentations and omissions constitute information important to Plaintiffs and members of the Damages Class as they related to the cost of generic Pravastatin they purchased. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Rhode Island Gen. Laws. § 6-13.1-1, *et seq*., and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

**South Carolina**

331.    Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of South Carolina Unfair Trade Practices Act, S.C. Code Ann. § 39-5-10, *et seq*. Defendants' combination or conspiracy had the following effects: (1) generic Pravastatin price competition was restrained, suppressed, and eliminated throughout South Carolina; (2) generic Pravastatin prices were raised, fixed, maintained, and stabilized at artificially high levels throughout South Carolina; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Pravastatin. During the Class Period, Defendants' illegal conduct had a substantial effect on South Carolina commerce and consumers. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of S.C. Code Ann. § 39-5-10, *et seq*., and, accordingly, Plaintiffs and the members of the Damages Class seek all relief available under that statute.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

**South Dakota**

332.    Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the South Dakota Deceptive Trade Practices and Consumer Protection Statute, S.D. Codified Laws § 37-24-1, *et seq*.  Defendants agreed to, and did in fact, act in restraint of trade or commerce in South Dakota, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which generic Pravastatin were sold, distributed, or obtained in South Dakota. Defendants deliberately failed to disclose material facts to Plaintiffs and members of the Damages Class concerning Defendants' unlawful activities and artificially inflated prices for generic Pravastatin. Defendants misrepresented to all purchasers during the Class Period that Defendants' generic Pravastatin prices were competitive and fair. Defendants' unlawful conduct had the following effects: (1) generic Pravastatin price competition was restrained, suppressed, and eliminated throughout South Dakota; (2) generic Pravastatin prices were raised, fixed, maintained, and stabilized at artificially high levels throughout South Dakota; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Pravastatin. Defendants' illegal conduct substantially affected South Dakota commerce and consumers. As a direct and proximate result of Defendants' violations of law, Plaintiffs and members of the Damages Class suffered an ascertainable loss of money or property as a result of Defendants' use or employment of unconscionable and deceptive commercial practices as set forth above. That loss was caused by Defendants' willful and deceptive conduct, as described herein. Defendants' deception, including their affirmative misrepresentations and omissions concerning the price of generic Pravastatin, likely misled all purchasers acting reasonably under the circumstances to

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

believe that they were purchasing generic Pravastatin at prices set by a free and fair market.

Defendants' affirmative misrepresentations and omissions constitute information important to

Plaintiffs and members of the Damages Class as they related to the cost of generic Pravastatin

they purchased. Defendants have engaged in unfair competition or unfair or deceptive acts or

practices in violation of S.D. Codified Laws § 37-24-1, *et seq*., and, accordingly, Plaintiffs and

members of the Damages Class seek all relief available under that statute.

**Utah**

333.    Defendants have engaged in unfair competition or unfair, unconscionable, or

deceptive acts or practices in violation of the Utah Consumer Sales Practices Act, Ut. Stat. § 13-

11-1, *et seq*.  Members of the Damages Class purchased generic Pravastatin for personal, family,

or household purposes. Defendants agreed to, and did in fact, act in restraint of trade or

commerce in a market that includes Utah, by affecting, fixing, controlling, and/or maintaining, at

artificial and non-competitive levels, the prices at which generic Pravastatin were sold,

distributed, or obtained in Utah. Defendants deliberately failed to disclose material facts to

Plaintiffs and members of the Damages Class concerning Defendants' unlawful activities and

artificially inflated prices for generic Pravastatin. Defendants owed a duty to disclose such facts,

and considering the relative lack of sophistication of the average, non-business purchaser,

Defendants breached that duty by their silence. Defendants misrepresented to all purchasers

during the Class Period that Defendants' generic Pravastatin prices were competitive and fair.

Defendants' unlawful conduct had the following effects: (1) generic Pravastatin price

competition was restrained, suppressed, and eliminated throughout Utah; (2) generic Pravastatin

prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Utah;

(3) Plaintiffs and members of the Damages Class were deprived of free and open competition;

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Pravastatin. Defendants' illegal conduct substantially affected Utah commerce and consumers. As a direct and proximate result of Defendants' violations of law, Plaintiffs and members of the Damages Class suffered an ascertainable loss of money or property as a result of Defendants' use or employment of unconscionable and deceptive commercial practices as set forth above and are threatened with further injury. That loss was caused by Defendants' willful and deceptive conduct, as described herein. Defendants' deception, including their affirmative misrepresentations and omissions concerning the price of generic Pravastatin, likely misled all purchasers acting reasonably under the circumstances to believe that they were purchasing generic Pravastatin at prices set by a free and fair market. Defendants' affirmative misrepresentations and omissions constitute information important to Plaintiffs and members of the Damages Class as they related to the cost of generic Pravastatin they purchased. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Ut. Stat. § 13-11-1 *et seq*., and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute and as equity demands.

**Vermont**

334.     Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of 9 Vermont Statutes § 2451, *et seq*. Defendants agreed to, and did in fact, act in restraint of trade or commerce in a market that includes Vermont, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which generic Pravastatin were sold, distributed, or obtained in Vermont. Defendants deliberately failed to disclose material facts to Plaintiffs and members of the Damages Class concerning Defendants' unlawful activities and artificially inflated prices for generic Pravastatin.

Defendants owed a duty to disclose such facts, and considering the relative lack of sophistication of the average, non-business purchaser, Defendants breached that duty by their silence. Defendants misrepresented to all purchasers during the Class Period that Defendants' generic Pravastatin prices were competitive and fair. Defendants' unlawful conduct had the following effects: (1) generic Pravastatin price competition was restrained, suppressed, and eliminated throughout Vermont; (2) generic Pravastatin prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Vermont; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Pravastatin. During the Class Period, Defendants' illegal conduct had a substantial effect on Vermont commerce and consumers. As a direct and proximate result of Defendants' violations of law, Plaintiffs and members of the Damages Class suffered an ascertainable loss of money or property as a result of Defendants' use or employment of unconscionable and deceptive commercial practices as set forth above. That loss was caused by Defendants' willful and deceptive conduct, as described herein. Defendants' deception, including their affirmative misrepresentations and omissions concerning the price of generic Pravastatin, likely misled all purchasers acting reasonably under the circumstances to believe that they were purchasing generic Pravastatin at prices set by a free and fair market. Defendants' misleading conduct and unconscionable activities constitutes unfair competition or unfair or deceptive acts or practices in violation of 9 Vt. Stat. § 2451, *et seq*., and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

**Virginia**

335.   Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Virginia Consumer Protection Act of 1977, Va. Code § 59.1-196, *et seq*.  Members of the Damages Class purchased generic Pravastatin to be used for personal, family, or household purposes. Defendants agreed to, and did in fact, act in restraint of trade or commerce in a market that includes Virginia, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which generic Pravastatin were sold, distributed, or obtained in Virginia. Defendants deliberately failed to disclose material facts to Plaintiffs and members of the Damages Class concerning Defendants' unlawful activities and artificially inflated prices for generic Pravastatin. Defendants misrepresented to all purchasers during the Class Period that Defendants' generic Pravastatin prices were competitive and fair. Defendants' unlawful conduct had the following effects: (1) generic Pravastatin price competition was restrained, suppressed, and eliminated throughout Virginia; (2) generic Pravastatin prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Virginia; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Pravastatin. Defendants' illegal conduct substantially affected Virginia commerce and consumers. As a direct and proximate result of Defendants' violations of law, Plaintiffs and members of the Damages Class suffered an ascertainable loss of money or property as a result of Defendants' use or employment of unconscionable and deceptive commercial practices as set forth above. That loss was caused by Defendants' willful and deceptive conduct, as described herein. Defendants' deception, including their affirmative misrepresentations and omissions concerning the price of generic

Pravastatin, likely misled all purchasers acting reasonably under the circumstances to believe that they were purchasing generic Pravastatin at prices set by a free and fair market. Defendants' affirmative misrepresentations and omissions constitute information important to Plaintiffs and members of the Damages Class as they related to the cost of generic Pravastatin they purchased. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Va. Code § 59.1-196, *et seq*., and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

**West Virginia**

336.   Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the West Virginia Consumer Credit and Protection Act, W.Va. Code § 46A-6-101, *et seq*.  Defendants agreed to, and did in fact, act in restraint of trade or commerce in a market that includes West Virginia, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which generic Pravastatin were sold, distributed, or obtained in West Virginia. Defendants deliberately failed to disclose material facts to Plaintiffs and members of the Damages Class concerning Defendants' unlawful activities and artificially inflated prices for generic Pravastatin. Defendants affirmatively misrepresented to all purchasers during the Class Period that Defendants' generic Pravastatin prices were competitive and fair. Defendants' unlawful conduct had the following effects: (1) generic Pravastatin price competition was restrained, suppressed, and eliminated throughout West Virginia; (2) generic Pravastatin prices were raised, fixed, maintained, and stabilized at artificially high levels throughout West Virginia; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Pravastatin.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

Defendants' illegal conduct substantially affected West Virginia commerce and consumers. As a direct and proximate result of Defendants' violations of law, Plaintiffs and members of the Damages Class suffered an ascertainable loss of money or property as a result of Defendants' use or employment of unconscionable and deceptive commercial practices as set forth above. That loss was caused by Defendants' willful and deceptive conduct, as described herein. Defendants' deception, including their affirmative misrepresentations and omissions concerning the price of generic Pravastatin, likely misled all purchasers acting reasonably under the circumstances to believe that they were purchasing generic Pravastatin at prices set by a free and fair market. Defendants' affirmative misrepresentations and omissions constitute information important to Plaintiffs and members of the Damages Class as they related to the cost of generic Pravastatin they purchased. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of W.Va. Code § 46A-6-101, *et seq*., and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

### Wisconsin

337.    Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Wisconsin Consumer Protection Statutes, Wisc. Stat. § 100.18, *et seq*.  Defendants agreed to, and did in fact, act in restraint of trade or commerce in a market that includes Wisconsin, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which generic Pravastatin were sold, distributed, or obtained in Wisconsin. Defendants affirmatively misrepresented to all purchasers during the Class Period that Defendants' generic Pravastatin prices were competitive and fair. Defendants' unlawful conduct had the following effects: (1) generic Pravastatin price competition was restrained, suppressed, and eliminated throughout Wisconsin; (2) generic

Pravastatin prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Wisconsin; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Pravastatin. Defendants' illegal conduct substantially affected Wisconsin commerce and consumers. As a direct and proximate result of Defendants' violations of law, Plaintiffs and members of the Damages Class suffered an ascertainable loss of money or property as a result of Defendants' use or employment of unconscionable and deceptive commercial practices as set forth above. That loss was caused by Defendants' willful and deceptive conduct, as described herein. Defendants' deception, including their affirmative misrepresentations concerning the price of generic Pravastatin, likely misled all purchasers acting reasonably under the circumstances to believe that they were purchasing generic Pravastatin at prices set by a free and fair market. Defendants' affirmative misrepresentations constitute information important to Plaintiffs and members of the Damages Class as they related to the cost of generic Pravastatin they purchased. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Wisc. Stat. § 100.18, *et seq.*, and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

**U.S. Virgin Islands**

338.    Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the U.S. Virgin Islands Consumer Fraud and Deceptive Business Practices Act, 12A V.I.C. §§ 102, 301-35, *et seq*.  Defendants agreed to, and did in fact, act in restraint of trade or commerce in a market that includes U.S.V.I., by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

generic Pravastatin were sold, distributed, or obtained in U.S.V.I. Defendants deliberately failed

to disclose material facts to Plaintiffs and members of the Damages Class concerning

Defendants' unlawful activities and artificially inflated prices for generic Pravastatin. Defendants

affirmatively misrepresented to all purchasers during the Class Period that Defendants' generic

Pravastatin prices were competitive and fair. Defendants' unlawful conduct had the following

effects: (1) generic Pravastatin price competition was restrained, suppressed, and eliminated

throughout U.S.V.I.; (2) generic Pravastatin prices were raised, fixed, maintained, and stabilized

at artificially high levels throughout U.S.V.I.; (3) Plaintiffs and members of the Damages Class

were deprived of free and open competition; and (4) Plaintiffs and members of the Damages

Class paid supracompetitive, artificially inflated prices for generic Pravastatin. Defendants'

illegal conduct substantially affected U.S.V.I. commerce and consumers. As a direct and

proximate result of Defendants' violations of law, Plaintiffs and members of the Damages Class

suffered an ascertainable loss of money or property as a result of Defendants' use or employment

of unconscionable and deceptive commercial practices as set forth above and are threatened with

further injury. That loss was caused by Defendants' willful and deceptive conduct, as described

herein. Defendants' deception, including their affirmative misrepresentations and omissions

concerning the price of generic Pravastatin, likely misled all purchasers acting reasonably under

the circumstances to believe that they were purchasing generic Pravastatin at prices set by a free

and fair market. Defendants' affirmative misrepresentations and omissions constitute information

important to Plaintiffs and members of the Damages Class as they related to the cost of generic

Pravastatin they purchased. Defendants have engaged in unfair competition or unfair or

deceptive acts or practices in violation of 12A V.I.C. §§ 102, 301-35, *et seq.*, and, accordingly,

Plaintiffs and members of the Damages Class seek all relief available under that statute and as equity demands.

**FOURTH COUNT**

**Unjust Enrichment**[104]
**(on behalf of Plaintiffs and the Damages Class)**

339.    Plaintiffs incorporate by reference the allegations set forth above as if fully set forth herein.

340.    To the extent required, this claim is pleaded in the alternative to the other claims in this Complaint.

341.    Defendants have unlawfully benefited from their sales of Pravastatin because of the unlawful and inequitable acts alleged in this Complaint. Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Pravastatin at prices that were more than they would have been but for Defendants' unlawful actions.

342.    Defendants' financial benefits resulting from their unlawful and inequitable acts are traceable to overpayments by Plaintiffs and the Damages Class.

343.    Plaintiffs and the Damages Class have conferred upon Defendants an economic benefit, in the nature of profits resulting from unlawful overcharges, to the economic detriment of Plaintiffs and the Damages Class.

344.    Defendants have been enriched by revenue resulting from unlawful overcharges for Pravastatin while Plaintiffs and the Damages Class have been impoverished by the overcharges they paid for Pravastatin imposed through Defendants' unlawful conduct. Defendants' enrichment and Plaintiffs' and the Damages Class's impoverishment are connected.

---

[104] Unjust enrichment claims are alleged herein under the laws of all States (except Ohio and Indiana) as well as the District of Columbia, Puerto Rico and the U.S. Virgin Islands.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

345.    There is no justification for Defendants' retention of, and enrichment from, the benefits they received, which caused impoverishment to Plaintiffs and the Damages Class, because Plaintiffs and the Damages Class paid supracompetitive prices that inured to Defendants' benefit, and it would be inequitable for Defendants to retain any revenue gained from their unlawful overcharges.

346.    Plaintiffs and the Damages Class did not interfere with Defendants' affairs in any manner that conferred these benefits upon Defendants.

347.    The benefits conferred upon Defendants were not gratuitous, in that they constituted revenue created by unlawful overcharges arising from Defendants' illegal and unfair actions to inflate the prices of Pravastatin.

348.    The benefits conferred upon Defendants are measurable, in that the revenue Defendants have earned due to their unlawful overcharges of Pravastatin are ascertainable by review of sales records.

349.    It would be futile for Plaintiffs and the Damages Class to seek a remedy from any party with whom they have privity of contract. Defendants have paid no consideration to any other person for any of the unlawful benefits they received indirectly from Plaintiffs and the Damages Class with respect to Defendants' sales of Pravastatin.

350.    It would be futile for Plaintiffs and the Damages Class to seek to exhaust any remedy against the immediate intermediary in the chain of distribution from which they indirectly purchased Pravastatin, as the intermediaries are not liable and cannot reasonably be expected to compensate Plaintiffs and the Damages Class for Defendants' unlawful conduct.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

351.    The economic benefit of overcharges and monopoly profits derived by Defendants through charging supracompetitive and artificially inflated prices for Pravastatin is a direct and proximate result of Defendants' unlawful practices.

352.    The financial benefits derived by Defendants rightfully belong to Plaintiffs and the Damages Class, because Plaintiffs and the Damages Class paid supracompetitive prices during the Class Period, inuring to the benefit of Defendants.

353.    It would be inequitable under unjust enrichment principles under the laws of all States (except Ohio and Indiana) and of the District of Columbia, Puerto Rico and the U.S. Virgin Islands, for Defendants to be permitted to retain any of the overcharges for Pravastatin derived from Defendants' unlawful, unfair and unconscionable methods, acts, and trade practices alleged in this Complaint.

354.    Defendants are aware of and appreciate the benefits bestowed upon them by Plaintiffs and the Damages Class. Defendants consciously accepted the benefits and continue to do so as of the date of this filing.

355.    Defendants should be compelled to disgorge in a common fund for the benefit of Plaintiffs and the Damages Class all unlawful or inequitable proceeds they received from their sales of Pravastatin.

356.    A constructive trust should be imposed upon all unlawful or inequitable sums received by Defendants traceable to indirect purchases of Pravastatin by Plaintiffs and the Damages Class.

357.    Plaintiffs and the Damages Class have no adequate remedy at law.

358.    By engaging in the foregoing unlawful or inequitable conduct depriving Plaintiffs and the Damages Class of the opportunity to purchase lower-priced generic versions of

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

Pravastatin and forcing them to pay higher prices for Pravastatin, Defendants have been unjustly enriched in violation of the common law of various states, as outlined below:

**Alabama**

359.    Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Pravastatin in Alabama at prices that were more than they would have been but for Defendants' actions.  Defendants received money from Plaintiffs and the Damages Class as a direct result of the unlawful overcharges, and have retained this money. Defendants have benefitted at the expense of Plaintiffs and the Damages Class from revenue resulting from unlawful overcharges for Pravastatin.  It is inequitable for Defendants to accept and retain the benefits received without compensating Plaintiffs and the Damages Class.

**Alaska**

360.    Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Pravastatin in Alaska at prices that were more than they would have been but for Defendants' actions.  Plaintiffs and the Damages Class have conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiffs and the Damages Class.  Defendants appreciated the benefits bestowed upon them by Plaintiffs and the Damages Class. Defendants accepted and retained the benefits bestowed upon them under inequitable and unjust circumstances arising from unlawful overcharges to Plaintiffs and the Damages Class.   Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating Plaintiffs and the Damages Class.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

**Arizona**

361.    Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Pravastatin in Arizona at prices that were more than they would have been but for Defendants' actions. Defendants have been enriched by revenue resulting from unlawful overcharges for Pravastatin. Plaintiffs and the Damages Class have been impoverished by the overcharges for Pravastatin resulting from Defendants' unlawful conduct.   Defendants' enrichment and Plaintiffs' and the Damages Class's impoverishment are connected.  There is no justification for Defendants' receipt of the benefits causing their enrichment and Plaintiffs' and the Damages Class's impoverishment, because Plaintiffs and the Damages Class paid supracompetitive prices that inured to Defendants' benefit, and it would be inequitable for Defendants to retain any revenue gained from their unlawful overcharges.  Plaintiffs and the Damages Class have no remedy at law.

**Arkansas**

362.    Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Pravastatin in Arkansas at prices that were more than they would have been but for Defendants' actions.  Defendants received money from Plaintiffs and the Damages Class as a direct result of the unlawful overcharges, and have retained this money. Defendants have paid no consideration to any other person in exchange for this money.  Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating Plaintiffs and the Damages Class.

**California**

363.    Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Pravastatin in California at prices that were more than they would have been

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

but for Defendants' actions.  Defendants have received a benefit from Plaintiffs and the Damages

Class as a direct result of the unlawful overcharges.  Defendants retained the benefits bestowed

upon them under inequitable and unjust circumstances at the expense of Plaintiffs and the

Damages Class.

### Colorado

364.   Defendants unlawfully overcharged End-payers, who made purchases of or

reimbursements for Pravastatin in Colorado at prices that were more than they would have been

but for Defendants' actions.  Defendants have received a benefit from Plaintiffs and the Damages

Class in the nature of revenue resulting from the unlawful overcharges, which revenue resulted

from anticompetitive prices that inured to the benefit of Defendants.  Defendants have benefitted

at the expense of Plaintiffs and the Damages Class. Under the circumstances, it would be

inequitable for Defendants to retain such benefits without compensating Plaintiffs and the

Damages Class.

### Connecticut

365.   Defendants unlawfully overcharged End-payers, who made purchases of or

reimbursements for Pravastatin in Connecticut at prices that were more than they would have

been but for Defendants' actions.  Defendants were benefitted in the nature of revenue resulting

from unlawful overcharges to the economic detriment of Plaintiffs and the Damages Class.

Defendants have paid no consideration to any other person in exchange for this benefit.

Defendants retained the benefits bestowed upon them under inequitable and unjust circumstances

at the expense of Plaintiffs and the Damages Class.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

**Delaware**

366.    Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Pravastatin in Delaware at prices that were more than they would have been but for Defendants' actions.  Defendants have been enriched by revenue resulting from unlawful overcharges for Pravastatin.  Plaintiffs and the Damages Class have been impoverished by the overcharges for Pravastatin resulting from Defendants' unlawful conduct.  Defendants' enrichment and Plaintiffs' and the Damages Class's impoverishment are connected.  There is no justification for Defendants' receipt of the benefits causing their enrichment, because Plaintiffs and the Damages Class paid supracompetitive prices that inured to Defendants' benefit, and it would be inequitable for Defendants to retain any revenue gained from their unlawful overcharges.  Plaintiffs and the Damages Class have no remedy at law.

**District of Columbia**

367.    Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Pravastatin in the District of Columbia at prices that were more than they would have been but for Defendants' actions.  Plaintiffs and the Damages Class have conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiffs and the Damages Class.  Defendants retained the benefit bestowed upon them under inequitable and unjust circumstances arising from unlawful overcharges to Plaintiffs and the Damages Class.  Under the circumstances, it would be inequitable and unjust for Defendants to retain such benefits.

**Florida**

368.    Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Pravastatin in Florida at prices that were more than they would have been

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

but for Defendants' actions. Plaintiffs and the Damages Class have conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiffs and the Damages Class. Defendants appreciated the benefits bestowed upon them by Plaintiffs and the Damages Class. Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating Plaintiffs and the Damages Class.

**Georgia**

369.   Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Pravastatin in Georgia at prices that were more than they would have been but for Defendants' actions. Plaintiffs and the Damages Class have conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiffs and the Damages Class. Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating Plaintiffs and the Damages Class.

**Hawaii**

370.   Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Pravastatin in Hawaii at prices that were more than they would have been but for Defendants' actions. Plaintiffs and the Damages Class have conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiffs and the Damages Class. Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating Plaintiffs and the Damages Class.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

**Idaho**

371.    Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Pravastatin in Idaho at prices that were more than they would have been but for Defendants' actions.  Plaintiffs and the Damages Class have conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiffs and the Damages Class.  Defendants appreciated the benefit conferred upon them by Plaintiffs and the Damages Class.   Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating Plaintiffs and the Damages Class.

**Illinois**

372.    Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Pravastatin in Illinois at prices that were more than they would have been but for Defendants' actions. Plaintiffs and the Damages Class have conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiffs and the Damages Class.  Defendants retained the benefits bestowed upon them under unjust circumstances arising from unlawful overcharges to Plaintiffs and the Damages Class.  It is against equity, justice, and good conscience for Defendants to be permitted to retain the revenue resulting from their unlawful overcharges.

**Iowa**

373.    Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Pravastatin in Iowa at prices that were more than they would have been but for Defendants' actions.  Defendants have been enriched by revenue resulting from unlawful overcharges for Pravastatin, which revenue resulted from anticompetitive prices paid by

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

Plaintiffs and the Damages Class, which inured to Defendants' benefit.  Defendants' enrichment has occurred at the expense of Plaintiffs and the Damages Class.  Under the circumstances, it would be unjust for Defendants to retain such benefits without compensating Plaintiffs and the Damages Class.

### Kansas

374.   Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Pravastatin in Kansas at prices that were more than they would have been but for Defendants' actions.  Plaintiffs and the Damages Class have conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiffs and the Damages Class.  Defendants retained the benefits bestowed upon them under unjust circumstances arising from unlawful overcharges to Plaintiffs and the Damages Class.  Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating Plaintiffs and the Damages Class.

### Kentucky

375.   Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Pravastatin in Kentucky at prices that were more than they would have been but for Defendants' actions.  Plaintiffs and the Damages Class have conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiffs and the Damages Class.  Defendants appreciated the benefit conferred upon them by Plaintiffs and the Damages Class.  Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating Plaintiffs and the Damages Class.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

**Louisiana**

376.    Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Pravastatin in Louisiana at prices that were more than they would have been but for Defendants' actions.  Defendants have been enriched by revenue resulting from unlawful overcharges for Pravastatin.  Plaintiffs and the Damages Class have been impoverished by the overcharges for Pravastatin resulting from Defendants' unlawful conduct.  Defendants' enrichment and Plaintiffs' and the Damages Class's impoverishment are connected.  There is no justification for Defendants' receipt of the benefits causing their enrichment, because Plaintiffs and the Damages Class paid supracompetitive prices that inured to Defendants' benefit, and it would be inequitable for Defendants to retain any revenue gained from their unlawful overcharges.  Plaintiffs and the Damages Class have no other remedy at law.

**Maine**

377.    Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Pravastatin in Maine at prices that were more than they would have been but for Defendants' actions.  Plaintiffs and the Damages Class have conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiffs and the Damages Class.  Defendants were aware of or appreciated the benefit bestowed upon them by Plaintiffs and the Damages Class.  Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating Plaintiffs and the Damages Class.

**Maryland**

378.    Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Pravastatin in Maryland at prices that were more than they would have been

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

but for Defendants' actions.  Plaintiffs and the Damages Class have conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiffs and the Damages Class.  Defendants were aware of or appreciated the benefit bestowed upon them by Plaintiffs and the Damages Class.  Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating Plaintiffs and the Damages Class.

**Massachusetts**

379.    Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Pravastatin in Massachusetts at prices that were more than they would have been but for Defendants' actions.  Plaintiffs and the Damages Class have conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiffs and the Damages Class.  Defendants were aware of or appreciated the benefit conferred upon them by Plaintiffs and the Damages Class.  Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating Plaintiffs and the Damages Class.

**Michigan**

380.    Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Pravastatin in Michigan at prices that were more than they would have been but for Defendants' actions.  Defendants have received a benefit from Plaintiffs and the Damages Class in the nature of revenue resulting from the unlawful overcharges, which revenue resulted from anticompetitive prices that inured to the benefit of Defendants.  Defendants retained the benefits bestowed upon them under unjust circumstances arising from unlawful overcharges to

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

Plaintiffs and the Damages Class.   Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating Plaintiffs and the Damages Class.

**Minnesota**

381.   Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Pravastatin in Minnesota at prices that were more than they would have been but for Defendants' actions.   Plaintiffs and the Damages Class have conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiffs and the Damages Class.  Defendants appreciated and knowingly accepted the benefits bestowed upon them by Plaintiffs and the Damages Class.   Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating Plaintiffs and the Damages Class.

**Mississippi**

382.   Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Pravastatin in Mississippi at prices that were more than they would have been but for Defendants' actions.  Defendants received money from Plaintiffs and the Damages Class as a direct result of the unlawful overcharges.  Defendants retain the benefit of overcharges received on the sales of Pravastatin, which in equity and good conscience belong to Plaintiffs and the Damages Class on account of Defendants' anticompetitive conduct.   Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating Plaintiffs and the Damages Class.

**Missouri**

383.   Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Pravastatin in Missouri at prices that were more than they would have been

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

but for Defendants' actions. Plaintiffs and the Damages Class have conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiffs and the Damages Class. Defendants appreciated the benefit bestowed upon them by Plaintiffs and the Damages Class. Defendants accepted and retained the benefit bestowed upon them under inequitable and unjust circumstances arising from unlawful overcharges to Plaintiffs and the Damages Class.

**Montana**

384.    Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Pravastatin in Montana at prices that were more than they would have been but for Defendants' actions. Plaintiffs and the Damages Class have conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiffs and the Damages Class. Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating Plaintiffs and the Damages Class.

**Nebraska**

385.    Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Pravastatin in Nebraska at prices that were more than they would have been but for Defendants' actions. Defendants received money from Plaintiffs and the Damages Class as a direct result of the unlawful overcharges, and have retained this money. Defendants have paid no consideration to any other person in exchange for this money. In justice and fairness, Defendants should disgorge such money and remit the overcharged payments back to Plaintiffs and the Damages Class.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

**Nevada**

386.     Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Pravastatin in Nevada at prices that were more than they would have been but for Defendants' actions.   Plaintiffs and the Damages Class have conferred an economic benefit upon Defendants in the nature of revenue resulting from unlawful overcharges for Pravastatin.   Defendants appreciated the benefits bestowed upon them by Plaintiffs and the Damages Class, for which they have paid no consideration to any other person.   Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating Plaintiffs and the Damages Class.

**New Hampshire**

387.     Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Pravastatin in New Hampshire at prices that were more than they would have been but for Defendants' actions.   Defendants have received a benefit from Plaintiffs and the Damages Class in the nature of revenue resulting from the unlawful overcharges, which revenue resulted from anticompetitive prices that inured to the benefit of Defendants.    Under the circumstances, it would be unconscionable for Defendants to retain such benefits.

**New Jersey**

388.     Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Pravastatin in New Jersey at prices that were more than they would have been but for Defendants' actions.   Defendants have received a benefit from Plaintiffs and the Damages Class in the nature of revenue resulting from the unlawful overcharges, which revenue resulted from anticompetitive prices that inured to the benefit of Defendants.   The benefits conferred upon Defendants were not gratuitous, in that they comprised revenue created by

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

unlawful overcharges arising from arising from unlawful overcharges to Plaintiffs and the Damages Class.  Defendants have paid no consideration to any other person for any of the unlawful benefits they received from Plaintiffs and the Damages Class with respect to Defendants' sales of Pravastatin.  Under the circumstances, it would be unjust for Defendants to retain such benefits without compensating Plaintiffs and the Damages Class.

**New Mexico**

389.  Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Pravastatin in New Mexico at prices that were more than they would have been but for Defendants' actions.  Defendants have knowingly benefitted at the expense of Plaintiffs and the Damages Class from revenue resulting from unlawful overcharges for Pravastatin.  To allow Defendants to retain the benefits would be unjust because the benefits resulted from anticompetitive pricing that inured to Defendants' benefit and because Defendants have paid no consideration to any other person for any of the benefits they received.

**New York**

390.  Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Pravastatin in New York at prices that were more than they would have been but for Defendants' actions.  Defendants have been enriched by revenue resulting from unlawful overcharges for Pravastatin, which revenue resulted from anticompetitive prices paid by Plaintiffs and the Damages Class, which inured to Defendants' benefit.  Defendants' enrichment has occurred at the expense of Plaintiffs and the Damages Class.  It is against equity and good conscience for Defendants to be permitted to retain the revenue resulting from their unlawful overcharges.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

**North Carolina**

391.     Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Pravastatin in North Carolina at prices that were more than they would have been but for Defendants' actions.  Plaintiffs and the Damages Class have conferred an economic benefit upon Defendants in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiffs and the Damages Class.  Plaintiffs and the Damages Class did not interfere with Defendants' affairs in any manner that conferred these benefits upon Defendants.  The benefits conferred upon Defendants were not gratuitous, in that they comprised revenue created by unlawful overcharges arising from arising from unlawful overcharges to Plaintiffs and the Damages Class.  The benefits conferred upon Defendants are measurable, in that the revenue Defendants have earned due to unlawful overcharges are ascertainable by review of sales records.  Defendants consciously accepted the benefits conferred upon them.

**North Dakota**

392.     Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Pravastatin in North Dakota at prices that were more than they would have been but for Defendants' actions. Defendants have been enriched by revenue resulting from unlawful overcharges for Pravastatin.  Plaintiffs and the Damages Class have been impoverished by the overcharges for Pravastatin resulting from Defendants' unlawful conduct.  Defendants' enrichment and Plaintiffs' and the Damages Class's impoverishment are connected.  There is no justification for Defendants' receipt of the benefits causing their enrichment, because Plaintiffs and the Damages Class paid supracompetitive prices that inured to Defendants' benefit, and it would be inequitable for Defendants to retain any revenue gained from their unlawful overcharges.  Plaintiffs and the Damages Class have no remedy at law.  Under the circumstances,

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

it would be unjust for Defendants to retain such benefits without compensating Plaintiffs and the Damages Class.

**Oklahoma**

393.    Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Pravastatin in Oklahoma at prices that were more than they would have been but for Defendants' actions.  Defendants received money from Plaintiffs and the Damages Class as a direct result of the unlawful overcharges, and have retained this money. Defendants have paid no consideration to any other person in exchange for this money.  Plaintiffs and the Damages Class have no remedy at law.  It is against equity and good conscience for Defendants to be permitted to retain the revenue resulting from their unlawful overcharges.

**Oregon**

394.    Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Pravastatin in Oregon at prices that were more than they would have been but for Defendants' actions.  Plaintiffs and the Damages Class have conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiffs and the Damages Class.  Defendants were aware of the benefit bestowed upon them by Plaintiffs and the Damages Class.  Under the circumstances, it would be unjust for Defendants to retain such benefits without compensating Plaintiffs and the Damages Class.

**Pennsylvania**

395.    Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Pravastatin in Pennsylvania at prices that were more than they would have been but for Defendants' actions. Plaintiffs and the Damages Class have conferred an economic

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiffs and the Damages Class.  Defendants appreciated the benefit bestowed upon them by Plaintiffs and the Damages Class.  Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating Plaintiffs and the Damages Class.

**Puerto Rico**

396.   Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Pravastatin in Puerto Rico at prices that were more than they would have been but for Defendants' actions.  Defendants have been enriched by revenue resulting from unlawful overcharges for Pravastatin.  Plaintiffs and the Damages Class have been impoverished by the overcharges for Pravastatin resulting from Defendants' unlawful conduct.  Defendants' enrichment and Plaintiffs' and the Damages Class's impoverishment are connected.  There is no justification for Defendants' receipt of the benefits causing their enrichment and Plaintiffs' and the Damages Class's impoverishment, because Plaintiffs and the Damages Class paid supracompetitive prices that inured to Defendants' benefit, and it would be inequitable for Defendants to retain any revenue gained from their unlawful overcharges.  Plaintiffs and the Damages Class have no remedy at law.

**Rhode Island**

397.   Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Pravastatin in Rhode Island at prices that were more than they would have been but for Defendants' actions.  Plaintiffs and the Damages Class have conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiffs and the Damages Class.  Defendants appreciated the benefit

bestowed upon them by Plaintiffs and the Damages Class.  Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating Plaintiffs and the Damages Class.

### South Carolina

398.    Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Pravastatin in South Carolina at prices that were more than they would have been but for Defendants' actions.  The benefits conferred upon Defendants were not gratuitous, in that they comprised revenue created by unlawful overcharges arising from arising from unlawful overcharges to Plaintiffs and the Damages Class.  Defendants realized value from the benefit bestowed upon them by Plaintiffs and the Damages Class.  Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating Plaintiffs and the Damages Class.

### South Dakota

399.    Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Pravastatin in South Dakota at prices that were more than they would have been but for Defendants' actions.  Defendants have received a benefit from Plaintiffs and the Damages Class in the nature of revenue resulting from the unlawful overcharges, which revenue resulted from anticompetitive prices that inured to the benefit of Defendants.  Defendants were aware of the benefit bestowed upon them by Plaintiffs and the Damages Class.  Under the circumstances, it would be inequitable and unjust for Defendants to retain such benefits without reimbursing Plaintiffs and the Damages Class.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

**Tennessee**

400.     Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Pravastatin in Tennessee at prices that were more than they would have been but for Defendants' actions.   Plaintiffs and the Damages Class have conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiffs and the Damages Class.   Defendants appreciated the benefit bestowed upon them by Plaintiffs and the Damages Class.   Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating Plaintiffs and the Damages Class.   It would be futile for Plaintiffs and the Damages Class to seek a remedy from any party with whom they have privity of contract. Defendants have paid no consideration to any other person for any of the unlawful benefits they received indirectly from Plaintiffs and the Damages Class with respect to Defendants' sales of Pravastatin.   It would be futile for Plaintiffs and the Damages Class to exhaust all remedies against the entities with which Plaintiffs and the Damages Class have privity of contract because Plaintiffs and the Damages Class did not purchase Pravastatin directly from any Defendant.

**Texas**

401.     Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Pravastatin in Texas at prices that were more than they would have been but for Defendants' actions.   Defendants have received a benefit from Plaintiffs and the Damages Class in the nature of revenue resulting from the unlawful overcharges, which revenue resulted from anticompetitive prices that inured to the benefit of Defendants.   Defendants were aware of or appreciated the benefit bestowed upon them by Plaintiffs and the Damages Class.   The circumstances under which Defendants have retained the benefits bestowed upon them by

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

Plaintiffs and the Damages Class are inequitable in that they result from Defendants' unlawful overcharges for Pravastatin.  Plaintiffs and the Damages Class have no remedy at law.

**Utah**

402.     Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Pravastatin in Utah at prices that were more than they would have been but for Defendants' actions.  Plaintiffs and the Damages Class have conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiffs and the Damages Class.  Defendants were aware of or appreciated the benefit bestowed upon them by Plaintiffs and the Damages Class.  Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating Plaintiffs and the Damages Class.

**Vermont**

403.     Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Pravastatin in Vermont at prices that were more than they would have been but for Defendants' actions.  Plaintiffs and the Damages Class have conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiffs and the Damages Class.  Defendants accepted the benefit bestowed upon them by Plaintiffs and the Damages Class.  Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating Plaintiffs and the Damages Class.

**Virginia**

404.     Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Pravastatin in Virginia at prices that were more than they would have been

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

but for Defendants' actions.  Plaintiffs and the Damages Class have conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiffs and the Damages Class.  Defendants were aware of the benefit bestowed upon them.  Defendants should reasonably have expected to repay Plaintiffs and the Damages Class. The benefits conferred upon Defendants were not gratuitous, in that they constituted revenue created by unlawful overcharges arising from Defendants' illegal and unfair actions to inflate the prices of Pravastatin.  Defendants have paid no consideration to any other person for any of the benefits they have received from Plaintiffs and the Damages Class.

**Washington**

405.    Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Pravastatin in Washington at prices that were more than they would have been but for Defendants' actions.  Plaintiffs and the Damages Class have conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiffs and the Damages Class.  Defendants were aware of or appreciated the benefit conferred upon them by Plaintiffs and the Damages Class.  Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating Plaintiffs and the Damages Class.

**West Virginia**

406.    Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Pravastatin in West Virginia at prices that were more than they would have been but for Defendants' actions.  Plaintiffs and the Damages Class have conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiffs and the Damages Class.  Defendants were aware of or

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

appreciated the benefit bestowed upon them by Plaintiffs and the Damages Class. Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating Plaintiffs and the Damages Class.

**Wisconsin**

407.    Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Pravastatin in Wisconsin at prices that were more than they would have been but for Defendants' actions. Plaintiffs and the Damages Class have conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiffs and the Damages Class. Defendants appreciated the benefit bestowed upon them by Plaintiffs and the Damages Class. Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating Plaintiffs and the Damages Class.

**Wyoming**

408.    Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Pravastatin in Wyoming at prices that were more than they would have been but for Defendants' actions. Plaintiffs and the Damages Class have conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiffs and the Damages Class. Defendants accepted, used and enjoyed the benefits bestowed upon them by Plaintiffs and the Damages Class. Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating Plaintiffs and the Damages Class.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

**U.S. Virgin Islands**

409.    Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Pravastatin in the United States Virgin Islands at prices that were more than they would have been but for Defendants' actions.  Defendants have been enriched by revenue resulting from unlawful overcharges for Pravastatin, which revenue resulted from anticompetitive prices paid by Plaintiffs and the Damages Class, which inured to Defendants' benefit.  Defendants' enrichment has occurred at the expense of Plaintiffs and the Damages Class.  Defendants appreciated the benefit bestowed upon them by Plaintiffs and the Damages Class.  It is against equity and good conscience for Defendants to be permitted to retain the revenue resulting from their unlawful overcharges.  Plaintiffs and the Damages Class have no remedy at law.

## XV.    PRAYER FOR RELIEF

WHEREFORE, Plaintiffs demand judgment for the following relief:

1.    The Court determine that this action may be maintained as a class action under Rule 23(a), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure, and direct that reasonable Notice of this action, as provided by Rule 23(c)(2) of the Federal Rules of Civil Procedure, be given to each and every member of the Class;

2.    That the unlawful conduct, contract, conspiracy, or combination alleged herein be adjudged and decreed: (a) an unreasonable restraint of trade or commerce in violation of Sections 1 and 3 of the Sherman Act; (b) a *per se* violation of Sections 1 and 3 of the Sherman Act; (c) an unlawful combination, trust, agreement, understanding and/or concert of action in violation of the state antitrust and unfair competition and consumer protection laws as set forth herein; and (d) acts of unjust enrichment by Defendants as set forth herein.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

3.      Plaintiffs and members of the Damages Class recover damages, to the maximum extent allowed under such state laws, and that a judgment in favor of Plaintiffs and members of the Damages Class be entered against Defendants jointly and severally in an amount to be trebled to the extent such laws permit;

4.      Plaintiffs and members of the Damages Class recover damages, to the maximum extent allowed by such laws, in the form of restitution and/or disgorgement of profits unlawfully obtained;

5.      Plaintiffs and members of the Damages Class be awarded restitution, including disgorgement of profits Defendants obtained as a result of their acts of unfair competition and acts of unjust enrichment, and the Court establish of a constructive trust consisting of all ill-gotten gains from which Plaintiffs and members of the Damages Class may make claims on a *pro rata* basis;

6.      Defendants, their affiliates, successors, transferees, assignees and other officers, directors, partners, agents and employees thereof, and all other persons acting or claiming to act on their behalf or in concert with them, be permanently enjoined and restrained from in any manner continuing, maintaining or renewing the conduct, contract, conspiracy, or combination alleged herein, or from entering into any other contract, conspiracy, or combination having a similar purpose or effect, and from adopting or following any practice, plan, program, or device having a similar purpose or effect;

7.      Plaintiffs and members of the Classes be awarded pre- and post- judgment interest as provided by law, and that such interest be awarded at the highest legal rate;

8.      Plaintiffs and members of the Classes recover their costs of suit, including reasonable attorneys' fees, as provided by law; and

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

9.      Plaintiffs and members of the Classes have such other and further relief as the case may require and the Court may deem just and proper.

### XVI.   **JURY DEMAND**

Plaintiffs demand a trial by jury, pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, of all issues so triable.

April 1, 2019

Respectfully submitted,

*Roberta D. Liebenberg*

Roberta D. Liebenberg, Esquire
Fine, Kaplan and Black, R.P.C.
One South Broad Street, 23rd Floor
Philadelphia, PA  19107
(215) 567-6565
rliebenberg@finekaplan.com

**Lead Counsel for the End-Payer Plaintiffs**

Gregory S. Asciolla, Esquire
Labaton Sucharow LLP
140 Broadway
New York, NY  10005
(212) 907-0700
gasciolla@labaton.com

Michael M. Buchman, Esquire
Motley Rice LLC
600 Third Avenue, Suite 2101
New York, NY  10016
(212) 577-0040
mbuchman@motleyrice.com

Elizabeth J. Cabraser, Esquire
Lieff Cabraser Heimann & Bernstein LLP
275 Battery Street, 29th Floor
San Francisco, CA  94111-3339
(415) 956-1000
ecabraser@lchb.com

James R. Dugan, II, Esquire
The Dugan Law Firm, APLC
365 Canal Street, Suite 1000
New Orleans, LA 70130
(504) 648-0180
jdugan@dugan-lawfirm.com

Jayne A. Goldstein, Esquire
Shepherd Finkelman Miller & Shah, LLP
1625 N. Commerce Parkway, Suite 320
Fort Lauderdale, FL 33326
(886) 849-7545
jgoldstein@sfmslaw.com

Mindee J. Reuben, Esquire
Lite DePalma Greenberg, LLC
1835 Market Street, 27th Floor
Philadelphia, PA  19103
(267) 314-7980
mreuben@litedepalma.com

Joseph R. Saveri, Esquire
Joseph Saveri Law Firm, Inc.

Dena C. Sharp, Esquire
Girard Gibbs LLP

181

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

555 Montgomery Street, Suite 1210
San Francisco, CA  94111
(415) 500-6800
jsaveri@saverilawfirm.com

Heidi M. Silton, Esquire
Lockridge Grindal Nauen P.L.L.P.
100 Washington Avenue South
Suite 2200
Minneapolis, MN  55401
(612) 339-6900
hmsilton@locklaw.com

Adam J. Zapala, Esquire
Cotchett, Pitre & McCarthy, LLP
840 Malcolm Road, Suite 200
Burlingame, CA  94010
(650) 697-6000
azapala@cpmlegal.com

601 California Street, Suite 1400
San Francisco, CA 94108
(415) 981-4800
chc@girardsharp.com

Bonny E. Sweeney, Esquire
Hausfeld LLP
600 Montgomery Street, Suite 3200
San Francisco, CA  94111
(415) 633-1908
bsweeney@hausfeld.com

## End-Payer Plaintiffs' Steering Committee

Audrey A. Browne, Esquire
American Federation of State, County and
    Municipal Employees District Council 37
    Health & Security Plan
125 Barclay Street, Room 313
New York, NY 10007
(212) 815-1304
abrowne@dc37.net

**Attorneys for Plaintiff American Federation
of State, County and Municipal Employees
District Council 37 Health & Security Plan**

Peter Safirstein, Esquire
Safirstein Metcalf LLP
1250 Broadway, 27th Floor
New York, NY 10001
(212) 201-2845
psafirstein@safirsteinmetcalf.com

**Additional End-Payer Plaintiffs' Counsel**

Hassan Zavareei
Tycko & Zavareei LLP
1828 L Street, NW Suite 1000
Washington, DC 20036
(202) 299-4737
hzavareei@tzlegal.com

**Attorneys for Plaintiff David Sherman**

Cadio Zirpoli, Esquire
Saveri & Saveri, Inc.
706 Sansome Street
San Francisco, CA 94111
(415) 217-6810
cadio@saveri.com

**Attorneys for Plaintiffs Robby Johnson and
David Sherman**

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

E. Kirk Wood, Esquire
Wood Law Firm, LLC
P. O. Box 382434
Birmingham, AL 35238-2434
205-612-0243
ekirkwood1@bellsouth.net

**Attorneys for Plaintiff Robby Johnson**

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

CERTIFICATE OF SERVICE

I hereby certify that on this 1st day of April, 2019, the foregoing Consolidated Amended End-Payer Class Action Complaint was filed with the Clerk of Court who will electronically enter this filing on the docket. Thereafter, via ECF notifications, the filing will be served on all interested parties registered for electronic filing and be available for viewing and downloading from the Court's ECF system.

Roberta D. Liebenberg